JUDGE ABRAMS

13 CIV 6836

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



Preetpal Grewal,

          Plaintiff,

    v.

Jonathan W. Cuneo, Charles J. LaDuca, Pamela
Gilbert, Joel Davidow, Michael J. Flannery,
Robert J. Cynkar, Sandra Cuneo, Daniel M. Cohen,
Matthew E. Miller, Cuneo Gilbert & LaDuca LLP,

          Defendants.

**COMPLAINT**

Index No. _____

JURY TRIAL
DEMANDED



## INTRODUCTION

1.    This is a case about a powerful Washington D.C. attorney and self-proclaimed champion of civil rights who, together with his partners, illegally squeezed out the Plaintiff, an Indian national whom they had induced to become a partner in their firm, for the purpose of expropriating the substantial value of her interest in the firm. In the course of their scheme, Defendants illegally threatened and intimidated Plaintiff, engaged in gross acts of discrimination, violated her rights as a partner in the firm, interfered with her opportunities to obtain other work, deprived her of her means of livelihood, and unjustly enriched themselves at her expense. Plaintiff seeks compensatory and punitive damages, an injunction, and an accounting for the value of her partnership interest.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over this case. There is diversity of citizenship under 28 U.S.C. 1332. Cuneo Gilbert and LaDuca has its principal office in the District

of Colombia and individual Defendants are based in different states.  The amount in controversy exceeds seventy-five thousand dollars ($75,000).  Plaintiff also seeks a declaration of rights under 28 U.S.C. 2201, the Federal Declaratory Judgment Act, and Rule 57 of the Federal Rules of Civil Procedure.

3.      Venue is proper in this jurisdiction and this Court has personal jurisdiction over Plaintiff, and over the Defendants to the extent they conduct business within the State of New York.  The contract at issue was accepted on June 18, 2008 in New York City, New York, and Plaintiff worked at the New York office of Cuneo Gilbert & LaDuca, LLP.

4.      There is no other litigation pending in federal or state court that would resolve the rights of the parties.

### THE PARTIES

5.      Plaintiff Preetpal Grewal ("Plaintiff") is a New York attorney, and a graduate of New York University Law School (LLM 2001).  Plaintiff is also a licensed attorney in India.  Prior to emigrating to the United States, Plaintiff ran her own law practice in the Indian state of Himachal Pradesh and represented the entire judiciary of that state in their official legal affairs.

6.      After graduating from NYU Law School, Plaintiff practiced civil litigation at Bisceglie & Friedman, a labor and employment law boutique (2002-2005), and later at Hahn & Hessen, a general corporate and business law firm (2005-2008).

7.      In 2008 Plaintiff joined the firm of Cuneo, Gilbert & LaDuca LLP ("CGL"), where she was a partner and head of the firm's New York office.  In 2012, Plaintiff was illegally squeezed out of her position at CGL, in violation of her rights as a

partner, her contractual agreement with CGL, and New York's Human Rights Law.

8.      Defendant Jonathan Cuneo ("Cuneo") is a partner in the Washington D.C. office of CGL.  Cuneo represents himself as the "founding member" of CGL.  Cuneo's Web Site states that he has "over 20 years of experience successfully representing plaintiffs in complex antitrust, civil and human rights, consumer protection, corporate governance, and securities class actions."  Cuneo claims that "the class bar looks to Mr. Cuneo as one of its key leaders in Washington" and that he is "widely recognized for his achievements as a class action litigator."

9.      Defendant Pamela Gilbert ("Gilbert") is a named partner in the Virginia (previously at the Washington, D.C.) office of CGL. Gilbert has practiced at CGL since 2003.  She boasts in her website that she is "one of the leading advocates in Washington D.C. working to preserve access to the civil justice system for both individuals and businesses," that she sits on "numerous" nonprofit boards of directs, and that she was chosen in 1995 as "consumer advocate of the year" by the Trial Lawyers Association of Metropolitan Washington.

10.     Defendant Charles LaDuca ("LaDuca") is a named partner in the Bathesda (previously at the Washington, D.C.) office of CGL. LaDuca has worked at CDL for eighteen years.  His Web Site brags about his "empathy for people who suffer from the wrongdoings of others" and asserts that his "concern for people" led him to focus on consumer law and civil rights cases.  LaDuca's Web Site claims that "he and his family are active in his community, especially in helping to repair, rebuild and raise money for better homes for the poor."

11.     Defendant Joel Davidow is a partner in the Bathesda (previously at

Washington, D.C.) office of CGL.

12.     Defendant Michael Flannery ("Flannery") is a partner in the St. Louis office of CGL.  On his Web Site Flannery purports to represent the "victims of corporate greed and neglect" including small businesses, consumers, and "victims of race, sex and other civil rights discrimination."

13.     Defendant Robert Cynker ("Cynker") is a partner in the Virginia (previously at theWashington D.C.) office of CGL.

14.     Defendant Sandra W. Cuneo ("Sandra Cuneo") is a partner in the Los Angeles (California) office of CGL.  Sandra Cuneo is Jonathan Cuneo's sister.

15.     Defendant Daniel Cohen ("Cohen") is a partner in the Bethesda (previously at the Washington D.C.) office of CGL.

16.     Defendant Matthew Miller ("Miller") is a partner in the Washington D.C. office of CGL.

17.     Cuneo Gilbert & LaDuca ("CGL") is a limited liability law partnership headquartered in Washington, D.C., and at all times relevant to this action, had an office in New York City, New York.   CGL has and continues to conduct business in the State of New York.

## FACTS

### Plaintiff is Induced to Join CGL

18.     While working at Hahn & Hessen, Plaintiff was introduced to Cuneo by a mutual friend.

19.     On or about March 20, 2008, Cuneo contacted Plaintiff and expressed an interest in having Plaintiff join his firm.

20.     On or about April 15, 2008, Cuneo invited Plaintiff to meet him for breakfast in New York City. Plaintiff explained to Cuneo that she was thinking about opening her own law practice but that she would be willing to discuss joining CGL on suitable terms.

21.     At that meeting Cuneo boasted about his law practice and his work, the nature of their work, how successful and profitable his firm was, touted how much money he and his partners were making, and indicated that if Plaintiff were to join the firm she, too, would enjoy a lucrative practice.

22.     Specifically, Cuneo informed Plaintiff that if she joined the firm, she would be entitled to a share in the profits of any case she worked on, with an extra share for cases that she brought in to the office. Cuneo further explained that because the firm worked on a cash flow basis, Plaintiff would receive a lower monthly draw than she could receive elsewhere, but that at the end of the day her compensation would exceed what she could earn at a conventional firm.

23.     On June 6, 2008, after this breakfast meeting, Cuneo emailed Plaintiff asking: "Are you still licensed in India? Do you know anything about the antitrust laws of India." Plaintiff confirmed that she was licensed to practice in India and if Cuneo was more specific about his antitrust question she could look into the issue. Given Cuneo's assurances and claims of his lucrative practice, Plaintiff was willing to defer her compensation for a few months until the funding came through, to facilitate a deal if the parties otherwise wanted to make one.

24.     On June 9, 2008, Cuneo emailed Plaintiff, stating that "your attitude has knocked everyone's socks off here!" He invited her to come to Washington, at CGL's

expense, to meet with his partners.

25.     Plaintiff traveled to Washington D.C. on June 14, 2008, and met with Cuneo and several of his partners.

26.     On June 17, 2008 CGL extended Plaintiff a formal offer to join the firm.  In an email to Plaintiff of that date, Cuneo stated that "we are delighted to welcome you to our little corner of the world.  You made a tremendous impression on us and we sincerely look forward to working with you."

27.     The email explained that Plaintiff would work at the firm on a "trial basis" at $60/hour for several months, "at which time our standard deal kicks in."  The email further stated that Plaintiff would be working out of CGL's New York City office.

28.     On June 17, 2008 Plaintiff requested further information.  The next day Cuneo responded, inter alia, by explaining that "we want you . . . ultimately to be our NY presence."  Cuneo further promised that Plaintiff was not being brought on board to review documents, and that CGL already had two attorneys who performed that task almost exclusively.

29.     Cuneo's June 18, 2008 email further stated that the "standard deal" was that "you would be compensated for [client development activities] hourly, plus 10 percent of work you originate, plus twelve percent of your lodestar contribution."  Cuneo further promised that these additional amounts were "an entitlement (so really not a bonus) based on your relative value of contribution to a case (based on lodestar)."

30.     Based on the terms of this written offer, Plaintiff accepted by email CGL's offer to join the firm on June 18, 2008.

**Plaintiff's Work at CGL**

31.    Plaintiff's first day of work was on June 30, 2008.  Despite Cuneo's earlier email, CGL informed Plaintiff that she would not in fact have to complete a trial period but rather would work full time under the "standard deal" immediately.

32.    Plaintiff was treated as a partner at CGL from the beginning of her affiliation with that firm.

33.    Plaintiff regularly attended partnership lunches with Cuneo, Gilbert and LaDuca where issues of strategy were discussed.  These included, for example, how to position the firm in the competitive marketplace, what sorts of cases CGL should take on, how it should plan for future workflows, and so on.

34.    CGL represented Plaintiff on their Web Site and in other communications as the head of the firm's New York office.

35.    CGL regularly represented to others, including courts, that Plaintiff was a partner at the firm.

36.    For example, in *In re Living Social Marketing and Sales Practices Litigation*, MDL # 2254 (D.D.C. 2011), CGL partner Charles LaDuca submitted a declaration in support of CGL's fee request.  That declaration lists all firm members who worked on the case and the nature of their affiliation with the firm.  LaDuca's declaration states that Plaintiff was a "partner" at CGL and recites a billing rate of $575/hour.  This was the same billing rate as named partner Pamela Gilbert, also listed as a "partner" and billing at $575/hour.

37.    On information and belief, CGL represented that Plaintiff was a "partner" at CGL in other fee applications and never represented her in fee applications as serving

in any other capacity.

## Defendants Subvert Plaintiff's Ability to Bring Cases

38.    From the very start of Plaintiff's affiliation with CGL, however, Cuneo sought to nullify the promises made under this contract.

39.    On her first day of work Plaintiff traveled to Washington D.C. to attend a litigation meeting and thereafter, together with Cuneo and others, traveled to the offices of Michael Hausfeld ("Hausfeld"), a prominent international antitrust attorney, and with whom Cuneo had a past work relationship. The participants at that meeting discussed the possibility that Plaintiff would travel to India to speak with potential claimants about their rights under international antitrust cases brought by Hausfeld.

40.    At some point during this meeting with Hausfeld, Cuneo instructed Plaintiff to leave the room. While Plaintiff was absent, Cuneo struck a deal with Hausfeld under which Hausfeld would give Cuneo the lead counsel position in domestic antitrust cases in exchange for Cuneo supplying Indian clients to Hausfeld for international cases.

41.    In August and September 2008, Cuneo negotiated and signed a fee sharing agreement with Hausfeld for all the international antitrust cases.

42.    In reliance on Cuneo's representations that Plaintiff would receive credit for work she brought into the firm and to establish the firm's international antitrust practice, Plaintiff traveled to India from September 14, 2008 through October 28, 2008. In order to save money for her firm Plaintiff flew with frequent flier miles and stayed at an official guest house of the Governor of Gujarat at a greatly discounted rate as compared with what she would have paid at a hotel.

43.     While in India, Plaintiff met and/or spoke with hundreds of potentially interested parties in order to advise them of their legal rights. This process was time consuming because Plaintiff had to explain the nature of cartel cases, the class actions pending in the United States and the international dimensions of these cartel cases, which was unfamiliar in India. In addition to New Delhi, Plaintiff traveled to Jaipur, Gujarat, Mumbai, and other locations.

44.     Several of these parties subsequently requested that CGL represent them. When Plaintiff came back from India, at least two firms, Gujaral Brothers and Vigneshwara Exports Ltd., signed litigation retainer agreements to join the litigation to seek recovery of their claims in London.

45.     While in India, Plaintiff was invited to apply for a position as an in-house counsel at Ranbaxy, a major Indian drug manufacturer. When plaintiff returned to the United States, Cuneo congratulated her accomplishment in India and dissuaded her from applying for positions in India, indicating that she was doing excellent work and had a great future at CGL.

46.     In reliance on Cuneo's promises, Plaintiff returned to India on December 27, 2008, again staying at the Governor of Gujarat's accommodation in New Delhi, Gujarat, and Mumbai. In addition, Plaintiff traveled to Banglore, Jaipur, Jodphur, and other cities. Plaintiff met and/or spoke with managing directors, senior management or general counsels at numerous companies, including among others, Tata Steel, Terex India, Ranbaxy Laboratories Ltd., Tata Teleservices, Voltas, Lupin Ltd., Dr. Ready's Laboratories, Inc., Bosch Ltd., Cipla Ltd., Reliance Industries, BARCO, Motherson Sumi Systems Ltd., Brakes India Ltd., Torrent Pharmaceuticals Ltd., Cadila Pharmaceuticals

Ltd., Matrix Clothing Pvt. Ltd., HCL, Crompton Grives, Sire Enterprises, CCL Flowers

Ltd., Shahi Exports Pvt. Ltd., RICO Auto Industries Ltd., Brakes Ind Ltd., Bharat

Cellular, Bharat Forge, Bharat Heavy Electricals Ltd., Kirloskar Oil, Xerox, Sandhar

Technologies Ltd., Capital Foods Ltd., Fairy Food Products Ltd., SABS Exports, Bharti

Cellular, Zazman Exports, Bhagwandas Bherumal, CCL Flowers, Orient Craft, Maruti,

and advised them of their legal rights. Several of these parties subsequently requested

that CGL represent them, and signed retainer agreements with the full knowledge and

consent of CGL. When Plaintiff returned from India on February 19, 2009, she had

signed retainer agreements from Torrent Pharmaceuticals Ltd., Appollo International Ltd.,

Cipla ltd., Cadila Pharmaceuticals, KayBee Exports, L.M. Apparels, Matrix Clothing Pvt.

Ltd., Motherson Sumi Systems Ltd., Neetee Clothing Pvt. Ltd., Orchid Oversees pt. Ltd.,

Shahi Exports Pvt. Ltd., Sira Enterprises, KayBee Exports, Bhagwandas Bharumal and

Co., Ashvina Trading Co., CCL Flowers, Hi Tech Gears, RR Leathers, and

others. Cuneo congratulated Plaintiff on her success.

47.    In further reliance on Cuneo's promises, Plaintiff returned to India on June

4, 2009, and stayed there until August 12, 2009. Plaintiff traveled to Mumbai, Bangalore,

Hyderabad, and New Delhi. During this trip Plaintiff met numerous additional

companies to advise them of their rights. During that trip approximately twenty

companies requested that CGL represent them and signed retainer agreements with the

full knowledge and consent of CGL.

48.    Meanwhile, while Plaintiff was undertaking these efforts on CGL's behalf,

Cuneo became unhappy about his relationship with Hausfeld. Cuneo complained to

Plaintiff and others at CGL that Hausfeld was unreliable, that Hausfeld did not keep his

promises, that Hausfeld would not pay his fair share of fees and expenses, that Cuneo no longer trusted Hausfeld, and that Hausfeld was not keeping his part of the bargain by giving CGL lead counsel rights in domestic cases.

49.      As a result of his changed feelings about Hausfeld, Cuneo no longer wanted to participate with Hausfeld in international class action cases. He therefore, and in violation of representations and promises made to Plaintiff, upon which Plaintiff had relied, caused CGL to cease doing an additional work in the international antitrust cases with Hausfled. Cuneo knew that if Plaintiff will not return to India and follow-up on her work she will lose her contacts/potential clients and some of the claims will become time barred. In consequence, Plaintiff was deprived of the value she would have received had CGL actively pursued her work in the international antitrust cases.

50.      Once Cuneo decided not to participate any further in Hausfeld's international antitrust practice, his praise for Plaintiff ceased. In an effort to frighten and intimidate Plaintiff Cuneo ordered that the firm investigate the expenses Plaintiff had incurred during her trips to India, even though her expenses were extraordinarily low (less than $17,000 for 23 weeks of travel, lodging, food etc. for Plaintiff and a local colleague).

51.      To further intimidate and threaten, and in breach of CGL's contractual agreement, Cuneo refused to give Plaintiff any substantive work and told her to bring her own domestic cases and work on them.

### Plaintiff Works Hard to Find Domestic Clients and Cases

52.      Plaintiff worked very hard to find and investigate domestic class action cases and also spent time and energy in developing new business and clients for CGL.

53.     LaDuca instructed Plaintiff to keep all the partners informed of her ideas/leads she was investigating for potential class cases, so that there is no duplication or competing efforts amongst the partners.

54.     Cuneo instructed Plaintiff on the first day at CGL that in the plaintiffs' class action bar no one takes advantage of another's idea for a case.

55.     Based on these assurances, and her contractual agreement with CGL, Plaintiff shared all her ideas and leads for potential class action cases with Cuneo, Gilbert and LaDuca as well as other Defendants from time to time.

### Defendants Expropriate Plaintiff's Work in Antitrust Cases

56.     In 2011 CGL brought Joel Davidow and his associate Victoria Romanenko into the firm.  Davidow purports to be an expert in antitrust law.

### Bosch

57.     Plaintiff's trip to India had resulted in excellent international contacts, including senior officers at Bosch, a multinational company based in Germany.  On or about April 2011, M.C. Arvind, a senior attorney at Bosch, contacted Plaintiff and indicated that Bosch wanted to discuss the possibility of retaining Plaintiff to represent the company in the Air Cargo antitrust case.

58.     Plaintiff reported this contact to Cuneo and to others at CGL at a litigation meeting.

59.     When Davidow learned of this contact, he insisted that CGL make him the lead attorney on any case involving Bosch, even though Plaintiff had brought this potential client into the firm.

60.     Shortly thereafter, during a trip to the New York office to discuss the

mortgage cases with Mark Malone, Cuneo met with Plaintiff and informed her that the Bosch case was "not your case" because Plaintiff had done no work on the matter, even though Plaintiff had worked to develop the Bosch connection and build CGL's international antitrust practice.

### Wire Harness/Auto Parts

61.    On or about October 2, 2010, Plaintiff sent an email to Cuneo identifying a possible antitrust claim against auto part manufacturers who were being investigated by the United States Department of Justice on suspicion of price fixing.

62.    After taking Plaintiff's consent, Cuneo shared the information with Jon Tostrud and other Defendants. Plaintiff also shared her investigation with Cuneo, and informed him that was in discussions with auto-dealers and auto-part shops. Cuneo encouraged Plaintiff to proceed on her theory of instituting the lawsuit.

63.    In 2011 and 2012, CGL filed antitrust complaints against automobile part manufacturers on exactly the theory that Plaintiff had brought to the office in 2010.

64.    In violation of its contractual promises to Plaintiff, and with the intent to minimize Plaintiff's contributions to this matter, Cuneo did not permit Plaintiff to work on this matter and originally assigned her no credit for having brought the idea into the office. Cuneo and Davidow deliberately and intentionally left Plaintiff out of the conference calls and meetings with experts which were held in Washington D.C.

65.    At a litigation meeting on January 2012, Plaintiff raised the issue of her not receiving any credit for originating the cases. Cuneo announced at that meeting that "these are my cases" even though he had done nothing to identify the issue, the theory on how to proceed or locate clients in these cases. Cuneo further proceeded to announce that

Victoria Romanenko would be the designate attorney for this matter.

66.     Plaintiff thereafter raised the issue with LaDuca.  LaDuca recognized that Plaintiff had brought the cases to the office and indicated that she should receive 5% of any fees, even though her agreement with CGL entitled her to 10% of the fees.  LaDuca confirmed this promise in an email to Plaintiff and others in the firm.

67.     On April 2, 2012, Cuneo deliberately and intentionally with intent to minimize Plaintiff's involvement and contribution to the case, asked Plaintiff to leave a meeting with co-counsel held in the New York office of CGL.

68.     On the same day, Plaintiff conveyed to Cuneo, her displeasure of the manner in which she was being treated, despite of her honest and diligent efforts to establish and advance CGL's interest in the plaintiffs' class action bar.   On the following day, while travelling with her to her office, Cuneo informed Plaintiff that if she was unhappy she was free to leave the firm.

69.     In a further effort to deprive Plaintiff of compensation to which she was entitled, Defendants later claimed, falsely, that in fact there were two different cases – one on "wire harnesses" and one on "auto parts".  CGL reduced its offer to pay Plaintiff 5% of the fee (less expenses) for the purported "wire harness" case, and nothing for the purported "auto parts" case.  In fact this is a single case and Plaintiff's contract makes no provision for deduction of expenses, and ten percent entitlement is based on gross receipts.

### CGL Undermines Plaintiff's Work on Mortgage Cases

70.     After Cuneo's break with Hausfeld, and the resulting decision not to pursue or advance further the international antitrust work, Plaintiff met with Cuneo,

Gilbert and LaDuca in the fall of 2010 and insisted that they comply with the terms of her agreement and give her substantive work on all CGL cases. Plaintiff was at that time investigating a number of leads for potential class action cases as well.

71.     In December 2010, Cuneo asked Plaintiff to work on class action cases against Bank of America, JPMorgan Chase, Citigroup, and Wells Fargo, challenging those defendants' mortgage foreclosure practices.

72.     During her work on these cases, Plaintiff identified another legal claim against these defendants, namely that they had violated class members' rights in the process by which they modified the repayments of defaulted mortgage. Cuneo recognized the value of this contribution and added the mortgage modification claims to the complaints.

73.     At Cuneo's request, Plaintiff identified and obtained signed retainer agreements with clients in the JPMorgan Chase, Bank of America, and Wells Fargo cases. These retainer agreements were signed with full knowledge and consent of CGL.

74.     Plaintiff worked for hundreds of hours on these mortgage cases, often staying at the office all night. Among other tasks, she reviewed documents, identified issues, wrote memoranda in support of class certification, drafted complaints, drafted deposition questions, traveled for depositions, drafted discovery requests, drafted the opposition to the motion to dismiss, and coordinated with other attorneys in the MDL process.

75.     In violation of her rights under her agreement with CGL, Plaintiff was not given proper credit for her work on these cases.

76.     On Cuneo's express instructions, Plaintiff sought to find additional named

plaintiffs for the mortgage cases. She identified a possible plaintiff, Elizabeth Thomas, who had approached CGL in mortgage modification cases. Ms. Thomas then approached Plaintiff to discuss her pro se case against a servicing company that provides specialized services to legal professional for the mortgage default processing services.

77.     Plaintiff mentioned Ms. Thomas' overture to Cuneo. Over the next seven months Plaintiff repeatedly asked Cuneo to either take on the case or, better, to decline the case or give it to another attorney. Cuneo ignored Plaintiff's requests and refused to decide whether the firm would take the case or not.

78.     Because Cuneo never responded, and Ms. Thomas was at the risk of missing her filing deadline and in consideration of the fact that she has been waiting so long, Plaintiff had helped Ms. Thomas in the last moment with only some stylistic suggestions. Plaintiff's assistance was limited to making stylistic suggestions and did not include any substantive legal advice.

79.     In December 2011, Cuneo had appeared at Plaintiff's office and demanded that she provide him with all signed retainer agreements in the mortgage cases. Cuneo announced "these are my cases." Cuneo thereafter refused to use these clients as named plaintiffs, in a further effort to deny Plaintiff the compensation she was entitled to for having brought the cases into the office.

**CGL Wrongfully Denies Plaintiff Credit For Her Contribution**

80.     In December 2011, Plaintiff met with Cuneo, Gilbert and LaDuca to discuss various issues including her compensation.

81.     During the course of this meeting, Cuneo informed Plaintiff that he was only thinking of building his own career and could not be concerned about Plaintiff. In a

litigation meeting in January 2012, Cuneo announced that it was the Washington DC rule that no one gets any credit at the firm.

82.     Subsequent to the December 2011 meeting, Cuneo announced Alexandra Warren, an associate at CGL, would be the designate attorney on all mortgage cases at CGL.

83.     At Plaintiff's instance that she had identified the mortgage modification issues in the multi-district litigation and worked on same, Cuneo permitted her to put in her appearance and participate in conference calls in *In re. JP Morgan Mortgage Modification Litigation* (2001-md-02290) and in *In re. Citimortgage Inc. Home Modification Program HAMP Contract Litigation* (2011-md-02274).

84.     Plaintiff, thereafter, established a great working relationship with the co-lead counsel and worked on all aspects of the muti-district litigation.  Specifically, Plaintiff participated in all aspects of the case, including attending conference calls and coordinating strategy with co-counsel, drafting of the consolidated complaint, reviewing plaintiffs' documents, drafting discovery demands, preparing opposition to the motions to dismiss, and coordinating mediation strategy.

85.     In April 2012, under Cuneo's supervision, Alexandra Warren emailed Plaintiff thanking her for her contribution in *In re. JP Morgan Mortgage Modification Litigation* (2001-md-02290), and indicated that henceforth she would be working on the case.

86.     During this time, Plaintiff also worked on the *Beals v. Bank of America.* Specifically, Plaintiff had been involved in all aspects of the case from the beginning, including but not limited to, preparing the opposition to the motion to dismiss, reviewing

documents, attending conferences and meetings, identifying and preparing memoranda on certification issues, and preparing deposition outlines, travelling for depositions, and strategizing certification issues under applicable New Jersey law.

87.     On April 30, 2012, CGL filed its motion for class action certification and motion for summary judgment in *Beals v. Bank of America* case. Plaintiff's name was deleted from these motion papers.

### CGL Expropriates Plaintiff's Work in the Product Defect Case

88.     In September 2010, Plaintiff shared a lead for a potential product defect case with the Defendants. On September 15, 2010, Plaintiff prepared a memo and circulated it to Cuneo and LaDuca.

89.     Plaintiff also put together a complaint on behalf of Elizabeth Norton, and at LaDuca's suggestion agreed to work with co-counsel Robert Shlequist. Defendants were continuing investigation of the product defect at the time Plaintiff was ousted out of CGL.

90.     In an effort to deprive Plaintiff of compensation to which she was entitled, Defendants later claimed that they would not use Plaintiff's client to pursue the matter. Plaintiff has not been provided with any updates or information necessary for her to follow-up with the client to enable her to file the lawsuit on her own.

### Defendants Expropriate Plaintiff's Leads for Potential Cases

91.     On account of the numerous assurances that Defendants will not compete with her unfairly, Plaintiff shared with Cuneo, Gilbert and LaDuca and other Defendants her leads/ideas for potential class action cases.

92.     For example, in 2009, 2010 and 2011 Plaintiff shared with Defendants

leads to file potential class action lawsuits including actions against Sony, Capital One for excessive fees, and product defect cases for hip replacement surgery, amongst others.

93.     Plaintiff also shared with Cuneo of her leads for various overdraft fee-related class cases.  Plaintiff made it clear to Cuneo on numerous occasions that she wished to bring the overdraft fee cases and work on them.  Plaintiff also discussed these ideas with Matthew Wiener and other Defendants during the course of various litigation meetings.

94.     In violation of their promises and fiduciary obligations to Plaintiff, after ousting Plaintiff from CGL, in 2012 and 2013, Cuneo in collaboration with other Defendants, filed class action lawsuits on the same and identical theories that Plaintiff had shared with Defendants in confidence.

95.     Despite repeated requests, Plaintiff has not been supplied with a list of all cases filed on Plaintiff's ideas and theories.

96.     Plaintiff is entitled to compensation for any new business generated from Plaintiff's leads which she shared with Defendants in confidence, and which were utilized by CGL.

### Cuneo's Discrimination against Plaintiff Based of Nationality

97.     Despite his claims to being a champion of human rights and an opponent of discrimination, Cuneo repeatedly threatened and humiliated Plaintiff on the basis of her Indian nationality.

98.     Cuneo repeatedly, in Plaintiff's presence and in the presence of others, mocked and denigrated Plaintiff's accent, claiming that he "could not understand" her when she spoke over the phone – even though Plaintiff is a native English speaker who

has no trouble communicating with others.

99.    Cuneo repeatedly, in Plaintiff's presence and in the presence of others, told Plaintiff that "we treat you like a foreigner" and that "we never take you seriously." Cuneo never made such statements to others at the firm.

100.    In July 2011, after a meeting regarding position papers in response to Citigroup's request for MDL, Cuneo remarked at a firm litigation meeting that "we don't take this girl seriously" and "we just treat her as a foreigner." Cuneo admitted at that time that "we should be ashamed of ourselves" for how the firm treated Plaintiff.

101.    On or about early September 2011, after a meeting in Washington D.C. on the Bank of America mortgage modification case, Plaintiff visited Cuneo in his offices in the presence of Matthew Weiner. Plaintiff told Cuneo that she felt that she was often treated as a foreigner and not given proper respect for that reason. Cuneo responded, "I have repeatedly told you that you are treated as a foreigner and that nobody takes you seriously." Matthew Weiner stopped Cuneo from making any further discriminatory comments and instructed Plaintiff to leave the room.

### CGL's Threats against Plaintiff

102.    On September 30, 2011, during the course of business travel with Plaintiff, Cuneo described a lawsuit he had had against an attorney named Joel Joseph with whom Cuneo had a fee dispute. Cuneo told Plaintiff that Joseph had lost his case against Cuneo "and then he got disbarred." Cuneo implied to Plaintiff that Cuneo himself had gotten Joseph disbarred and that anyone who fought with Cuneo could expect a similar fate.

103.    In 2011 during in a telephone conversation about the Bosch representation, Davidow falsely warned Plaintiff that all of the antitrust clients that Plaintiff had brought

into the firm were "the firm's clients" and that if she left and took the clients with her, she would be prosecuted for ethical violations and disbarred. Davidow knew or should have known that clients do not "belong" to any firm and that any client has an absolute right to substitute counsel after an attorney leaves a former firm. At the time of this conversation, Plaintiff was trying to bring Bosch as a client to CGL.

104. On June 27, 2012, through their attorney Michael Smith, CGL demanded a copy of Plaintiff's Green Card "for our records," even though CGL had affiliated with Plaintiff as a partner since 2008. CGL had no valid reason to have this information; it is also a violation of U.S. immigration law to demand to review a Green Card as a condition of employment. This was a thinly-disguised attempt to frighten Plaintiff by threatening her immigration status in the United States (in fact Plaintiff is a lawful permanent resident of the United States and has at all times maintained legal immigration status here).

### Plaintiff is Illegally Squeezed Out of CGL

105. On May 4, 2012, Plaintiff received a call from Cuneo, Gilbert & Laduca claiming that LaDuca had received a phone call from Elizabeth Thomas. Plaintiff informed Cuneo, Gilbert and LaDuca that this was the case she had been discussing the Cuneo for a while and asking CGL to take on or refer to someone else. Plaintiff also informed that because Cuneo never responded, and Ms. Thomas was at the risk of missing her filing deadline and in consideration of the fact that she has been waiting so long, Plaintiff had helped Ms. Thomas in the last moment with only some stylistic suggestions. Plaintiff's assistance was limited to making stylistic suggestions and did not include any substantive legal advice.

106.    On May 5, 2012, LaDuca emailed Plaintiff instructing her not to speak with Ms. Thomas or delete her emails and that CGL will be looking into this matter.

107.    On May 7, 2012, LaDuca and Gilbert instructed Plaintiff not to come to her office in New York. Plaintiff was told that her office had been sealed and office equipment confiscated. Plaintiff was told that she would be informed shortly where to meet with them.

108.    That same day, on LaDuca's and Gilbert's instructions, Plaintiff attended a meeting with LaDuca, Gilbert and Michael Ross ("Ross"), an attorney who purported to represent CGL. Ross further informed Plaintiff that she was being investigated by CGL for ethical violations and that any such violations would be reported to the New York Bar Association. When Plaintiff asked what specifically she was being investigated for, Ross told her "you had better talk with your lawyer about it."

109.    Gilbert handed Plaintiff a document stating that Plaintiff had been placed on administrative leave and instructing her to prepare memoranda describing the status of all her current cases so that her work can be given to other attorneys. Plaintiff was specifically told that she should not claim any affiliation with CGL henceforth.

110.    In violation of their fiduciary duty and of Plaintiff's rights as a partner at CGL, Plaintiff was given no rights to explain herself and no say in the decision to seal her office and terminate her affiliation with the firm.

111.    Plaintiff understood that as of May 7, 2012, she had been thrown out of her office, which had been sealed and all her office equipment confiscated. That afternoon Plaintiff called Pamela Gilbert to confirm and was told to pick up her personal effects by that evening. Plaintiff removed all of her personal effects from the office after

business hours on that date.

## The Aftermath
## CGL'S Bogus "Investigation"

112.    After Plaintiff's summary dismissal from CGL, the firm continued to investigate purported allegations of misconduct.  Agents of CGL reviewed all of Plaintiff's emails and insisted that she meet with Ross for another meeting.

113.    CGL informed the court in Ms. Thomas's case that they were investigating Plaintiff for "ghostwriting" a pro se complaint, apparently without any effort to ascertain whether there was anything improper in Plaintiff's conduct.

114.    In fact, there is no bar under New York law against an attorney helping a pro se plaintiff.  *In re Fengling Liu*, 664 F.3d 367 (2d Cir. 2011).

115.    As noted in the *Fengling* case, Plaintiff is to be commended, not criticized, for attempting, even in a limited way, to assist Ms. Thomas prepare her complaint under highly adverse circumstances.

116.    Any ethical concerns arising out of this matter pertain to Cuneo, not Plaintiff.  It was Cuneo who for nearly seven months dithered on whether CGL would take Ms. Thomas on as a client or not, leaving Ms. Thomas at the end of the day with no choice but to prepare a last-minute complaint on a pro se basis.

117.    Plaintiff did not in any way misconduct herself in dealing with Ms. Thomas on behalf of CGL, and at all times worked as an authorized agent of the firm.

118.    Even though a cursory review of the case law would have established the complete absence of any misconduct by Plaintiff, CGL informed Plaintiff that they had expended over $70,000 on their "investigation."

119.    Adding insult to injury, CGL demanded that Plaintiff reimburse the firm

for the expense of this bogus "investigation" as part of any settlement of their obligations to her.

120.    The purported "investigation" was simply an opportunity to intimidate and frighten Plaintiff in order to induce her not to vindicate her rights, and an excuse for dismissing her from the firm on a basis that would make Plaintiff, rather than CGL, appear to be at fault.

### Defendants Expropriate Plaintiff's Potential Clients

121.    In further attempt to intimidate and frighten Plaintiff in order to induce her not to indicate her rights, to make her look at fault, and unfairly obtain her contacts and potential clients, Defendants kept Plaintiff's email account open for an additional three months after Plaintiff was no longer at CGL.

122.    Plaintiff had worked very hard to bring business and clients to CGL.

123.    Therefore, on July 31, 2012, Plaintiff requested that her email account be closed. Instead of closing her official email account, Gilbert wrote: "We can't close your account until we have resolved the issues with all of the clients who use you as a contact. When we are sure that we have protected our clients, we can close the account."

124.    Plaintiff immediately demanded to know what "issues" Gilbert has seen in the past three months and given the fact that Defendants had a list of all clients and their retainer agreements whom Defendants could contact directly, Plaintiff was at a loss of how keeping the email account enabled anything. Plaintiff also informed Gilbert that it was improper for CGL to contact potential clients by using her email account. No answer regarding the potential "issues" was provided; instead Plaintiff was told that the email account would be closed.

125.    Despite repeated requests, Defendants have not provided a list of all the potential clients that Defendants contacted by keeping her email account open.

126.    Plaintiff is entitled to compensation for any new business generated from these clients whose communications were utilized by CGL.

### Disparagement/Unlawful Interference

127.    After her summary dismissal from CGL, Plaintiff made assiduous efforts to locate another job.

128.    On May 14, 2012, Gretchen Cappio ("Cappio"), a partner at Keller Rohrback, a leading plaintiffs' class action firm, contacted Plaintiff and expressed an interest in Keller Rohrback hiring Plaintiff given that Plaintiff was no longer working at CGL. Cappio had encountered Plaintiff in the course of work on the JPMorgan Chase Mortgage Modification MDL case. Cappio told Plaintiff that Plaintiff was very smart and that Keller Rohrback would be interested in discussing a possible affiliation. At their request, Plaintiff supplied her resume and interviewed with the Keller Rohrback firm.

129.    In July 2012, Cappio and other lead counsel met in Washington D.C. with Cuneo to interview expert witnesses in the JP Morgan Mortgage Modification MDL.

130.    Thereafter, after returning from the meeting in Washington with Cuneo, Cappio informed Plaintiff that Keller Rohrback did not have any permanent position for her.

131.    On information and belief, Keller Rohback and other potential employers have been deterred from hiring Plaintiff because of disparaging remarks made by Cuneo and other Defendants.

132.    Upon information and belief, Defendants and /or their agents have also

interfered with Plaintiff's relationship with potential clients and working relationships with class action attorneys.

**Plaintiffs' Damages**

133.    On account of Cuneo's subversive tactics, Plaintiff lost the opportunity to build an international antitrust practice, which Plaintiff had worked hard to establish.

134.    Due to Defendants' conduct, Plaintiff lost the opportunity to work on the issues and cases that she got to CGL, build her lodestar and receive benefit of her contractually promised compensation, which compensation has been wrongfully denied to Plaintiff.

135.    Plaintiff has lost her potential clients whom Defendants contacted by unlawfully keeping her email account open, and Defendants continue to unlawfully interfere in Plaintiff's relationships with potential clients and class action attorneys.

136.    After her summary dismissal from CGL, Plaintiff could not locate and still has not been able to locate another position, despite assiduous efforts to do so.  Plaintiff was forced to open her own law office, at considerable expense, but without any financing, the trauma of the injustice suffered by her, and stigma of her summary dismissal, Plaintiff was not able to make the practice profitable.  This has resulted in economic damage as well as damage to Plaintiff's career.

137.    As a result of Defendant's illegal and unfair conduct Plaintiff has experienced intense emotional and personal distress, as well as great shame and humiliation.

26

## LEGAL CLAIMS

### Count One: Violation of Fiduciary Duty

138.    Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

139.    As partners, Defendants owed high fiduciary obligations to Plaintiff.

140.    Defendants violated their fiduciary duty to Plaintiff by improperly depriving her of the opportunity to develop her career on the cases/issues she got to CGL and building her experience and lodestar.

141.    Defendants violated their fiduciary duty to Plaintiff by improperly squeezing her out of her position as a partner at CGL in a crass attempt to expropriate for themselves the value of her investment in the firm.

142.    As a direct and proximate cause of the aforementioned wrongful conduct of the Defendants, Plaintiff has suffered damages and economic loss.

### Count Two: Violation of Contractual Agreement

143.    Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

144.    Plaintiff's agreement with CGL entitled her to a percentage of fees in cases on which she worked and/or that for all matters that she originated.

145.    Plaintiff relied upon the representations made by Defendants and expended time and effort to establish CGL's international antitrust practice and building CGL's domestic class action work.

146.    CGL violated and breached Plaintiff's rights under this agreement by:

(a) repeatedly denying Plaintiff credit for cases she brought to the firm;

(b) subverting Plaintiff ability to continue her work and develop CGL's international antitrust practice;

(c) refusing to allow Plaintiff to litigate cases she had brought to the firm;

(d) manipulating cases so as to eliminate or minimize Plaintiff's entitlement to compensation;

(e) illegally terminating Plaintiff's affiliation with the firm by presenting Plaintiff in bad light and damaging her career while expropriating her work and shares;

(f) refusing to compensate Plaintiff for the value of her investment in cases; and

(g) failing to compensate Plaintiff for the value of her partnership share.

147.    Plaintiff was never provided an opportunity to participate in the decision to oust her from the firm, sealing her office and starting a bogus investigation, in violation of her rights as a partner in CGL.

148.    As a direct and proximate cause of the aforementioned wrongful conduct of the Defendants, Plaintiff has suffered and continues to suffer damages and economic loss. In addition, Plaintiff also lost the opportunity to establish her career in the plaintiffs' class action bar by working on the cases she got to CGL, upon which Plaintiff had expended considerable time and effort.

## Count Three: Bad Faith Breach of Contract/ Breach of Covenant of Good Faith and Fair Dealing

149.    Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

150.    Defendants' conduct toward Plaintiff violated the covenant of good faith

implied in the negotiation and performance of every contract.

151.    Defendants' conduct breached their obligations to Plaintiff and was undertaken in bad faith and in conscious disregard of her contractual rights.

152.    In so doing, Defendants acted recklessly, maliciously, in bad faith, and without good cause, thereby preventing Plaintiff from receiving the reasonably expected benefits under her contract.

153.    As a direct and proximate cause of the aforementioned wrongful conduct of the Defendants, Plaintiff has suffered and continues to suffer damages and economic loss.  In addition to the irreparable damage to her image, the compensation benefits of her contract, Plaintiff also lost the opportunity to establish her career in the plaintiffs' class action bar by working on the cases she got to CGL, upon which Plaintiff had expended considerable time and effort.

### Count Four: Unjust Enrichment

154.    Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

155.    Plaintiff's work at CGL conferred a substantial benefit on Defendants.

156.    By minimizing or denying Plaintiff's right to compensation for that work, sealing Plaintiff's office and confiscating her office equipment and starting a bogus investigation, and thus creating situations that humiliated and damaged Plaintiff's image and reputation, with intent to summarily eject Plaintiff from her position at the firm, Defendants expropriated for themselves valuable benefits which properly belonged to Plaintiff.

157.    Despite repeated efforts to enter into a proper separation agreement,

Defendants have refused to give Plaintiff a reasonable offer that protects her contractual shares, or the right to work on the cases she got to CGL.

158.    Defendants' conduct in expropriating for themselves the value of Plaintiff's contributions was unjust, unfair, and unconscionable.

159.    As a direct and proximate cause of the aforementioned wrongful conduct of the Defendants, Plaintiff has suffered and continues to suffer damages and economic loss. Plaintiff also lost the opportunity to establish her career in the plaintiffs' class action bar by working on the cases and issues she identified and got to CGL, upon which Plaintiff had expended considerable time and effort.

### Count Five: Unlawful Interference with Contractual Relations

160.    Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

161.    On information and belief, Defendants have disparaged Plaintiff's ethics and professional abilities in communications with potential employers.

162.    Defendants have interfered with Plaintiff's prospective contractual relations.

163.    Defendants' conduct inflicted pecuniary harm on Plaintiff by interfering with her ability to find alternative employment.

164.    Upon information and belief, Defendants have also interfered in Plaintiff's relationship with her potential clients and working relationship with class action attorneys in the plaintiff's class action bar.

165.    As a direct and proximate cause of the aforementioned wrongful conduct of the Defendants, Plaintiff has suffered and continues to suffer damages and economic

loss.

## Count Six: Fraudulent Inducement

166.    Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

167.    Cuneo and other Defendants induced Plaintiff to forego other potentially lucrative opportunities by promising that she could achieve a significantly higher income doing interesting, socially valuable work at CGL.

168.    Thereafter Cuneo and others induced Plaintiff to remain at CGL for more than four years, and to work thousands of hours – by repeatedly indicating how successful the firm was, how wealthy the senior partners were, and how much money Plaintiff could expect when her cases paid off.

169.    Cuneo, in particular, frequently boasted of the fact that he took home four or five million dollars a year, that he enjoyed a luxurious lifestyle with homes in Manhattan and Capitol Hill, that he was friends with powerful politicians, and that he was married to Mara Lliason, a famous Washington D.C. journalist.

170.    These inducements were fraudulent insofar as Defendants never intended to provide Plaintiff with the compensation to which she was entitled.

171.    As a direct and proximate cause of the aforementioned wrongful conduct of the Defendants, Plaintiff has suffered and continues to suffer damages and economic loss.

## Count Seven: Unlawful Threats

172.    Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

loss.

**Count Nine: Negligent and Intentional Infliction of Emotional Distress**

179.    Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

180.    Defendants intentionally and maliciously sought to inflict severe emotional distress on Plaintiff by:

> (a) denigrating her legal abilities;
>
> (b) mocking her accent;
>
> (c) abusing Plaintiff in person and on the telephone;
>
> (d) insulting Plaintiff's Indian heritage;
>
> (e) threatening her right to practice law;
>
> (f) threatening her immigration status;
>
> (g) launching a bogus investigation into Plaintiff's perfectly lawful conduct;
>
> (h) summarily and illegally discharging Plaintiff, confiscating her computer, reading her emails, and locking her out of her office.

181.    As a result of this conduct, Plaintiff has suffered serious, lasting, and debilitating emotional distress that has significantly interfered with her ability to function or to seek alternative employment.

182.    Defendants' purpose in inflicting this severe emotional distress was to demoralize Plaintiff so as to disable her from pursuing her legal rights against CGL and the individual Defendants.

183.    As a direct and proximate cause of the aforementioned wrongful conduct

of the Defendants, Plaintiff has suffered and continues to suffer damages and economic loss.

### Count Eight: Unfair Competition

184.    Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

185.    Defendants intentionally and with the intent to deprive Plaintiff of her lodestar compensation started an unfair competition with the Plaintiff. To this end, without Plaintiff's consent, Defendants appointed associates as designate attorneys on cases Plaintiff got to CGL, and Plaintiff was deliberately left out of meetings and conferences.

186.    Defendants illegally kept Plaintiff's email account open to contact potential clients and unfairly compete with Plaintiff by taking advantage of her hard work.

187.    Defendants also unfairly induced Plaintiff to share her leads and ideas for potential cases, which Defendants used for themselves after ousting Plaintiff from the firm.

188.    As a direct and proximate cause of the aforementioned wrongful conduct of the Defendants, Plaintiff has suffered and continues to suffer damages and economic loss.

### DEMAND FOR RELIEF

189.    Wherefore, Plaintiff demands relief in the form of:

(a) Compensatory damages in the amount of $6,000,000;

(b) Punitive damages, as applicable;

(c) An injunction prohibiting Defendants from further disparaging

Plaintiff;

(d) An injunction restraining Defendants from using any of Plaintiff's ideas/leads for filing of new class action cases;

(e) An accounting to determine the value of Plaintiff's partnership interest in CGL;

(f) A declaration relief that Plaintiff is entitled to work on all cases and potential leads Plaintiff got to CGL which Defendants have used, and that Defendants' actions are unlawful;

(g) An award of reasonable attorney's fees and expenses; and

(h) Such additional relief as the Court deems equitable and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues within the instant action so triable.

PRO SE

Dated: September 25, 2013    By: Preetpal Grewal
Preetpal Grewal
395 South End Avenue, Apt. 8P
New York, NY 10280
preetpalgrewal@yahoo.com
Tel: (917) 576-9298