**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12 20 13

Preetpal Grewal,

           Plaintiff,

        v.

Jonathan W. Cuneo, Charles J. LaDuca, Pamela
Gilbert, Joel Davidow, Michael J. Flannery,
Robert J. Cynkar, Sandra Cuneo, Daniel M. Cohen,
Matthew E. Miller, Cuneo Gilbert & LaDuca LLP,

           Defendants.

**SECOND AMENDED**
**COMPLAINT**

JURY TRIAL
DEMANDED

Index No.13 CIV6836

## INTRODUCTION

1.      This is a case about a powerful Washington D.C. attorney and self-proclaimed champion of civil rights who, together with his partners, illegally squeezed out the Plaintiff, an Indian national whom they had induced to become a partner in their firm, for the purpose of expropriating the substantial value of her interest in the firm.  In the course of their scheme, Defendants illegally threatened and intimidated Plaintiff, engaged in gross acts of discrimination, violated her rights as a partner in the firm, interfered with her opportunities to obtain other work, deprived her of her means of livelihood, and unjustly enriched themselves at her expense.  Plaintiff seeks restitution, compensatory and punitive damages, an injunction, declaration, and an accounting for the value of her partnership interest.

## JURISDICTION AND VENUE

2.      Plaintiff brings this action under Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C. § 1961 et seq., Title VII of the Civil Rights Act of

a 1964, 28 U.S.C. §2000e-5, declaration of rights under 28 U.S.C. 2201, the Federal

Declaratory Judgment Act, Rule 57 of the Federal Rules of Civil Procedure, and also

seeks equitable and other relief under 42 U.S.C. §e-5(g). Plaintiff also asserts claims for

actual and exemplary damages pursuant to state laws, and to obtain damages and secure

other relief against Defendants for violation of those state laws. Plaintiff also seeks

attorneys' fees and costs under federal and state law.

      3.     This Court also has federal question subject matter jurisdiction pursuant to

28 U.S.C. §1331. This Court has also jurisdiction in this action pursuant to 28 U.S.C.

§1332 as the amount in controversy exceeds seventy-five thousand dollars ($75,000) and

the parties have diversity of citizenship.

      4.     Venue is proper in this district pursuant to 18 U.S.C. § 1965(a) and 28

U.S.C. § 1391, because Plaintiff worked at the New York office of Cuneo Gilbert &

LaDuca, LLP and a substantial part of the events giving rise to Plaintiff's claims occurred

in this district, Cuneo Gilbert & LaDuca, LLP continues to transact business within this

district, a substantial portion of the interstate commerce discussed below has been carried

out in this district, and one or more of the Defendants are licensed to do business in, are

doing business in, had agents in, or found to transact business in this district.

      5.     This Court has personal jurisdiction over the Defendants pursuant to 18

U.S.C. §1965(b) and (d). This Court has *in personam* jurisdiction over each of the

Defendants because each Defendant, *inter alia*: (a) purposely transacts business in this

district; (b) has substantial aggregate contacts with this district; (c) regularly does

business and derives substantial revenue from services rendered in New York State; (d)

committed tortious acts within New York State; (d) committed tortious acts which they

reasonably should have expected would cause injury to Plaintiff within New York State; and/or (e) engaged in an act that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of Plaintiff, aperson residing in this district. Each Defendant is subject to this Court's jurisdiction because they purposely availed themselves of the privilege of conducting business activities within New York and thereby invoked the benefits and protection of the laws of this jurisdiction, and on matters subject of this litigation.

6.      There is no other litigation pending in federal or state court that would resolve the rights of the parties.

## THE PARTIES

7.      Defendant Cuneo Gilbert & LaDuca LLC ("CGL") is a limited liability partnership.   CGL is engaged in inter-state commerce and has more than fifteen employees.  CGL has conducted and continues to conduct substantial business in the State of New York.  Until August 2012, CGL operated an office in the state of New York located at Rockefeller Center, 620 Fifth Avenue, 6th Floor, New York, NY 10002. Through that office CGL conducted extensive business and represented clients in numerous lawsuits throughout the United States and in the state of New York.  CGL continues to conduct extensive activities as counsel of record in lawsuits filed throughout the United States and in the state of New York.  CGL has been paid or expects to be paid millions of dollars in attorney fees from litigation conducted in the state of New York, including from matters Plaintiff brought to the firm and which are subject of this litigation.

8.      Defendant Jonathan Cuneo ("Cuneo") is a citizen of Washington D.C. and

3

an attorney licensed to practice law in the state of New York. He is also admitted to practice law before this Court. He is the founding and named partner of CGL and in that capacity is directly involved in all of CGL's activities in New York State. Cuneo claims that "the class bar looks to Mr. Cuneo as one of its key leaders in Washington" and that he is "widely recognized for his achievements as a class action litigator." Cuneo has personally been paid or expects to be paid many thousands of dollars in fees as a result of CGL's activities in New York and elsewhere. Cuneo regularly visits New York to manage CGL's litigation in this State. Cuneo held numerous meetings in New York with Plaintiff in issues/cases Plaintiff had originated and/or brought to CGL, including the overdraft fees cases, mortgage modification claims against various banks (including the *JP Morgan Mortgage Modification Litigation*) and international antitrust cases, antitrust litigation against auto-component manufacturers (*In re: Automotive Parts Antitrust Litigation*). Cuneo maintains a pied-a-terre apartment in New York City.

9.      Defendant Pamela Gilbert ("Gilbert") is a citizen of Virginia and is a named partner at CGL. Gilbert has practiced at CGL since 2003. She boasts in her website that she is "one of the leading advocates in Washington D.C. working to preserve access to the civil justice system for both individuals and businesses," that she sits on "numerous" nonprofit boards of directs, and that she was chosen in 1995 as "consumer advocate of the year" by the Trial Lawyers Association of Metropolitan Washington. Gilbert is a licensed attorney in the State of New York and is a member of the New York State Bar Association. Gilbert has personally been paid or expects to be paid many thousands of dollars in fees as a result of CGL's activities in New York, including issues/cases Plaintiff brought to CGL and which are subject of this litigation. Gilbert

regularly visits New York to manage CGL's litigation/business in this State. On May 7,
2012, Gilbert came to New York City to seal Plaintiff's office and confiscate her office
equipment and files. Later that day, Gilbert attended a meeting at office of Michael Ross,
attorney for the Defendants, which was held at Ross' offices in New York City, at which
Plaintiff was informed that she had been removed from her position at CGL.

      10.    Defendant Charles LaDuca ("LaDuca") is a citizen of Maryland and a
named partner at CGL. LaDuca is responsible for managing CGL's business activities.
LaDuca is an attorney to practice licensed in the state of New York and is a member of
the New York State Bar Association. LaDuca has worked at CDL for eighteen years. His
Web Site boasts of his "empathy for people who suffer from the wrongdoings of others"
and asserts that his "concern for people" led him to focus on consumer law and civil
rights cases. LaDuca has earned and expects to earn many thousands of dollars in legal
fees as a result of CGL's activities in New York. He is counsel in, amongst others, at least
the following cases pending or recently concluded in the state of New York: *Lyons et al.
v. Litton Loan Servicing LP et al.*, 13-cv-00513 (S.D.N.Y. 2013); *Bristol Village, Inc. v.
Louisiana-Pacific Corporation et al.*, 12-cv-00263-WMS/LGF (W.D.N.Y. 2012);
*Paolone v. Wal-Mart Stores, Inc.*, 12-cv-01333-NAM/TWD (N.D.N.Y. 2012); *Arrow
Express Packing and Shipping, LLC et al. v. Ford Motor Company*, 12-cv-01493-
ADS/GRB (E.D.N.Y. 2012); *Mitchell v. Bank of America, NA et al.*, 11-cv-00845
(E.D.N.Y. 2011); *Tesoriero v. CertainTeed Corporation*, 11-cv-00109-TJM/ATB
(N.D.N.Y. 2011); *DeCaro v. JP Morgan Chase & Co.*, 10-cv-08993-SAS (S.D.N.Y.
2010); *Costigan v. Citigroup Inc. et al.*, 10-cv-08776-SAS (S.D.N.Y. 2010); *Czuba v.
IKO Manufacture, Inc.*, 09-cv-00409-WMS (W.D.N.Y. 2009); *Chiacchierini v.*

*CertainTeed Corp.*, 07-cv-06210-MAT (W.D.N.Y. 2007); *Williams v. The County of Niagara, et al.*, 06-cv-00291-RJA/HBS (W.D.N.Y. 2006); *Mitchell v. The County of Clinton et al.*, 06-cv-00254-DRH (N.D.N.Y. 2006); *Pritchard et al v. The County of Erie et al.*, 04-cv-00534-RJA/HBS (W.D.N.Y. 2004); *McDaniel v. The County of Schenectady et al.*, 04-cv-00757 (N.D.N.Y. 2004). LaDuca regularly visited New York to conduct business meetings and conferences, including meetings with Plaintiff on other matters subject of this litigation. On May 7, 2012, LaDuca came to New York City to seal Plaintiff's office and confiscate her office equipment and files.Later that day, LaDuca attended the meeting held in New York City at the office of Michael Ross, attorney for the Defendants, at which Plaintiff was informed that she had been removed from her position at CGL.

11.      Defendant Joel Davidow ("Davidow") is a citizen of Washington, D.C. and an attorney admitted to practice in the state of New York and in this Court. He knowingly allowed CGL to represent him as a partner at CGL in numerous declarations for attorney fees filed on behalf of CGL. Accordingly, Davidow is a partner by estoppel in CGL. In that capacity, Davidow has substantial responsibility and expects to earn many thousands of dollars in legal fees from litigation pending or recently concluded in New York and elsewhere, including from *In re. Automotive Parts Antitrust Litigation*, one of the cases at issue in his lawsuit. In addition to *Automotive Parts*, Davidow is counsel in, among others, at least the following cases pending or recently concluded in the state of New York: *Textpower v. Cellco Partnership et al.*, 12-cv-02729-AJN (S.D.N.Y. 2012); *Phelps v. Stomber et al.*, 11-cv-07271-PKC (S.D.N.Y. 2011); *Verizon New York Inc. et al. v. Global Naps, Inc. et al.*, 07-cv-04459-ENV-RML (E.D.N.Y. 2007).

Davidow has on various occasions attended meetings in New York to discuss strategy and to participate in lawsuits pending in this state.

12.     Defendant Michael Flannery ("Flannery") is a citizen of Missouri. Flannery boasts that he represents the "victims of corporate greed and neglect" including small businesses, consumers, and "victims of race, sex and other civil rights discrimination." Flannery knowingly allowed CGL to represent him as a partner at CGL in numerous declarations for attorney fees and costs. For this reason he is a partner in CGL by estoppel. In that capacity, he has earned and expects to earn many thousands of dollars in fees from litigation pending or recently concluded in New York and elsewhere. Flannery is counsel of record in at least the following cases pending or recently concluded in the state of New York: *Bristol Village, Inc. v. Louisiana-Pacific Corporation et al.*, 12-cv-00263-WMS/LGF (W.D.N.Y. 2012); *Bonnist v. USB AG et al*, 08-cv-02967-LMM (S.D.N.Y. 2008). Flannery has made multiple visits to New York in connection with his business activities. For example, on April 2, 2012, Flannery came to CGL's New York office to attend a meeting with all co-lead counsel to discuss strategy in *In re. Automotive Parts Antitrust Litigation,* in which he is counsel of record and which forms part of the subject of this litigation. On another occasion, Flannery participated in a meeting with LaDuca and co-counsel held at Plaintiff's New York office regarding a product defect case Plaintiff brought to CGL, which is also a subject of this litigation. Flannery is counsel of record in *JP Morgan Mortgage Modification Litigation*, a case pending in New York State which is part of the subject matter of this lawsuit.

13.     Defendant Daniel Cohen ("Cohen") is a citizen of Maryland. He knowingly allowed CGL to represent him as a partner at CGL in numerous fee

declarations for attorney fees and costs. For this reason he is a partner in CGL by

estoppel. Cohen has over the past five years paid multiple visits to New York in

connection with his business activities in this State. Cohen worked closely with Plaintiff

in building the firm's antitrust practice and visited New York to attend meetings in

antitrust cases with Plaintiff and co-counsel, and which form part of the subject matter of

this lawsuit. Cohen is counsel of record in the following cases which are pending or

recently concluded in New York State: *In re. Air Cargo Shipping Services Antitrust*

*Litigation*, MDL 1775 (E.D.N.Y. 2006); *Murr v. Capital One Bank (USA) N.A.*, 13-cv-

01091 (E.D.N.Y. 2013); *In re. HSBC Bank U.S.A., N.A., Debit Card Overdraft Fee*

*Litigation*, 13-cv-02451 (E.D.N.Y. 2013). Defendant Cohen has submitted declarations

for attorney fees in matters pending before courts in the State of New York.

14.     Defendant Robert Cynkar ("Cynkar") is a citizen of Virginia and an

attorney admitted to practice before the United States Court of Appeal for the Second

Circuit, a court whose territory includes New York State. Cynkar knowingly allowed

CGL to represent him as a partner at CGL in numerous declarations for attorney fees

filed on behalf of CGL. For this reason he is a partner in CGL by estoppel. In that

capacity, Cynkar has substantial responsibility and expects to earn many thousands of

dollars in legal fees from litigation pending or recently concluded in New York and

elsewhere. Cynkar is counsel of record in at least the following cases pending in the state

of New York: *Murr v. Capital One Bank (USA) N.A.*, 13-cv-01091 (E.D.N.Y. 2013); *In*

*re: HSBC Bank U.S.A., N.A., Debit Card Overdraft Fee Litigation*, 13-cv-02451

(E.D.N.Y. 2013), each of which arising from the overdraft fees issues which form part of

the subject of this litigation.

15.     Defendant Sandra W. Cuneo ("Sandra Cuneo") is a citizen of California. She knowingly allowed herself to be represented as a partner at CGL in numerous declarations for attorney fees filed on behalf of CGL. For this reason she is a partner in CGL by estoppel. She has been licensed as an attorney in New York State. Defendant Sandra Cuneo has been paid or expects to be paid many thousands of dollars in legal fees for her activities in New York State. Defendant Sandra Cuneo is lead-counsel in *In re. HSBC Bank U.S.A., N.A., Debit Card Overdraft Fee Litigation*, 13-cv-02451 (E.D.N.Y. 2013), arising from the overdraft fees issues which form part of the subject of this litigation. In addition, Sandra Cuneo works on all CGL cases presently pending the state of New York.

16.     Defendant Matthew E. Miller ("Miller") is a citizen of Washington D.C. Miller knowingly allowed CGL to represent him as a partner at CGL in numerous fee declarations for attorney fees and costs. For this reason he is a partner in CGL by estoppel. In the last two years Miller made multiple trips to New York in connection with his legal business in New York City. He has been admitted pro hac vice in lawsuits recently concluded in New York City. He has been paid or expects to be paid many thousands of dollars in compensation for his activities New York. He is a counsel of record in at least the following cases pending or recently concluded in the state of New York: *Phelps v. Stomber et al.*, 11-cv-07271-PKC (S.D.N.Y. 2011); *Bresalier v. Immelt et al.*, 10-cv-01807-DLC (S.D.N.Y. 2010); *N.A. Lambrecht v. O'Neal et al.*, 09-cv-08259- JSR (S.D.N.Y. 2009); *N.A. Lambrecht v. O'Neal et al.*, 08-cv-06582-LBS (S.D.N.Y. 2008); *In re. Merrill Lynch & Co. Inc. Securities, Derivative and ERISA Litigation*, 07-cv-09633 (S.D.N.Y. 2007).

17.     Plaintiff Preetpal Grewal ("Plaintiff") is an attorney licensed to practice in the courts of New York State, and a graduate of New York University Law School (LLM 2001).  Plaintiff is also a licensed attorney in India.  Prior to immigrating to the United States, Plaintiff ran her own law practice in the Indian state of Himachal Pradesh and represented the entire judiciary of that state in their official legal affairs.

18.     After graduating from NYU Law School, Plaintiff practiced civil litigation at Bisceglie & Friedman, a labor and employment law boutique (2002-2005), and later at Hahn & Hessen, a general corporate and business law firm (2005-2008).

19.     In 2008 Plaintiff joined the firm of Cuneo, Gilbert & LaDuca LLP ("CGL"), where she was a partner and head of the firm's New York office.  In 2012, Grewal was illegally squeezed out of her position at CGL, in violation of her rights as a partner, her contractual agreement with CGL, Title VII of the Civil Right Act, and New York's Human Rights Law.

## FACTS

### Plaintiff is Induced to Join CGL

20.     While working at Hahn & Hessen, Plaintiff was introduced to Cuneo by a mutual friend.

21.     On or about March 20, 2008, Cuneo contacted Plaintiff and expressed an interest in having Plaintiff join CGL.

22.      On or about April 15, 2008, Cuneo invited Plaintiff to meet him for breakfast in New York City.  Plaintiff explained to Cuneo that she was thinking about opening her own law practice but that she would be willing to discuss joining CGL on suitable terms.

23.     At that meeting Cuneo boasted about CGL's law practice, the nature of its activities, and how successful and profitable the firm was. Cuneo touted how much money he and his partners were making and indicated that if Plaintiff were to join the firm she, too, would enjoy a lucrative practice.

24.     Specifically, Cuneo informed Plaintiff that if she joined the firm, she would be entitled to a share in the profits of any case she worked on, with an extra share for cases that she brought in to the office. Cuneo further explained that because the firm worked on a cash flow basis, Plaintiff would receive a lower monthly draw than she could receive elsewhere, but that at the end of the day her compensation would exceed what she could earn at a conventional firm.

25.     On June 9, 2008, Cuneo emailed Plaintiff, stating that "your attitude has knocked everyone's socks off here!" He invited her to come to Washington, at CGL's expense, to meet with his partners.

26.     Plaintiff traveled to Washington D.C. on June 14, 2008, and met with Cuneo and several of his partners.

27.     On June 17, 2008 CGL extended Plaintiff a formal offer to join the firm. In an email to Plaintiff of that date, Cuneo stated that "we are delighted to welcome you to our little corner of the world. You made a tremendous impression on us and we sincerely look forward to working with you."

28.     The email explained that Plaintiff would work at the firm on a "trial basis" for several months, at which time "our standard deal kicks in." The email further stated that Plaintiff would be working out of CGL's New York City office.

29.     On June 17, 2008 Plaintiff requested further information. The next day

Cuneo responded, inter alia, by explaining that "we want you . . . ultimately to be our NY presence." Cuneo further promised that Plaintiff was not being brought on board to review documents, and that CGL already had two attorneys who performed that task almost exclusively.

30.     Cuneo's June 18, 2008 email further stated that the "standard deal" was that "you would be compensated for [client development activities] hourly, plus ten percent of work you originate, plus twelve percent of your lodestar contribution." Cuneo further promised that these additional amounts were "an entitlement (so really not a bonus) based on your relative value of contribution to a case (based on lodestar)."

31.     Based on the terms of this written offer, Plaintiff accepted by email CGL's offer to join the firm on June 18, 2008.

## Plaintiff's Work at CGL

32.     Plaintiff's first day of work was on June 30, 2008.  Despite Cuneo's earlier email, CGL informed Plaintiff that she would not in fact have to complete a trial period but rather would work full time under the "standard deal" immediately.

33.     Plaintiff was treated as a partner at CGL from the beginning of her affiliation with that firm.

34.     Plaintiff regularly attended partnership lunches with Cuneo, Gilbert and LaDuca where issues of strategy were discussed.  These included, for example, how to position the firm in the competitive marketplace, what sorts of cases CGL should take on, how it should plan for future workflows, and so on.

35.     CGL regularly represented to others, including multiple courts, that Plaintiff was a partner at the firm and Plaintiff believed these representations to be true.

36.     For example, in *In re Living Social Marketing and Sales Practices Litigation*, MDL # 2254 (D.D.C. 2011), LaDuca submitted a declaration in support of CGL's fee request for the reporting period from inception through January 15, 2013.  That declaration lists all firm members who worked on the case and the nature of their affiliation with the firm.  LaDuca's declaration states that Plaintiff was a "partner" at CGL and recites a billing rate of $575/hour.  This was the same billing rate as named partner Pamela Gilbert, also listed as a "partner" and billing at $575/hour.  *In re Living Social Marketing and Sales Practices Litigation*, MDL # 2254 (D.D.C. 2011) (Exhibit 7); see also, Supplemental Declaration of Charles Laduca in Support of Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Expenses submitted to the court in *In re Living Social Marketing and Sales Practices Litigation*, MDL # 2254 (D.D.C. 2011) (see Exhibit 10).

37.     In *In re Certainteed Corp. Roofing Shingle Product liability Litigation*, MDL 1817 (E.D. Pa. 2007), CGL represented Plaintiff as a "partner" in CGL for the reporting period August 1, 2006 – March 2, 2010 (see Exhibit 1).

38.     In *In re. Air Cargo Shipping Services Antitrust Litigation*, MDL 1775 (E.D.N.Y. 2006), CGL represented Plaintiff as a "partner" in CGL for the reporting period December 6, 2006 through December 31, 2010 (see Exhibit 3).

39.     In *In re: Uponor, Inc. F1807 Plumbing Products Liab. Litig.*, MDL 2247 (D. Minn. 2011), CGL represented Plaintiff as a "partner" in CGL for the reporting period August 1, 2008 – June 4, 2012 (see Exhibit 5).

40.     In *In re. Air Cargo Shipping Services Antitrust Litigation*, MDL 1775 (E.D.N.Y. 2006), that for the reporting period January 1, 2011 – December 31, 2011,

Daniel Cohen, Brent Walton and Plaintiff were "partners" at CGL (Exhibit 6).

41.     In *In re: Navistar Diesel Engine Products Liability Litigation*, MDL 2223
(N.D. Ill. 2011), CGL represented Plaintiff as a "partner" in CGL for the reporting period
from inception to March 2013 (see Exhibit 8).

42.     In *In re. Zurn Pex Plumbing Products Liability Litigation*, MDL 1958 (D.
Minn. 2008), CGL represented Plaintiff as a "partner" in CGL for the reporting period
from inception to February 19, 2013 (see Exhibit 9).

43.     On information and belief, CGL represented that Plaintiff was a "partner"
at CGL in other fee applications and never represented her in fee applications as serving
in any other capacity.

## Defendants Subvert Plaintiff's Ability to Bring Cases

44.     From the very start of Plaintiff's affiliation with CGL, Cuneo and CGL
sought to nullify the promises made under this contract and described above.

45.     On her first day of work Plaintiff traveled to Washington D.C. to a
meeting at the offices of Michael Hausfeld ("Hausfeld"), a prominent international
antitrust attorney, and with whom Cuneo had a past work relationship.  The participants
at that meeting discussed the possibility that Plaintiff would travel to India to speak with
potential claimants about their rights under international antitrust cases brought by
Hausfeld.

46.     At some point during this meeting with Hausfeld, Cuneo instructed
Plaintiff to leave the room.  While Plaintiff was absent, Cuneo struck a deal with
Hausfeld under which Hausfeld would give Cuneo the lead counsel position in domestic
antitrust cases in exchange for Cuneo supplying Indian clients to Hausfeld for

international cases.  The result of this deal was that Plaintiff would receive no credit for the work that CGL received in lieu of the Indian clients she brought to CGL in international antitrust cases.  The purpose and effect of this deal was to deprive Plaintiff of benefits promised to her under her contract with CGL, including compensation for originating cases as well as rights to participate in litigation for which she had obtained clients.

47.     In reliance on Cuneo's representations that Plaintiff would receive credit for work she brought into the firm and that CGL wanted to establish an international antitrust practice, Plaintiff traveled to India from September 14, 2008 through October 28, 2008.  In order to save money for CGL, Plaintiff flew with frequent flier miles and stayed at an official guest house of the Governor of Gujarat at a greatly discounted rate as compared with what she would have paid at a hotel.

48.     While in India, Plaintiff met/spoke with hundreds of potentially interested parties in order to advise them of their legal rights.  This process was time consuming because Plaintiff had to explain the nature of cartel cases, the class actions filed in the United States and the international dimensions of these cartel cases, which was unfamiliar in India.  In addition to conducting many meetings in New Delhi, Plaintiff traveled to Jaipur, Gujarat, Mumbai, and other locations.

49.     Several of these parties with whom Plaintiff met during this trip subsequently requested that CGL represent them.  For example, Gujaral Brothers and Vigneshwara Exports Ltd. both signed litigation retainer agreements to join the litigation to seek recovery of their claims in London.

50.     While in India, Plaintiff was invited to apply for a position as an in-house

counsel at Ranbaxy, a major Indian drug manufacturer.  When plaintiff returned to the

United States, Cuneo congratulated her on her accomplishment in India and dissuaded

her from applying for positions in India, indicating that she was doing excellent work and

had a great future at CGL.

      51.     In reliance on Cuneo's promises, Plaintiff returned to India on December

27, 2008, again staying at the Governor of Gujarat's accommodations in New Delhi,

Gujarat, and Mumbai.  In addition, Plaintiff traveled to Banglore, Jaipur, Jodphur, and

other cities.  During this trip, Plaintiff met/spoke with managing directors, senior

management or general counsels at numerous companies, including among others: Tata

Steel, Terex India, Ranbaxy Laboratories Ltd., Tata Teleservices, Voltas, Lupin Ltd., Dr.

Ready's Laboratories, Inc., Bosch Ltd., Cipla Ltd., Reliance Industries, BARCO,

Motherson Sumi Systems Ltd., Brakes India Ltd., Torrent Pharmaceuticals Ltd., Cadila

Pharmaceuticals Ltd., Matrix Clothing Pvt. Ltd., HCL, Crompton Grives, Sire Enterprises,

CCL Flowers Ltd., Shahi Exports Pvt. Ltd., RICO Auto Industries Ltd., Brakes Ind Ltd.,

Bharat Cellular, Bharat Forge, Bharat Heavy Electricals Ltd., Kirloskar Oil, Xerox,

Sandhar Technologies Ltd., Capital Foods Ltd., Fairy Food Products Ltd., SABS Exports,

Bharti Cellular, Zazman Exports, Bhagwandas Bherumal, CCL Flowers, Orient Craft,

Maruti.  Plaintiff advised each of these parties of their legal rights in connection with

pending antitrust litigation.  Several of these parties subsequently requested that CGL

represent them and signed retainer agreements with the full knowledge and consent of

CGL.  When Plaintiff returned from India on February 19, 2009, she had signed retainer

agreements from Torrent Pharmaceuticals Ltd., Appollo International Ltd., Cipla ltd.,

Gujaral Borthers, Cadila Pharmaceuticals, KayBee Exports, L.M. Apparels, Matrix

Clothing Pvt. Ltd., Motherson Sumi Systems Ltd., Neetee Clothing Pvt. Ltd., Orchid

Oversees pt. Ltd., Shahi Exports Pvt. Ltd., Vigneshwara Exports ltd., Sira Enterprises,

KayBee Exports, Bhagwandas Bharumal and Co., Ashvina Trading Co., CCL Flowers,

Hi Tech Gears, RR Leathers, and others.  Cuneo congratulated Plaintiff on her success.

52.     In further reliance on Cuneo's promises, Plaintiff returned to India on June

4, 2009, and stayed there until August 12, 2009.  Plaintiff traveled to Mumbai, Bangalore,

Hyderabad, and New Delhi.  During this trip Plaintiff met numerous additional

companies to advise them of their rights.  During that trip at least twenty companies

requested that CGL represent them and signed retainer agreements with the full

knowledge and consent of CGL.

53.     Plaintiff had full authority to sign, and did sign, the retainer agreements

with these and other clients on behalf of CGL.

54.     Meanwhile, while Plaintiff was undertaking these efforts on CGL's behalf,

Cuneo became unhappy about his relationship with Hausfeld.  Cuneo complained to

Plaintiff and others at CGL that Hausfeld was unreliable, that Hausfeld did not keep his

promises, that Hausfeld would not pay his fair share of fees and expenses, that Cuneo no

longer trusted Hausfeld, and that Hausfeld was not keeping his part of the bargain by

giving CGL lead counsel rights in domestic cases.

55.     As a result of his changed feelings about Hausfeld, Cuneo no longer

wanted to participate with Hausfeld in international class action cases.  He therefore, and

in violation of promises made to Plaintiff, caused CGL to cease actively litigating cases

that Plaintiff had brought into the firm from India.  Cuneo knew that if Plaintiff did not

return to India and follow-up on her work she would lose her contacts/potential clients

and some of the claims will become time-barred.  In consequence, Plaintiff was deprived of the value she would have received had CGL actively pursued the cases.

56.     Once Cuneo decided not to participate any further in Hausfeld's international antitrust practice, his praise for Plaintiff ceased.  Cuneo ordered that the firm investigate the expenses Plaintiff had incurred during her trips to India, even though her costs were extraordinarily low (less than $17,000 for 23 weeks of travel, lodging, food etc. for Plaintiff and a local colleague).  This investigation was initiated in order to intimidate and harass Plaintiff, and uncovered no evidence of wrongdoing.

57.     To further intimidate and threaten Plaintiff, and in breach of CGL's contractual agreement as well as his fiduciary duties, Cuneo refused to give Plaintiff any further substantive work on antitrust cases and told her to bring her own domestic cases and work on them.

### Plaintiff's Efforts to Find Domestic Clients and Cases

58.     In reliance on Cuneo's instructions that she turn her attention to domestic cases, Plaintiff made concerted and assiduous efforts to find and investigate domestic class action cases and to develop new business and clients for CGL.

59.     Cuneo had informed Plaintiff on the first day at CGL of the "unspoken rule" in the plaintiffs' class action bar that no one will steals another attorney's ideas, and was assured that no one at CGL would work on another attorney's idea/lead for a case without consent of the other attorney.

60.     Based on these assurances, and in reliance on her contractual agreement with CGL, Plaintiff shared all her ideas and leads for potential class action cases with Cuneo, Gilbert and LaDuca as well as other Defendants.

## Defendants Expropriate Plaintiff's Work in Antitrust Cases

61.     In March 2011, CGL brought Joel Davidow and his associate Victoria Romanenko into the firm.  Davidow represents himself as an expert in antitrust law. As a consequence of having a purported antitrust expert at the firm, Cuneo and CGL sought to squeeze Plaintiff out of any involvement in antitrust cases, to expropriate the value of Plaintiff's contribution to these cases, and to manipulate the cases so that Plaintiff would be denied compensation to which she was legally entitled under her contract with CGL.

## Bosch

62.     Plaintiff's trip to India resulted in excellent international contacts, including senior officers at Bosch, a multinational company based in Germany.

63.     On April 25, 2011, M.C. Arvind, a senior attorney at Bosch, contacted Plaintiff and indicated that Bosch wanted to discuss the possibility of retaining Plaintiff to represent the company in the Air Cargo antitrust case.

64.     Plaintiff reported this contact to Cuneo and to others at CGL at a litigation meeting.

65.     When Davidow learned of this contact, he insisted that CGL make him the lead attorney on any case involving Bosch, even though Plaintiff had brought this potential client into the firm.

66.     Shortly thereafter, during a trip to the New York office to discuss the mortgage cases, Cuneo met with Plaintiff and informed her that the Bosch case was "not your case" because Plaintiff had done no work on the matter, even though Plaintiff had worked for many days to develop the Bosch connection and CGL's international practice.

## Wire Harness/Auto Parts

67.     On or about October 2, 2010, Plaintiff sent an email to Cuneo identifying a possible antitrust claim against auto part manufacturers who were being investigated by the United States Department of Justice on suspicion of price fixing.  Plaintiff also informed Cuneo that this was her matter and she wanted to work on it and be a lead counsel.  Cuneo encouraged Plaintiff to proceed on her theory of instituting the lawsuit.

68.      In 2011 and 2012, CGL filed antitrust complaints against automobile part manufacturers on exactly the theory that Plaintiff had brought to the office in 2010.

69.     In violation of its contractual promises to Plaintiff, and with the intent to minimize Plaintiff's contributions to this matter, Cuneo did not permit Plaintiff to work on this matter and originally assigned her no credit for having brought the idea into the office.   Cuneo and Davidow deliberately excluded Plaintiff from the conference calls and meetings, including meetings with experts, which were held in Washington D.C.   The experts evaluated this case to be worth many billions of dollars in recovery.

70.     At a litigation meeting on January 2012, Plaintiff raised the issue of her not receiving any credit for originating the Wire Harness/Auto Parts cases.  Cuneo announced at that meeting that "these are my cases" even though he had done nothing to identify the issues, develop the theory on how to proceed, or locate clients in these cases. Cuneo further announced that Victoria Romanenko rather than Plaintiff would be the designated attorney on these matters.

71.     Plaintiff thereafter raised the issue with LaDuca.  LaDuca recognized that Plaintiff had brought the cases to the office and indicated that she should receive 5% of any fees, even though her agreement with CGL entitled her to 10% of the fees.  LaDuca confirmed this promise in an email to Plaintiff and others in the firm.

72.     Cuneo, realizing Plaintiff's potential and the fact that this was not his case, deliberately left Plaintiff out of the meetings and conferences.  With intent to build his own career while expropriating Plaintiff's opportunities to build her career and lodestar, Cuneo decided to oust Plaintiff out of the firm.

73.     In a further effort to deprive Plaintiff of compensation to which she was entitled, Defendants later claimed, falsely, that in fact there were two different cases – one on "wire harnesses" and one on "auto parts".  CGL reduced its offer to pay Plaintiff 5% of the fee (less expenses) for the purported "wire harness" case, and nothing for the purported the "auto parts" case.  This attempt to deprive Plaintiff of the value of her contribution in these cases and her opportunities to build her career was a direct violation of Plaintiff's contractual rights and of Defendants' fiduciary duties.

### Cuneo Undermines Plaintiff's Work on Mortgage Cases

74.     In December 2010, Cuneo asked Plaintiff to work on class action cases against Bank of America, JPMorgan Chase, Citigroup, and Wells Fargo, challenging those defendants' mortgage foreclosure practices.

75.     During her work on these cases, on or about February 8, 2011, Plaintiff identified another legal claim against these defendants, namely that they had violated class members' rights in the process by which they modified the repayments of defaulted mortgage. Cuneo recognized the value of this contribution and added the mortgage modification claims to the complaints.

76.     At Cuneo's request, Plaintiff identified and obtained signed retainer agreements with clients in the JPMorgan Chase, Bank of America, and Wells Fargo cases.  These retainer agreements were signed with full knowledge and consent of CGL.

77.     Plaintiff worked for many hundreds of hours on these mortgage cases, often staying at the office all night.  Among other tasks, she reviewed documents, identified issues, wrote memoranda in support of class certification, drafted complaints, drafted deposition questions, traveled for depositions, drafted discovery requests, drafted the opposition to the motion to dismiss, and coordinated with other attorneys in the MDL process.

78.     In December 2011, Cuneo appeared at Plaintiff's office and demanded that she provide him with all signed retainer agreements in the mortgage cases.  Cuneo announced "these are my cases."  Cuneo thereafter refused to use these clients as named plaintiffs, in a further effort to deny Plaintiff the compensation she was entitled to for having brought the cases into the office.

79.     In December 2011, Plaintiff met with Cuneo, Gilbert and LaDuca to discuss various issues including her compensation.  During the course of this meeting, Cuneo informed Plaintiff that he was "only thinking of building my own career" and "could not be concerned" about Plaintiff's situation.

80.     Subsequent to the December 2011 meeting, Cuneo announced Alexandra Warren, an associate at CGL, would be the designated attorney on all mortgage cases at CGL, even though Cuneo had previously given substantive authority over these cases to Plaintiff, Plaintiff had already devoted hundreds of hours to these matters, and Plaintiff had identified the mortgage modification issue which was potentially the strongest claim in the cases (and which claims formed the basis for CGL getting a position in the mortgage modification MDLs).

81.     Although Cuneo deprived Plaintiff of most of her involvement in these

cases, Cuneo did permit Plaintiff to enter an appearance and to participate in conference calls in *In re: JP Morgan Mortgage Modification Litigation* (2001-md-02290) and (to a limited extent) in conference calls in *In re: Citimortgage Inc. Home Modification Program HAMP Contract Litigation* (2011-md-02274).

82.     Despite Cuneo's attempt to hamstring Plaintiff's ability to act as an attorney in these cases, Plaintiff managed to establish an excellent working relationship with the co-lead counsel and worked on all aspects of the multi-district litigation, including attending conference calls with co-counsel, drafting of the consolidated complaint, reviewing plaintiffs' documents, drafting discovery demands, preparing opposition to the motions to dismiss, and coordinating with co-lead counsel in strategy.

83.     In recognition of Plaintiff's work on these cases, in April 2012, under the Cuneo's supervision, Alexandra Warren emailed Plaintiff thanking her for her contribution in the *In re: JP Morgan Mortgage Modification Litigation* (2001-md-02290) and getting it past the motion to dismiss stage, and indicated that henceforth she (Alexandra Warren) would be working on the multi-district mortgage modification cases with Cuneo. Until this time, Alexandra Warren had not done any substantive work in this matter.

84.     Plaintiff had drafted the complaints that formed part of the MDL proceedings in *In re: Citimortgage Inc. Home Modification Program HAMP Contract Litigation* (2011-md-02274) and also done substantive work on these matters. At Cuneo's request Plaintiff attended conference calls with lead counsel regarding CGL's position in its cases. These conference calls resulted in CGL's clients getting a prominent position in the Consolidated Amended Complaint. However, despite

Plaintiff's contributions to this case, Cuneo denied Plaintiff's request that she should also be part of CGL's Executive Committee in this matter.  Instead, Cuneo had appointed his sister Sandra Cuneo on the Executive Committee as sole designate attorney even though she had done no work in the mortgage modification cases.

85.     During this time, Plaintiff also worked on the *Beals v. Bank of America*. Plaintiff was involved in all aspects of the case from the beginning, including but not limited to, preparing the opposition to the motion to dismiss, reviewing documents, identifying and preparing memoranda on certification issues, attending conferences and instructing team/preparing memoranda on the certification issues under New Jersey law, discovery and also traveled for depositions to Dallas etc.  At this point, Cuneo started giving all credit of Plaintiff's work/ideas to Alexandra Warren to build her up as the designate attorney on the mortgage cases.

86.     On April 30, 2012, CGL filed its motion for class action certification and motion for summary judgment in *Beals v. Bank of America* case.  Plaintiff's name was deleted from these motion papers.

87.     In further attempt to minimize Plaintiff's credit, under Cuneo's supervision and instructions, Alexandra Warren posted on her web page, that she has defeated the motion to dismiss the claims in *Beals v. Bank of America.*  Both Cuneo and LaDuca were aware that Ms. Warren had only prepared the opposition to the FDCPA claim, which was dismissed.

**Defendants Expropriate Plaintiff's Work in the Product Defect Case**

88.     In September 2010, Plaintiff shared a lead for a potential product defect case with the Defendants.  On September 15, 2010, Plaintiff prepared a memo and

circulated it to Cuneo and LaDuca.

89.     Plaintiff also put together a complaint on behalf of a client, and at LaDuca's suggestion agreed to work with co-counsel Robert Shlequist.  Defendants were continuing investigation of the product defect at the time Plaintiff was ousted out of CGL.

90.     In an effort to deprive Plaintiff of compensation to which she was entitled, Defendants later claimed that they would not use Plaintiff's client to pursue the matter. Plaintiff has not been provided with any of the information necessary for her to follow-up with the client to enable her to file the lawsuit on her own.

**Defendants Expropriate Plaintiff's Work in the Capital One Case**

91.     In 2012 Plaintiff identified regarding a potential claim against Capital One, based on a claim of consumer misconduct with credit cards.  Plaintiff sent a memorandum to her partners at CGL describing the potential complains and enclosing a complaint.

92.     In April 2012, during a litigation meeting, Cuneo announced that "we already made a deal" on the case and struck it from the firm's roaster of cases.   Shortly thereafter, Capital One made an announcement of a settlement of their credit card class action in their media press releases.

93.     On information and belief, Cuneo obtained on behalf of CGL some consideration from another firm for not pursuing this litigation, none of which was shared with Plaintiff.

94.     Defendants have recently filed additional cases against Capital One bank based on the very issues that Plaintiff had identified.

**Defendants Expropriate Plaintiff's Leads for Potential Cases**

95.      In reliance on Defendants' numerous assurances that they would not use any of Plaintiff's ideas/leads or otherwise compete with her unfairly, Plaintiff shared with CGL and other Defendants her leads and ideas for other potential class action cases.

96.      For example, in 2010 and 2011 Plaintiff shared with Defendants leads to file potential class action lawsuits against Capital One for excessive fees, and product defect cases for hip replacement surgery, amongst others.  Plaintiff also shared with Cuneo of her leads for various overdraft fee-related class cases.  Plaintiff made it clear to Cuneo on numerous occasions that she wished to bring the overdraft fee cases and work on them.  Plaintiff also discussed these ideas with other Defendants during the course of various litigation meetings.

97.      After ousting Plaintiff from CGL, in violation of their promises and fiduciary obligations to Plaintiff, Defendants filed class action lawsuits on the identical theories that Plaintiff had shared with Defendants.

98.      Plaintiff is entitled to compensation for any new business generated from Plaintiff's leads which she shared in confidence with Defendants, and which were thereafter exploited by CGL.

**Cuneo's Discrimination against Plaintiff Based of Nationality**

99.      Despite his ostentatious claims to being a champion of human rights and an opponent of discrimination, Cuneo repeatedly threatened and humiliated Plaintiff on the basis of her Indian nationality.

100.     Cuneo repeatedly, in Plaintiff's presence and in the presence of others, mocked and denigrated Plaintiff's accent, claiming that he "could not understand" her

when she spoke over the phone – even though Plaintiff is a native English speaker who has no trouble communicating with others.

101.   Cuneo repeatedly, in Plaintiff's presence and in the presence of others, told Plaintiff that "we treat you like a foreigner" and that "we never take you seriously." Cuneo never made such statements to others at the firm.

102.   Sometime in the summer of 2011, after a meeting with all MDL firms that had filed cases against Citigroup, Cuneo remarked at a firm litigation meeting that "we don't take this girl seriously" and "we just treat her as a foreigner." Cuneo admitted at that time that "we should be ashamed of ourselves" for how the firm treated Plaintiff.

103.   In September 2011, after a meeting in Washington D.C. on the Bank of America mortgage modification case, Plaintiff visited Cuneo in his offices in the presence of Matthew Weiner, an attorney at CGL. Plaintiff told Cuneo that she felt that she was often treated as a foreigner and not given proper respect for that reason. Cuneo responded, "I have repeatedly told you that you are treated as a foreigner and that nobody takes you seriously." Weiner stopped Cuneo from making any further discriminatory comments and instructed Plaintiff to leave the room.

104.   In addition, Cuneo created a hostile work environment by depriving Plaintiff of her opportunities and giving her work opportunities/ credit of her work to other attorneys at CGL, and deliberately leaving Plaintiff out of meetings and conferences.

105.   Cuneo, with the intent to demoralize and harass Plaintiff, deliberately and intentionally ordered repeated investigations and Plaintiff was issued numerous threats (detailed below), all of which created a hostile work environment for Plaintiff.

## CGL's Threats against Plaintiff

106.   In an effort to frighten and intimidate Plaintiff, Cuneo and other Defendants repeatedly threatened Plaintiff's status as a resident of the United States as well as standing as an attorney qualified to practice in the State of New York. The purpose of these threats was to deter Plaintiff from seeking to enforce her legitimate rights as a partner in CGL.

107.   Defendants' threats began after Cuneo lost interest in pursuing international antitrust cases. As alleged above, Cuneo launched a bogus "investigation" of Plaintiff's expenses for three trips to India. Defendants knew that this investigation had no merit given that Plaintiff had accounted to the firm for her expenses and that the the total cost to the firm for 22 weeks of travel was only about $17,000. The sole purpose of this investigation was to demoralize and frighten Plaintiff so that she would raise questions or create problems in connection with CGL's decision to abandon the international antitrust cases.

108.   On September 30, 2011, during the course of business travel with Plaintiff, Cuneo described a lawsuit he had had against an attorney with whom Cuneo had a fee dispute. Cuneo told Plaintiff that this attorney had lost his case against Cuneo "and then he got disbarred." Cuneo implied to Plaintiff that Cuneo himself was the one who had gotten the attorney disbarred and implied that anyone who fought with Cuneo could expect a similar fate.

109.   In 2011 during in a telephone conversation about the Bosch representation, Defendant Davidow threatened Plaintiff that all of the antitrust clients that Plaintiff had brought into the firm were "the firm's clients" and that if she left and took the clients

with her, she would be prosecuted for ethical violations and disbarred. Davidow knew or should have known that clients do not "belong" to any firm and that any client has an absolute right to substitute counsel after an attorney leaves a former firm.

110.    On June 27, 2012, after CGL had determined to oust Plaintiff from her position at the firm, CGL demanded a copy of Plaintiff's Green Card "for our records," even though CGL had affiliated with Plaintiff as a partner since 2008. CGL had never before requested to see Plaintiffs' immigration papers. CGL had no valid reason to have this information and no legal basis to demand it (it is a violation of U.S. immigration law for an employer to demand to review a Green Card as a condition of employment). CGL's demand for Plaintiff's Green Card was a thinly-disguised attempt to frighten Plaintiff by threatening her immigration status in the United States. In fact Plaintiff is a lawful permanent resident of the United States and has at all times maintained legal immigration status here.

111.    After Defendants determined to oust Plaintiff from her position at CGL, and in a further attempt to intimidate and demoralize Plaintiff, they launched yet another bogus "investigation", this time going to the extent of hiring a private investigator. Defendants falsely accused Plaintiff of having violated her ethical responsibilities by "ghost-writing" a brief for a pro se plaintiff. Defendants informed Plaintiff that they intended to inform the New York State Bar Association of any acts of misconduct which this investigation uncovered. The facts surrounding this purported "investigation" are described more fully below.

### **Plaintiff is Squeezed Out of CGL**

112.    On May 7, 2012, Plaintiff received a telephone call from Gilbert and

instructed not to come to her office in New York. Gilbert informed Plaintiff that her office had been sealed and office equipment confiscated, and if she came to the office she would be barred from entering.

113.    That same day, Plaintiff was summoned to attend a meeting with LaDuca and Gilbert at the office of an attorney named Michael Ross ("Ross"). Plaintiff was not provided with any reason why this meeting was being held.

114.    During this meeting, Plaintiff was informed that she had been placed under investigation because of the alleged misconduct in connection with a pro se litigant described above. When Plaintiff asked what specifically she was being investigated for, Ross told her "you had better talk with your lawyer."

115.    Also at this meeting, Gilbert handed Plaintiff a piece of paper that Plaintiff was instructed to sign. This document stated that Plaintiff had been placed on "administrative leave" and that she was not to have any contact with anyone at the firm, or any of the firm's clients, other than the administrator.

116.    Plaintiff was further instructed that she was not to claim any affiliation with CGL from this point forward. She was instructed to prepare memoranda describing the status of all her current or pending cases so that her work can be given to other attorneys.

117.    Plaintiff was given no rights to explain herself and no say in the decision to terminate her affiliation with the firm.

118.    Plaintiff was not given any warning, was not represented by counsel at this meeting, and was in a state of shock at the manner in which she was being treated.

119.    Plaintiff reasonably understood that as of this meeting on May 7, 2012,

she had been fired from her position at CGL.

120.   That afternoon Plaintiff called Gilbert to confirm that her position had been terminated.  Gilbert confirmed that Plaintiff no longer had a position at the firm and instructed to pick up her personal effects after office hours on the same day.

121.   That afternoon, as Gilbert had instructed, Plaintiff came to her former office together a friend who had offered to help to move out her possessions.  Plaintiff was not allowed to enter the office building and had to wait for almost an hour before being escorted by a representative of the building management who observed her at all times.

122.   Before Plaintiff could remove her belongings she was required to sign a document stating the number of boxes she was removing and acknowledging that she had not left any personal property in the office.

123.   As a result of Defendants' forgoing conduct Plaintiff was involuntarily terminated from her position at CGL on May 7, 2012.

**The Aftermath**

124.   After Plaintiff's summary dismissal from CGL, the firm continued to investigate purported allegations of misconduct.  Agents of CGL reviewed all of Plaintiff's emails and insisted that she meet with attorney Ross for another meeting.

125.   Defendants' accusations against Plaintiff were groundless.  Plaintiff did not "ghost-write" anything, and that Plaintiff's assistance to the pro se plaintiff was limited to stylistic suggestions on the draft of a pro se complaint in late hours after the filing deadline was set to expire.

126.   Plaintiff offered this help because the individual in question had been

asking CGL to represent her for more than six months, and CGL had dithered about whether to take on the case – leaving the person with no option but to draft her own pro se complaint at the last minute. Given that CGL was partly responsible for this individual's being in the position of having to draft her own complaint, Plaintiff felt a responsibility to offer limited assistance.

127.    Even if Plaintiff had provided more substantial help to the pro se plaintiff, Defendants should have known that such conduct would have been entirely permissible. There  is no bar under New York law against an attorney helping a pro se plaintiff. *In re Fengling Liu*, 664 F.3d 367 (2d Cir. 2011).

128.    As noted in the *Fengling* case, Plaintiff is to be commended, not criticized, for attempting, even in a limited way, to assist the pro se litigant to prepare her complaint under highly adverse circumstances.

129.    Defendants' purported investigation uncovered no evidence of misconduct.

130.    Even though a cursory review of the case law would have established the complete absence of any misconduct by Plaintiff, CGL expended over $70,000 on their "investigation." Astonishingly, even though Defendants' investigation was bogus and initiated solely for purposes of harassment and intimidation, Defendants sought to charge Plaintiff for the costs of the investigator whom Defendants themselves had hired in an attempt to destroy Plaintiff's career.

131.    The purported "investigation" was simply an opportunity to intimidate and frighten Plaintiff in order to induce her not to vindicate her rights, and an excuse for dismissing her from the firm on a basis that would make Plaintiff, rather than CGL, appear to be at fault.

## Defendants Expropriate Plaintiff's Potential Clients

132.   After Plaintiff's dismissal from CGL, Plaintiff requested that her email account at CGL be closed.

133.   Instead of closing her official email account, Gilbert wrote to Plaintiff on July 31, 2012, stating: "We can't close your account until we have resolved the issues with all of the clients who use you as a contact.  When we are sure that we have protected our clients, we can close the account."

134.   Plaintiff asked what "issues" Gilbert has seen in the past three months, given the fact that Defendants had a list of all clients and their retainer agreements whom Defendants could contact directly.

135.   On information and belief, Plaintiff alleges that CGL used her open email account to communicate with clients or potential clients whom Plaintiff had brought to the firm. Despite repeated requests, Defendants have not provided a list of all the potential clients that Defendants contacted by keeping her email account open.

136.   Plaintiff is entitled to compensation for any new business generated from clients whose communications were utilized by CGL.

## Plaintiffs' Damages

137.   Defendants' conduct toward Plaintiff, described above, represented an intentional, abusive, and unconscionable effort and scheme to demoralize Plaintiff and to deprive her of compensation and opportunities to which she was entitled as a member of CGL.

138.   As a direct and proximate result of Defendants' conduct alleged above, Plaintiff suffered the following:

(a) Plaintiff has never been paid her partnership draw from the time she was expelled from CGL up to the present.

(b) Plaintiff has never been compensated for originating cases which she brought to CGL.

(c) Plaintiff has never been compensated for the hours she worked on pending cases at CGL.

(d) Plaintiff lost her contacts and the opportunity to establish her international and domestic class action practice.

(e) Plaintiff lost the opportunity to establish and build her career.

(f) Plaintiff suffered severe humiliation, shame, embarrassment and mental distress.

139.    Plaintiff has made reasonable efforts to mitigate her damages.  Plaintiff sought assiduously to find other employment as an attorney, but with the post-financial crisis in legal hiring and the stigma of having been terminated from her prior position, Plaintiff was unable to find work.  Plaintiff was forced to open her own law office, at considerable expense, but without any financing and with the trauma of the injustice suffered by her, Plaintiff was not able to make the practice profitable.

## CLAIMS FOR RELIEF

### Count One: Breach of Contract (CGL only)

140.    Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

141.    Plaintiff entered into a contractual agreement with CGL.

142.    Plaintiff's agreement with CGL entitled her:

(a) to a percentage of fees in cases on which she worked or that she had

brought to the firm;

(b) to a reasonable opportunity to work on cases which she had identified

or brought to CGL;

(c) to be protected against termination without cause.

143.    Defendants violated and breached Plaintiff's rights under this agreement

by:

(a) repeatedly denying Plaintiff credit for cases she brought to the firm;

(b) subverting Plaintiff's ability to continue and develop her international

practice;

(c) refusing to allow Plaintiff to litigate cases she had brought to the firm;

(d) manipulating cases so as to eliminate or minimize Plaintiff's

entitlement to compensation;

(e) terminating Plaintiff's affiliation with the firm without good cause to

do so;

(f) refusing to compensate Plaintiff for the value of her investment in

cases; and

 (g) failing to compensate Plaintiff for the value of her partnership share.

144.    Plaintiff was never provided an opportunity to participate in the decision

to oust her from the firm, in violation of her rights as a partner in CGL.

145.    As a direct and proximate cause of this breach of contract, Defendants

caused the Plaintiff to suffer the economic harms described above.

## Count Two: Bad Faith Breach of Contract/
## Breach of Covenant of Good Faith and Fair Dealing

**(CGL only)**

146.    Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

147.    CGL owed a duty of good faith and fair dealing with Plaintiff as an implied term of the firm's contract with Plaintiff.

148.    CGL's conduct toward Plaintiff was undertaken in bad faith and in conscious disregard of her rights.

149.    CGL's actions towards Plaintiff were reckless, malicious, and performed in bad faith and without good cause.

150.    These actions constituted a breach of the covenant of good faith and fair dealing which CGL owed to Plaintiff.

151.    As a direct and proximate result of its violation of the covenant of good faith and fair dealing, Defendants caused Plaintiff to suffer the damages described above.

**Count Three: Violation of Fiduciary Duty (all Defendants)**

152.    Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

153.    As partners, Defendants owed fiduciary obligations to Plaintiff.

154.    As partners, Plaintiff trusted the Defendants who grossly abused their position and influence, and betrayed Plaintiff's confidence.

155.    Defendants violated their fiduciary duty to Plaintiff by improperly depriving her of the opportunity to develop her career on the cases and issues she brought to CGL and building her experience and lodestar, while expropriating the same for themselves.

156.    Defendants violated their fiduciary duty to Plaintiff by improperly squeezing her out of her position as a partner at CGL in a crass attempt to expropriate for themselves the value of her investment in the firm.

157.    As a direct and proximate cause of the aforementioned wrongful conduct of the Defendants, Plaintiff has suffered damages and economic loss.

### Count Four: Unjust Enrichment (All Defendants)

158.    Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

159.    Plaintiff's work at CGL conferred a substantial benefit on Defendants.

160.    Defendants are presently working on cases/issues that Plaintiff brought to CGL, and utilizing these opportunities to build their career, image and reputation.

161.    By minimizing or denying Plaintiff's right to compensation and credit for that work, sealing Plaintiff's office and confiscating her office equipment and starting a bogus investigation, thus creating situations that humiliated and damages Plaintiff's image and reputation, with intent to summarily eject Plaintiff from her position at the firm, Defendants expropriated for themselves valuable benefits which properly belonged to Plaintiff.

162.    As a direct and proximate cause of the aforementioned wrongful conduct of the Defendants, Plaintiff has suffered and continues to suffer damages and economic loss.  Plaintiff has also been deprived of the opportunity to establish her career in the plaintiffs' class action bar by working on the cases she got to CGL, and upon which Plaintiff had expended considerable time and effort.

## Count Five: Unlawful Interference with Contractual Relations
## (All Defendants)

163.    Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

164.    On information and belief, Defendants have disparaged Plaintiff's ethics and professional abilities in communications with potential employers.

165.    Defendants have interfered with Plaintiff's prospective contractual relations.

166.    Defendants' conduct inflicted pecuniary harm on Plaintiff by interfering with her ability to find alternative employment.

167.    Upon information and belief, Defendants have also interfered in Plaintiff's relationships with her potential clients and working relationship with class action attorneys in the plaintiff's class action bar.

168.    As a direct and proximate cause of the aforementioned wrongful conduct of the Defendants, Plaintiff has suffered and continues to suffer damages and economic loss.

## Count Six: Fraudulent Inducement
## (All Defendants)

169.    Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

170.    Cuneo and other Defendants induced Plaintiff to forego other potentially lucrative opportunities by promising that she could achieve a significantly higher income doing interesting, socially valuable work at CGL.

171.    Thereafter Cuneo and others induced Plaintiff to remain at CGL for more

than four years, and to work thousands of hours – often incurring 80 hour weeks – by repeatedly indicating how successful the firm was, how wealthy the senior partners were, and how much money Plaintiff could expect when her cases paid off.

172.    Cuneo, in particular, frequently boasted of the fact that he took home four or five million dollars a year, that he enjoyed a luxurious lifestyle with homes in Manhattan and Capitol Hill, that he was friends with powerful politicians, and that he was married to a famous Washington D.C. journalist.

173.    These inducements were fraudulent insofar as Defendants never intended to provide Plaintiff with the compensation to which she was entitled.

174.    As a direct and proximate cause of the aforementioned wrongful conduct of the Defendants, Plaintiff has suffered and continues to suffer damages and economic loss.

## Count Seven: Unlawful Threats
### (All Defendants)

175.    Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

176.    Defendants unlawfully intimidated Plaintiff by:

(a) threatening to have her disbarred if she represented any of the firm's clients after leaving her position at CGL;

(b) launching a bogus "investigation" of alleged misconduct in providing assistance to a pro se plaintiff – conduct which in fact was perfectly proper and legal;

(c) demanding to see Plaintiff's Green Card, thus suggesting that they would reveal any immigration problems to the authorities.

177.    As a direct and proximate cause of the aforementioned wrongful conduct

of the Defendants, Plaintiff has suffered and continues to suffer damages and economic loss.

### Count Eight: Violation of New York's Human Rights Law
### (All Defendants)

178.   Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

179.   Defendants violated New York State Human Rights Law (Executive Law §296) and New York's City Human Rights Law (§ 8-107 et seq. of the Administrative code of the City of New York) of by discriminating against Plaintiff in in her compensation and in the terms, conditions or privileges of her employment at CGL on the basis of her national origin and citizenship status.

180.   Defendants violated New York State Human Rights Law (Executive Law §296) and New York's City Human Rights Law (§ 8-107 et seq. of the Administrative code of the City of New York) by improperly terminating Plaintiff from her affiliation with CGL on the basis of her national origin and citizenship status.

181.   As a direct and proximate cause of the aforementioned wrongful conduct of the Defendants, Plaintiff has suffered and continues to suffer damages and economic loss.

### Count Nine: Negligent and Intentional Infliction of Emotional Distress
### (All Defendants)

182.   Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

183.   Defendants intentionally and maliciously sought to inflict severe

emotional distress on Plaintiff by:

      (a) denigrating her legal abilities;

      (b) mocking her accent;

      (c) abusing Plaintiff in person and on the telephone;

      (d) insulting Plaintiff's Indian heritage;

      (e) threatening her right to practice law;

      (f) threatening her immigration status;

      (g) launching a bogus investigation into Plaintiff's lawful conduct;

      (h) summarily and illegally discharging Plaintiff, confiscating her computer, reading her emails, and locking her out of her office.

184.    As a result of this conduct, Plaintiff has suffered serious, lasting, and debilitating emotional distress that has significantly interfered with her ability to function or to seek alternative employment.

185.    Defendants' purpose in inflicting this severe emotional distress was to demoralize Plaintiff so as to disable her from pursuing her legal rights against CGL and the individual Defendants.

186.    As a direct and proximate cause of the aforementioned wrongful conduct of the Defendants, Plaintiff has suffered and continues to suffer damages and economic loss.

## Count Ten: Unfair Competition
## (All Defendants)

187.    Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

188.    Defendants intentionally and with the intent to deprive Plaintiff of her

lodestar compensation and to expropriate for himself all of Plaintiff's opportunities and hard work, started an unfair competition with Plaintiff.

189.    To this end, Defendant Cuneo deliberately and intentionally, started giving credit of Plaintiff's hard work/ideas/leads to other attorneys and in this manner sought to misappropriate Plaintiff's labors, skills and good will.

190.    Defendant Cuneo, in gross misuse of his position, then started to appoint his associates as designated attorneys on Plaintiff's cases, and deliberately and intentionally left Plaintiff out of the meetings and conferences.

191.    In so doing, Defendants sought to misappropriate Plaintiff's opportunities for themselves, and thus denying Plaintiff the right to use her opportunities for herself.

192.    Defendant Cuneo is lead counsel on cases which Plaintiff had originated at CGL and is establishing his own career.  But for Plaintiff's hard work and the time frame in which she brought the cases to the firm, Defendants would not have had any of the benefits and would not be lead counsel on the antitrust cases and the mortgage modification cases, on which Defendants are presently establishing their own career.

193.    Defendants, with the intent to expropriate Plaintiff's leads on potential cases, falsely assured her that no one will use her ideas/leads without her consent.   After ousting Plaintiff from the firm, Defendants deliberately and intentionally filed cases based on the very issues that Plaintiff had got to the firm.

194.    Defendants' actions were calculated to take for themselves all of Plaintiff's opportunities, credit of her work, and compensation to her exclusion.

195.    Defendants misappropriated Plaintiff's work/cases with the intent to compete against the Plaintiff's right to work on her own cases and build her career and

lodestar, and also misappropriate her compensation.

196.    Defendants also improperly kept Plaintiff's email account open, with intent to contact potential clients and unfairly compete with Plaintiff and take advantage of her hard work.

197.    Defendants' conduct in expropriating for themselves the value of Plaintiff's contributions was unjust, unfair, and unconscionable.

198.    As a direct and proximate cause of the aforementioned wrongful conduct of the Defendants, Plaintiff has suffered and continues to suffer damages and economic loss.

## Count Eleven: Disparagement/Unlawful Interference with Prospective Contracts (All Defendants)

199.    Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

200.    After her summary dismissal from CGL, Plaintiff made assiduous efforts to locate another job.

201.    On May 14, 2012, Gretchen Cappio ("Cappio"), a partner at Keller Rohrback, a leading plaintiffs' class action firm, contacted Plaintiff and expressed an interest in Keller Rohrback hiring Plaintiff given that Plaintiff was no longer working at CGL. Cappio had encountered Plaintiff in the course of work on the JPMorgan Chase Mortgage Modification MDL case. Cappio told Plaintiff that Plaintiff was very smart and that Keller Rohrback would be interested in discussing a possible affiliation. At their request, Plaintiff supplied her resume and interviewed with the Keller Rohrback firm.

202.    In July 2012, Cappio and other lead counsel met in Washington D.C. with Cuneo to interview expert witnesses in the JP Morgan Mortgage Modification MDL.

43

203.    Thereafter, after returning from the meeting in Washington with Cuneo, Cappio informed Plaintiff that Keller Rohrback did not have any permanent position for her.

204.    On information and belief, Keller Rohback and other potential employers have been deterred from hiring Plaintiff because of disparaging remarks made by Cuneo and other Defendants.

205.    Upon information and belief, Defendants and /or their agents have also interfered with Plaintiff's relationship with potential clients and work relationships with class action attorneys in the plaintiff's bar.

### Count Twelve: Title VII of the Civil Rights Act
### (Against CGL)

206.    Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

207.    CGL is an "employer" within the meaning of Title VII of the Civil Rights Act of , 42 U.S.C. §2000e.

208.    Plaintiff is an "individual" and an "employee" within the meaning of Title VII of the Civil Rights Act of , 42 U.S.C. §2000e.

209.    By virtue of the actions alleged above, CGL discharged Plaintiff and otherwise discriminated against Plaintiff with respect to her compensation, terms, conditions, or privileges of employment, because of Plaintiff's race, color, religion, sex, or national origin.

210.    By virtue of the actions alleged above, CGL limited, segregated or classified Plaintiff so as to deprive or tend to deprive her of employment opportunities or otherwise adversely affect her status as an employee, because of her race, color, religion,

sex, or national origin.

### Count Thirteen: Civil RICO (Cuneo, Gilbert and LaDuca)

211.    Plaintiff incorporates by reference the allegations contained in the proceeding paragraphs as though fully set forth herein.

212.    CGL is an "enterprise" engaged in interstate commerce, as that term is defined in the civil RICO statute, 18 U.S.C. § 1961 *et. seq.*

213.    At all times relevant herein, the enterprise CGL was composed by the association in fact of (a) Cuneo, Gilbert and LaDuca ("RICO Defendants"), who participated in the operation and management of CGL, and (b) their former or current members, employees, and associated individuals; and who were, at all relevant times, linked with overlapping leadership, structural and financial ties, and continuing coordination.

214.    The RICO Defendants and others, knowingly and intentionally, aided and abetted, conspired and agreed, with each other, to attempt to commit, and each of them, in fact, did commit, as principals, the predicate acts of racketeering detailed hereunder, and in doing so violated the RICO prohibitions defined in 18 U.S.C. § 1962.  Each RICO Defendant violated 18 U.S.C. § 2 by seeking to, and aiding and abetting each of the other co-conspirators in the commission of the predicate acts of racketeering detailed hereunder, committed in violation of 18 U.S.C. § 1962.

215.    The RICO Defendants and others, individually and in concert, knowingly, intentionally and unlawfully, deprived Plaintiff of her position at CGL and sought to expropriate for themselves the substantial value of Plaintiff's contribution to GCL (including for origination of matters at CGL) through a pattern of criminal conduct

involving, at a minimum, repeated fraudulent representations to courts around the country regarding the status of attorneys at CGL who worked in class action cases brought by CGL.

216.    Specifically, RICO Defendants falsely represented in numerous courts around the country that attorneys associated with CGL were "partners" when the RICO Defendants and the involved attorneys knew that they were not in fact partners or members of CGL, rather employees whose positions at the firm were terminable at will, who did not have any equity interest, bear any responsibility for any losses, expenses or other liabilities of the firm, or have any management responsibilities or authority at CGL.

217.    For example, on July 30, 2010, Defendant LaDuca represented in connection with a fee application submitted under penalty of perjury by their Co-Lead Counsel Michael McShane in *In re Certainteed Corp. Roofing Shingle Product Liability Litigation*, MDL 1817 (E.D. Pa. 2007) that for the reporting period from August 1, 2006-March 2, 2010, attorneys Sandra Cuneo, Daniel Cohen, Matthew Miller, and Plaintiff were "partners" at CGL:

## CertainTeed Litigation
## Time Report

FIRM NAME:     Cuneo Gilbert & LaDuca, LLP
MONTH:         August 1, 2006 – July 15, 2010

|  | Status | Monthly Total Hours | Hourly Rate | Monthly Lodestar |
|---|---|---|---|---|
| Jonathan Cuneo | P | 145.50 | $650 | $94,575.00 |
| Pamela Gilbert | P | 5.0 | $575 | $2,875.00 |
| Charles LaDuca | P | 1761.00 | $475 | $836,475.00 |
| David Stanley | P | 0.25 | $625 | $156.25 |
| Sandra Cuneo | P | 377.50 | $575 | $217,062.50 |
| Sandra Cuneo | P | 1346.25 | $400 | $538,500.00 |
| Mike Lenett | P | 0.25 | $575 | $143.75 |
| Steve Berk | P | 125.00 | $575 | $71,875.00 |

| Daniel Cohen | P | 102.75 | $575 | $59,081.25 |
|---|---|---|---|---|
| Jon Tostrud | OC | 9.00 | $500 | $4,500.00 |
| Matthew Miller | P | 190.70 | $500 | $95,350.00 |
| Preetpal Grewal | P | 24.50 | $500 | $12,250.00 |
| William Anderson | A | 6.25 | $400 | $2,500.00 |
| Alexandra Warren | A | 848.75 | $400 | $339,500.00 |
| Brendan Thompson | A | 103.75 | $325 | $33,718.75 |
| Brendan Thompson | PL | 142.75 | $325 | $32,118.75 |
| Annie Reiner | PL | 86.50 | $150 | $12.975.00 |
| Laura Cheek | PL | 2.25 | $150 | $337.50 |
| Aaron Garza | PL | 8.50 | $175 | $1,487.50 |
| Jonathan Alexander | PL | 16.75 | $150 | $2,512.50 |
| Melissa Schaefer | PL | 106.75 | $150 | $16,012.50 |
| Pema Levy | PL | 22.00 | $150 | $3300.00 |
| Tylor Asen | PL | 0.75 | $150 | $112.50 |
| Sean Quinn | PL | 40.75 | $150 | $6112.50 |
| Annabelle Burgett | PL | 4.0 | $150 | $600.00 |
| **TOTAL** | | **5,477** | | **$2,384,287.50** |

A copy of the Declaration of Co-Lead Counsel Michael McShane in Support of Class

Counsel's Updated Petition for Fees and Expenses submitted in *In re Certainteed Corp.*

*Roofing Shingle Product Liability Litigation*, MDL 1817 (E.D. Pa. 2007), along with the

relevant exhibits is attached hereto as Exhibit 1.  This declaration states that it "is

submitted by and with the approval of the Leadership Counsel . . . Charles LaDuca of

Cuneo Gilbert & LaDuca . . ." Id. at ¶ 3.

      218.    On February 18, 2009, upon information and belief, Defendant Cuneo

represented in connection with a fee application submitted under penalty of perjury

through their employee Daniel Cohen in *In re. Air Cargo Shipping Services Antitrust*

*Litigation*, MDL 1775 (E.D.N.Y. 2006), that for the reporting period from inception of

the case to December 31, 2008, Daniel Cohen and others were "partners" at CGL.  A

copy of the Supplemental Declaration of Daniel Cohen in Support of Cuneo Gilbert &

LaDuca, LLP's Application for Attorneys' Fees and Reimbursement of Expenses for

Work Performed with Respect to the Lufthansa Settlement, also attached hereto as Exhibit 2.

219.    On May 10, 2011, upon information and belief, Defendant Cuneo represented in connection with a fee application submitted under penalty of perjury through their employee Daniel Cohen in *In re. Air Cargo Shipping Services Antitrust Litigation*, MDL 1775 (E.D.N.Y. 2006), that for the reporting period December 6, 2006 – December 31, 2010, Daniel Cohen, Brent Walton and Plaintiff were "partners" at CGL.

### SUMMARY TIME REPORT – December 6, 2006 – December 31, 2010

Firm Name:        Cuneo Gilbert & Laduca, LLP

| Name/Status | Total Hours | Hourly Rate | Current Lodestar |
|---|---|---|---|
| Jonathan W. Cuneo (P) | 10.50 | $650 | $6,825.00 |
| Daniel Cohen (P) | 91.95 | $575 | $52,871.25 |
| Daniel Cohen (P) | 601.85 | $350 | $210,647.50 |
| Jon Tostrud (OC) | 269.90 | $500 | $134,950.00 |
| Jon Tostrud (OC) | 195.35 | $350 | $68,372.50 |
| Brent Walton (P) | 80.50 | $500 | $40,250.00 |
| Preetpal Grewal (P) | 442.40 | $350 | $154,840.00 |
| Brendan Thompson (A) | 3.00 | $325 | $975.00 |
| Sean Quinn (PL) | 4.25 | $150 | $637.50 |
| Melissa Schaefer (PL) | 0.50 | $150 | $75.00 |
| Doran Lidsky (PL) | 353.00 | $150 | $52,950.00 |
| **TOTAL** | | **2,053.20** | **$723,393.75** |

Key:
Partner (P)
Of Counsel (OC)
Associate/Attorney (A)
Paralegal (PL); Law Clerk (LC)
Investigator (I).

A copy of this Declaration of Daniel M. Cohen in Support of Cuneo Gilbert & LaDuca, LLP's Application for Attorneys' Fees and Reimbursement of Expenses for the Period December 6, 2006 Through December 31, 2010 submitted in *In re. Air Cargo Shipping Services Antitrust Litigation*, MDL 1775 (E.D.N.Y. 2006) is attached hereto as Exhibit 3.

220. On May 10, 2012, Defendant Cuneo represented in connection with a fee application, under penalty of perjury, to the United States District Court for the District of Columbia in *In re Long-Distance Telephone Service Federal Excise Tax Refund Litigation*, MDL 1798 (D.D.C. 2007) that Robert Cynkar and Daniel Cohen are partners at CGL:

**I.R.S. Communications Excise Tax Litigation**
**TIME REPORT**
**Reporting Period: November 1, 2005-May 7, 2012**

| NAME | RATE | CUMULATIVE HOURS | CUMULATIVE LODESTAR |
|---|---|---|---|
| Jonathan W. Cuneo (P) | $800 | 705.75 | $564,600.00 |
| Pamela Gilbert (P) | $575 | 164.15 | $94,386.25 |
| Robert Cynkar (P) | $750 | 452.50 | $339,375.00 |
| Charles Tiefer (OC) | $750 | 85.10 | $63,825.00 |
| Daniel Cohen (P) | $595 | 21.50 | $12,792.50 |
| William Anderson (A) | $450 | 977.75 | $439,987.50 |
| Melissa Schaefer (PL) | $150 | 67.75 | $10,162.50 |
| **TOTAL** | | **2,474.50** | **$1,525,128.75** |

Key:
(P) Partner                    (LC)   Law Clerk
(O)Of Counsel              (LA)   Legal Assistant
(A)Associate                 (C)     Consultant
(PL)Paralegal

A copy of this Declaration of Jonathan W. Cuneo in Support of Motion for Award of Attorney's Fees and Litigation Expenses submitted in *In re Long-Distance Telephone*

*Service Federal Excise Tax Refund Litigation*, MDL 1798 (D.D.C. 2007) is attached

hereto as Exhibit 4.

      221.    On June 19, 2012, Defendant LaDuca represented in connection with a fee

application submitted under oath and penalty of perjury by their Co-Counsel Shawn M.

Raiter in *In re Uponor, Inc. F1807 Plumbing Product Liability Litigation*, MDL 2247 (D.

Minn. 2011) that for the reporting period from August 1, 2008-June 4, 2012, attorneys

Joel Davidow, Robert Cynkar, Daniel Cohen, Sandra Cuneo, Matthew Miller, Matthew

Weiner and Plaintiff are "partners" at CGL:

**In Re: Uponor, Inc. F1807 Plumbing Products Liab. Litig.**
**Court file No. 11-mdl-2247 (ADM/JJK)**

**LODESTAR REPORT**

Firm:              **Cuneo Gilbert & LaDuca, LLP**
Location:          **Washington, D.C.**
Reporting Period: **August 1, 2008-June 4, 2012**

| Professional | Status | Hourly Rate | Total Hours to Date | Total Lodestar to Date |
|---|---|---|---|---|
| Jonathan Cuneo | P | $800.00 | 6.50 | $5,200.00 |
| Pamela Gilbert | P | $575.00 | 2.00 | $1,150.00 |
| Charles LaDuca | P | $550.00 | 131.75 | $72,462.50 |
| Joel Davidow | P | $750.00 | .25 | $187.50 |
| David Stanley | P | $750.00 | .25 | $187.50 |
| Robert Cynkar | P | $750.00 | .50 | $187.50 |
| Michael Lenett | P | $575.00 | .25 | $375.00 |
| Daniel Cohen | P | $595.00 | 3.25 | $143.75 |
| Sandra Cuneo | P | $575.00 | 3.50 | $287.50 |
| Matthew Miller | P | $650.00 | .50 | $325.00 |
| Preetpal Grewal | P | $575.00 | 4.25 | $2,443.75 |
| Matthew Weiner | P | $700.00 | .25 | $175.00 |
| Alexandra Warren | A | $500.00 | 8.50 | $4,250.00 |
| William Anderson | A | $450.00 | .25 | $112.50 |
| Beatrice Yakubu | A | $375.00 | .25 | $93.75 |
| Jen Kelly | A | 375.00 | .25 | $93.75 |
| Victoria Romanenco | A | $375.00 | .25 | $93.75 |
| Brendan Thompson | A | $375.00 | 161.00 | $60,375.00 |
| Melissa Schaefer | PL | $150.00 | .25 | $37.50 |

| | | | | |
|---|---|---|---|---|
| Annie Reiner | LC | $200.00 | 1.25 | $250.00 |
| Gabe Stutman | LC | $200.00 | .25 | $50.00 |
| Sean Quinn | PL | $150.00 | 2.50 | $375.00 |
| Laura Cheek | PL | $150.00 | 3.25 | $487.50 |
| Taylor Asen | PL | $150.00 | .25 | $37.50 |
| Navarro Copes | PL | $150.00 | .25 | $37.50 |
| Brigid Davis | PL | $150.00 | 5.50 | $825.00 |
| **TOTAL** | | | | **$152,138.75** |

> Partner (P)
> Associate (A)
> Paralegal (PL)
> Administrative (Admin.)
> Law Clerk (LC)

A copy of this Affidavit of Shawn M. Raiter in Support of Motion for Award of Attorney's Fees and Costs and Payment of Service Awards to the Named Plaintiffs submitted in *In re Uponor, Inc. F1807 Plumbing Product Liability Litigation*, MDL 2247 (D. Minn. 2011), along with the relevant exhibits is attached hereto as Exhibit 5.

222.    On June 22, 2012, upon information and belief, Defendant Cuneo represented in connection with a fee application submitted under penalty of perjury through their employee Daniel Cohen in *In re. Air Cargo Shipping Services Antitrust Litigation*, MDL 1775 (E.D.N.Y. 2006), that for the reporting period January 1, 2011 – December 31, 2011, Daniel Cohen, Brent Walton and Plaintiff were "partners" at CGL.

**SUMMARY TIME REPORT – January 1, 2011 – December 31, 2011**

Firm Name:    Cuneo Gilbert & Laduca, LLP

| Name/Status | Hourly Rate | Cumulative Hours | Cumulative |
|---|---|---|---|
| Jonathan W. Cuneo (P) | $800 | 10.50 | $6,825.00 |
| Daniel Cohen (P) | $595 | 91.95 | $52,871.25 |
| Daniel Cohen (P) | $350 | 737.55 | $258,142.50 |
| Jon Tostrud (OC) | $600 | 301.40 | $153,850.00 |

| | | | |
|---|---|---|---|
| Jon Tostrud (OC) | $350 | 245.15 | $85,802.50 |
| Brent Walton (P) | $500 | 80.50 | $40,250.00 |
| Preetpal Grewal (P) | $350 | 442.40 | $154,840.00 |
| Brendan Thompson (A) | $375 | 3.00 | $975.00 |
| Sean Quinn (PL) | $150 | 4.25 | $637.50 |
| Melissa Schaefer (PL) | $150 | .50 | $75.00 |
| Doran Lidsky (PL) | $150 | 353.00 | $52,950.00 |
| **TOTAL** | | **2,270.20** | **$807,218.75** |

Partner (P); Of Counsel (OC); Associate/Attorney (A); Paralegal (PL); Law Clerk (LC)
Investigator (I).

A copy of this Declaration of Daniel M. Cohen in Support of Cuneo Gilbert & LaDuca,

LLP's Application for Attorneys' Fees and Reimbursement of Expenses submitted in *In*

*re. Air Cargo Shipping Services Antitrust Litigation*, MDL 1775 (E.D.N.Y. 2006) is

attached hereto as Exhibit 6.

     223.    On January 18, 2013, Defendant LaDuca represented under penalty of

perjury to the United States District Court for the District of Columbia in *In re.*

*LivingSocial Marketing and Sales Practices Litigation*, MDL 2254 (D.D.C. 2011) that

Robert Cynkar, Joel Davidow, Michael Flannery, Matthew Wiener, Matthew Miller,

Sandra Cuneo and Plaintiff were partners at CGL:

| NAME | | HOURS | RATE | LODESTAR |
|---|---|---|---|---|
| Jonathan Cuneo | (P) | 6.75 | $800 | $5,400 |
| Pamela Gilbert | (P) | 1.75 | $575 | $1,006.25 |
| Charles LaDuca | (P) | 233.75 | $600 | $140,250 |
| Robert Cynkar | (P) | 1.75 | $600 | $937.50 |
| Joel Davidow | (P) | 8.50 | $750 | $937.50 |
| Michael Flannery | (P) | .75 | $700 | $525 |
| Matthew Wiener | (P) | 16.75 | $700 | $11,725 |
| Matthew Miller | (P) | 1.75 | $700 | $1,225 |
| Sandra Cuneo | (P) | 14.50 | $625 | $9,062.50 |
| Preetpal Grewal | (P) | .25 | $575 | $143.75 |
| Alexandra Warren | (A) | 19.75 | $525 | $10,368.75 |

| | | | | |
|---|---|---|---|---|
| William Anderson | (A) | 643.25 | $500 | $321,625 |
| Victoria Romenenko | (A) | 7.50 | $450 | $3,375 |
| Brendan Thompson | (A) | 1.75 | $450 | $787.50 |
| Beatrice Yakubu | (A) | 5.25 | $375 | $1,968.75 |
| Jennifer Kelly | (A) | 1.50 | $375 | $562.50 |
| Katherine Van Dyck | (A) | 5.40 | $375 | $2,025.00 |
| Paralegal | (PL) | 215.5 | $200 | $43,100 |
| **TOTAL** | | **1185.90** | | **$560,462.50** |

    (P)     Partners
    (A)     Associate
    (PL)   Paralegal

A copy of this Declaration of Charles J. LaDuca in Support of Motion for Award of Attorney's Fees and Reimbursement of Expenses submitted in In re. *LivingSocial Marketing and Sales Practices Litigation*, MDL 2254 (D.D.C. 2011) is attached hereto as Exhibit 7.

    224.    On February 2, 2013, Defendant LaDuca in connection with a fee application submitted under oath and penalty of perjury by their Co-Counsel Shawn M. Raiter in *In re. Zurn Pex Plumbing Products Liability Litigation*, MDL 2247 (D. Minn. 2008) that for the reporting period from Inception – February 19, 2013, attorneys Joel Davidow, Robert Cynkar, Michael Flannery, Sandra Cuneo, Daniel Cohen, Matthew Weiner, Matthew Miller, and Plaintiff were "partners" at CGL:

**In Re. Zurn Pex Plumbing Products Liability Litigation**
**Court File No. 08-MDL-1958 (ADM/AJB)**

**LODESTAR REPORT**

    Firm:     Cuneo Gilbert & LaDuca, LLP
    Reporting Period: Inception – February 19, 2013

| Professional | Status | Hourly Rate | Total Hours to Date | Total Lodestar to Date |
|---|---|---|---|---|
| Jonathan Cuneo | P | $800.00 | 12.25 | $9800.00 |
| Pamela Gilbert | P | $575.00 | 3.5 | $2012.50 |
| Charles LaDuca | P | $600.00 | 333.25 | $199,950.00 |
| Joel Davidow | P | $750.00 | .75 | $562.50 |

| | | | | |
|---|---|---|---|---|
| David Stanley | P | $750.00 | .25 | $187.50 |
| Robert Cynkar | P | $750.00 | 3.25 | $2437.50 |
| Michael Flannery | P | $700.00 | .25 | $175.00 |
| Sandra Cuneo | P | $625.00 | 113 | $70625.00 |
| Michael Lennet | P | $575.00 | 11.25 | $6468.75 |
| Daniel Cohen | P | $595.00 | 3.50 | $2,082.50 |
| Brent Walton | P | $500.00 | .50 | $250.00 |
| Matthew Weiner | P | $700.00 | 1 | $700.00 |
| Matthew Miller | P | $700.00 | 3.25 | $2275.00 |
| Preetpal Grewal | P | $575.00 | 2 | $1150.00 |
| Jon Tostrud | OC | $600.00 | .5 | $300.00 |
| William Anderson | A | $500.00 | 1.5 | $750.00 |
| Alexandra Warren | A | $525.00 | 7.25 | $3806.25 |
| Beatrice Yakubu | A | $375.00 | .75 | $281.25.00 |
| Jen Kelly | A | $375.00 | 1 | $375.00 |
| Victoria Romanenco | A | $450.00 | 6 | $2700.00 |
| Brendan Thompson | A | $450.00 | 137 | $61,650.00 |
| Brendan Thompson | LC | $200.00 | 47.25 | $9450.00 |
| Gabe Stutman | LC | $200.00 | 2 | $400.00 |
| Tell Illos | LC | $200.00 | 22 | $4400.00 |
| Melissa Schaefer | PL | $150.00 | 11.5 | $1725.00 |
| Pema Levy | PL | $150.00 | .25 | $37.50 |
| Jonathan Alexander | PL | $150.00 | 7.5 | $1125.00 |
| Sean Quinn | PL | $150.00 | 2.5 | $375.00 |
| Annie Reiner | LC | $200.00 | 2 | $400.00 |
| Laura Cheek | PL | $150.00 | 1 | $150.00 |
| Navarro Copes | PL | $150.00 | .5 | $75.00 |
| Brigid Davis | PL | $150.00 | .5 | $75.00 |
| Ben Turner | PL | $150.00 | .75 | $112.50 |
| Taylor Asen | PL | $150.00 | 4.25 | $637.50 |
| TOTALS | | | | $387,501.25 |

Partner (P)
Associate (A)
Paralegal (PL)
Administrative (Admin)
Counsel (OC)
Law Clerk (LC)

A copy of this Affidavit of Shawn M. Raiter in Support of Motion for Final Approval of Class Action Settlement and in Support of Motion for an Award for Attorney's Fees and Costs and Payment of Service Awards to the Named Plaintiffs submitted in *In re. Zurn*

*Pex Plumbing Products Liability Litigation*, MDL 2247 (D. Minn. 2008), along with the relevant exhibits is attached hereto as Exhibit 8.

225.    On April 10, 2013, Defendant LaDuca represented under penalty of perjury to the United States District Court for the District of Illinois in *In re: Navistar Diesel Engine Products Liability Litigation*, MDL 2223 (N.D. Ill 2011) that for the reporting period from Inception to March 2013 attorneys Robert Cynkar, Matthew Weiner, Matthew Miller, Sandra Cuneo, Preetpal Grewal, Alexandra Warren were junior partners at CGL, and attorneys Victoria Romanenko, Jen Kelly, Brendan Thompson, and Beatrice Yakubu were senior attorneys at CGL:

### FORD 6.0 DIESEL ENGINE TIME SUMMARY REPORT

**Titles:**
(SP) Senior Partner/Shareholder
(JP) Junior Partner/Shareholder        (LC) Law Clerk
                                       (CA) Contract Attorney
(SA) Senior Associate                  (OC) Of Counsel
(JA) Junior Associate                  (PL) Paralegal
FIRM NAME:        Cuneo Gilbert & LaDuca, LLP
REPORTING PERIOD:   Inception – March 2013

| NAME (Title) | RATE | CUMULATIVE HOURS | CUMULATIVE LODESTAR |
|---|---|---|---|
| Jonathan Cuneo (SP) | $800 | 0.60 | $5,400 |
| Pamela Gilbert (SP) | $575 | 0.60 | $345.00 |
| Charles LaDuca (SP) | $600 | 51.10 | $30,660.00 |
| Robert Cynkar (JP) | $600 | 0.60 | $450.00 |
| Matthew Wiener (JP) | $700 | 0.60 | $420.00 |
| Matthew Miller (JP) | $700 | 1.85 | $1295.00 |
| Jon Tostrud (OC) | $600 | 0.50 | $300.00 |
| Sandra Cuneo (JP) | $625 | 0.60 | $375.00 |
| Preetpal Grewal (JP) | $575 | 0.60 | $345.00 |
| Alexandra Warren (JP) | $525 | 0.30 | $157.50 |
| Victoria Romenenko (SA) | $450 | 104.85 | $47,182.50 |
| Jennifer Kelly (SA) | $450 | 0.60 | $270.00 |
| Brendan Thompson (SA) | $450 | 4.10 | $1,845.00 |
| Beatrice Yakubu (SA) | $375 | 0.60 | $225.00 |

| Attorney Totals | | 167.50 | $84,350.00 |
|---|---|---|---|
| Annie Reiner (LC) | $200 | 5.60 | $1,120.00 |
| Laura Cheeks | $150 | 2.60 | $390.00 |
| Navarro Copes | $150 | 1.30 | $195.00 |
| Gabe Stutman | $200 | .30 | $60.00 |
| TOTALS | | 177.30 | $86,115.00 |

A copy of this Declaration of Charles J. LaDuca in Support of Plaintiffs' Motion for Award of Attorneys' Fees and Reimbursement of Expenses in *In re. Navistar Diesel Engine Products Liability Litigation*, MDL 2223 (N.D. Ill 2011), along with the relevant exhibits is attached hereto as Exhibit 9.

226.    On March 11, 2013, Defendant LaDuca represented under penalty of perjury to the United States District Court for the District of Columbia in *In re LivingSocial Marketing and Sales Practices Litigation*, MDL 2254 (D.D.C. 2011) that for the reporting period from Inception to January 15, 2013 attorneys Robert Cynkar, Joel Davidow, Michael Flannery, Matthew Weiner, Matthew Miller, Sandra Cuneo, and Plaintiff were partners at CGL:

**LIVINGSOCIAL**
**Cuneo Gilbert & Laduca, LLP**
Time Report from Inception through January 15, 2013

| Name | Title | Year | Hours | Rate | Lodestar |
|---|---|---|---|---|---|
| Jonathan Cuneo | Partner | 2011 | 4.75 | 650 | $3,087.50 |
| | | 2012[1] | 2.00 | 800 | $1,600.00 |
| Pamela Gilbert | Partner | 2011-2012 | 1.75 | 575 | $1,006.25 |
| Charles LaDuca | Partner | 2011 | 119 | 525 | $62,475.00 |
| | | 2012 | 114.75 | 550 | $63,112.50 |
| Robert Cynkar | Partner | 2011 | .50 | 625 | $312.50 |
| | | 2012 | .75 | 750 | $562.50 |
| Joel Davidow | Partner | 2011 | 7.50 | 650 | $4,875.00 |
| | | 2012 | 1.00 | 750 | $525.00 |

| Michael Flannery | Partner | 2012 | .75 | 700 | $525.00 |
|---|---|---|---|---|---|
| Matthew Weiner | Partner | 2011 | 15.25 | 500 | $250.00 |
| | | 2012 | 1.50 | 650 | $812.50 |
| Sandra Cuneo | Partner | 2011-2012 | 14.50 | 575 | $8,350.00 |
| Preetpal Grewal | Partner | 2011-2012 | .25 | 575 | $143.75 |
| Alexandra Warren | Associate | 2011 | 3.25 | 400 | $1,300.00 |
| | | 2012 | 16.50 | 500 | $8,250.00 |
| William Anderson | Associate | 2011 | 88 | 400 | $35,200.00 |
| | | 2012 | 555.25 | 450 | $249,862.50 |
| Beatrice Yakubu | Associate | 2012 | 5.25 | 375 | $1,968.75 |
| Victoria Romanenko | Associate | 2011 | 6.25 | 350 | $2,187.50 |
| | | 2012 | 1.25 | 375 | $468.75 |
| Brendan Thompson | Associate | 2011 | .25 | 325 | $81.25 |
| | | 2012 | 1.50 | 375 | $562.50 |
| Jennifer Kelly | Associate | 2012 | 1.50 | 375 | $562.50 |
| Katherine Van Dyke | Associate | 2012 | 5.40 | 375 | $2,025.00 |
| Anne Reiner | Paralegal | 2011 | 12.50 | 150 | $1,875.00 |
| | | 2012 | 18.25 | 200 | $3,650.00 |
| Dasha Gorlov | Paralegal | 2012 | 43.75 | 200 | $8,750.00 |
| Daniel Black | Paralegal | 2012 | 1.75 | 200 | $350.00 |
| Molly Green | Paralegal | 2012 | 4.50 | 200 | $900.00 |
| Claire Peters | Paralegal | 2012 | 3.50 | 200 | $700.00 |
| Gabe Stutman | Paralegal | 2012 | 14.75 | 200 | $2,950.00 |
| Vasiliki Katsarou | Paralegal | 2012 | 2.00 | 200 | $400.00 |
| Tess Illos | Paralegal | 2012 | 9.50 | 200 | $1,900.00 |
| Laura Cheek | Paralegal | 2011 | 10.50 | 150 | $1,575.00 |
| | | 2012 | 94.50 | 200 | $18,900.00 |

[1] In 2012 through present, the firm has brought its hourly rates in line with other comparable firms.

A copy of this Supplemental Declaration of Charles J. LaDuca in Support of Plaintiffs'

Motion for Award of Attorneys' Fees and Reimbursement of Expenses in *In re*

*LivingSocial Marketing and Sales Practices Litigation*, MDL 2254 (D.D.C. 2011) is

attached hereto as Exhibit 10.

227.   In each of the aforementioned cases and in others presently unknown to

Plaintiff, these representations were communicated by wire-communication modalities,

as well as by United States mail.

228.   Through the conduct described herein above, the RICO Defendants, in the

conduct of CGL's affairs, knowingly and intentionally engaged in activities affecting interstate commerce.

229.    RICO Defendants represented Defendants Davidow, Cynkar, Flannery, Cohen, Miller, Sandra Cuneo, and other attorneys at CGL as partners, despite the fact that they knew and understood that these individuals were not "partners" but rather employees at will.  Each of these individuals Joel Davidow, Robert Cynkar, Michael Flannery, Daniel Cohen, Matthew Miller, Sandra Cuneo have filed declarations before this Court, under oath and penalty of perjury, to inform this Court that "the title 'partner' does not reflect" their "actual status" at CGL.  They further state that they "have been salaried, at-will employee[s] of Cuneo, Gilbert & LaDuca, LLP" and "[a]lthough [they] may have been referred to in some contexts outside CGL as a 'partner' in the firm, this title does not reflect [their] actual status there.  [They are] not and never have been a member of CGL. [They] have no equity interest in CGL, nor do they bear any responsibility for any loss, expenses or other liabilities of the firm.  [They] have no management responsibilities or authority at CGL."  Copies of the Declaration of Joel Davidow, Declaration of Robert J. Cynkar, Declaration of Michael J. Flannery, Declaration of Daniel M. Cohen, Declaration of Sandra W. Cuneo, Declaration of Matthew E. Miller, are attached hereto as Exhibit 11.

230.    RICO Defendants knowingly, intentionally and unlawfully, as part of their scheme and conspiracy, made these false representations for the purpose of justifying an hourly rate fees that attorneys commensurate with the rates of being a "partner".

231.    As a result of these fraudulent representations RICO Defendants

expropriated for themselves fees and other economic benefits properly belonging to (a) clients and members of the class they purported to represent, (b) their co-counsel, and (c) the Plaintiff.

232.   This course of action was carried out through a pattern of racketeering activity, including at a minimum, the following offenses:

(a)   In re Certainteed Corp. Roofing Shingle Product liability Litigation, MDL 1817 (E.D. Pa. 2007)

1.   Obstruction of Justice in violation of 18 U.S.C. § 1503

2.   Wire fraud in violation of 18 U.S.C. § 1341

3.   Mail fraud in violation of 18 U.S.C. § 1333

(b)   I.R.S. Communications Excise Tax Litigation, MDL 1798 (D.D.C. 2007)

1.   Obstruction of Justice in violation of 18 U.S.C. § 1503

2.   Wire fraud in violation of 18 U.S.C. § 1341

3.   Mail fraud in violation of 18 U.S.C. § 1333

(c)   In re: Air Cargo Shipping Services Antitrust Litigation, MDL 1775 (E.D.N.Y. 2006)

1.   Obstruction of Justice in violation of 18 U.S.C. § 1503

2.   Wire fraud in violation of 18 U.S.C. § 1341

3.   Mail fraud in violation of 18 U.S.C. § 1333

(d)   In re Uponor, Inc. F1807 Plumbing Product Liability Litigation, MDL 2247 (D. Minn. 2011)

1.   Obstruction of Justice in violation of 18 U.S.C. § 1503

2.   Wire fraud in violation of 18 U.S.C. § 1341

3.   Mail fraud in violation of 18 U.S.C. § 1333

    (e)    In re: LivingSocial Marketing and Sales Practices Litigation, MDL 2254 (D.D.C. 2011)

        1.     Obstruction of Justice in violation of 18 U.S.C. § 1503

        2.     Wire fraud in violation of 18 U.S.C. § 1341

        3.     Mail fraud in violation of 18 U.S.C. § 1333

    (f)    In re. Zurn Pex Plumbing Products Liability Litigation, MDL 2247 (D. Minn. 2008)

        1.     Obstruction of Justice in violation of 18 U.S.C. § 1503

        2.     Wire fraud in violation of 18 U.S.C. § 1341

        3.     Mail fraud in violation of 18 U.S.C. § 1333

    (g)    In re. Navistar Diesel Engine Products Liability Litigation, MDL 2223 (N.D. Ill 2011)

        1.     Obstruction of Justice in violation of 18 U.S.C. § 1503

        2.     Wire fraud in violation of 18 U.S.C. § 1341

        3.     Mail fraud in violation of 18 U.S.C. § 1333

233.    The above offenses constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).  The multiple acts of racketeering activity that RICO Defendants committed amount to continued racketeering activity as defined in 18 U.S.C. § 1961(5).

234.    Each act of racketeering was related, had a similar purpose, involved the same participants and methods of commission, had similar results and impacted similar victims, including Plaintiff and others.

235.    The RICO Defendants received income from a pattern of racketeering activity and invested that income in CGL.

236.    Through a pattern of racketeering activities RICO Defendants acquired and maintained an interest in CGL.

237.     The RICO Defendants conducted the affairs of CGL through a pattern of racketeering activity in violation of 18 U.S.C. § 1962.

238.     Plaintiff was injured in her business or property by reason of violation of 18 U.S.C. § 1962 et seq. for the following reasons:

(a) Plaintiff was led to believe that she along with other individuals were partners at CGL and would be treated as such.  In reliance on these representations, Plaintiff was induced Plaintiff to stay CGL even though she had opportunities for employment elsewhere;

(b) Plaintiff was led to believe that Plaintiff would be entitled to benefits of fiduciary duties that partners owe one another, when in fact Defendants have egregiously violated those fiduciary obligations.

(c) The RICO Defendants expropriated valuable property belonging to Plaintiff as part of a pattern of activity, including the acts of racketeering discussed above, which was designed to garner for RICO Defendants remuneration and value that properly belonged to others.

## DEMAND FOR RELIEF

239.     Wherefore, Plaintiff demands relief in the form of:

(a) Compensatory damages in the amount of $6,000,000;

(b) Punitive and treble damages, as applicable;

(c) An injunction prohibiting Defendants from further disparaging Plaintiff;

(d) An injunction restraining Defendants from using any of Plaintiff's ideas/leads for filing of new class action cases;

(e) An accounting to determine the value of Plaintiff's partnership interest in

CGL;

(f) A declaration that Plaintiff should be allowed to work on her cases, and that Defendants' actions are unlawful;

(g) For injunctive relief, compelling Defendants to cease their unlawful actions;

(h) An award of reasonable attorney's fees and expenses; and

(i) Such additional relief as the Court deems equitable and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues within the instant action so triable.

Pro Se Plaintiff

Dated: December 20, 2013          By: _____
                                      Preetpal Grewal
                                      395 South End Avenue, Apt. 8P
                                      New York, NY 10280
                                      Tel: (917) 576-9298
                                      preetpalgrewal@yahoo.com

## CERTIFICATE OF SERVICE

The undersigned states that, on December 20, 2013, copy of Plaintiff's Second Amended Complaint was submitted to the Pro Se Office for ECF filing and a copy of this Second Amended Complaint was served by first-class mail, postage prepaid on R. Michael Smith of Bowe & Jensen, LLC, attorney for the Defendants, 29 W. Susquehanna Avenue, Towson, MD 21204.

_____
Preetpal Grewal (Pro Se Plaintiff)
Bar No. PG 6484
395 South End Avenue, #8P
New York, NY 10280
Phone: (917) 576-9298