UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: JUL 07 2015

PREETPAL GREWAL,

                Plaintiff,

       -against-

JONATHAN W. CUNEO, *et al.*,

             Defendant.

No. 13-cv-6836 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

    Plaintiff Preetpal Grewal, a licensed attorney, brings this *pro se* action against her former employer, Cuneo Gilbert & LaDuca LLP ("CGL"), its three named partners, Jonathan W. Cuneo, Pamela Gilbert, and Charles J. LaDuca (collectively, the "Cuneo Defendants"), as well as nine other purported partners of the firm, Michael J. Flannery, Joel Davidow, Robert J. Cynkar, Sandra Cuneo, Daniel M. Cohen, and Matthew E. Miller (collectively, the "Flannery Defendants"). In her Second Amended Complaint, Plaintiff alleges she was improperly induced to join CGL, purportedly as a partner, that Defendants systematically denied her the opportunity to realize the benefits promised in her employment contract, and that she was improperly and unfairly terminated from the firm in 2012. She brings claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, as well as a variety of state-law contract, tort, and anti-discrimination causes of action.

    Before the Court is Defendants' motion to dismiss Plaintiff's Second Amended Complaint. Defendants seek dismissal of the Flannery Defendants for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), and dismissal of all but Plaintiff's breach of contract cause of action for

failure to state a claim pursuant to Fed R. Civ. P. 12(b)(6). For the reasons that follow, Defendants'
motion to dismiss is granted in part and denied in part.

## BACKGROUND

Plaintiff, an Indian national, alleges that Jonathan Cuneo, a named partner at CGL,
contacted her on March 20, 2008, to express interest in Plaintiff joining CGL, a law firm based in
the District of Columbia. Second Am. Compl. ("SAC") (Dkt. 44) ¶ 21. At the time, Plaintiff was
considering opening her own law practice. *Id.* ¶ 22. Several weeks later, Cuneo and Plaintiff met
in New York City, where they discussed in more detail the possibility of Plaintiff joining CGL. *Id.*
Plaintiff alleges that at that meeting Cuneo "boasted about CGL's law practice, the nature of its
activities, and how successful and profitable the firm was." *Id.* ¶ 23. Cuneo allegedly "touted how
much money he and his partners were making and indicated that if Plaintiff were to join the firm
she, too, would enjoy a lucrative practice." *Id.*

Cuneo further "informed Plaintiff that if she joined the firm, she would be entitled to a
share in the profits of any case she worked on, with an extra share for cases that she brought into
the office." *Id.* ¶ 24. Following this meeting, Plaintiff was invited to CGL's District of Columbia
office to meet a second time with Cuneo as well as several of the firm's partners. *Id.* ¶¶ 25–26. On
the basis of this meeting, CGL extended a formal offer for Plaintiff to join the firm "on a 'trial
basis' for several months, at which time '[CGL's] standard deal kicks in.'" *Id.* ¶¶ 27–28. After
Plaintiff requested further information, *id.* ¶ 29, Cuneo e-mailed Plaintiff on June 18, 2008 to
explain that under the "standard deal," Plaintiff "would be compensated for [client development
activities] hourly, plus ten percent of work [she] originate[d], plus twelve percent of [her] lodestar
contribution," *id.* ¶ 30. Any amounts beyond the hourly rate for client development activities were

to be considered an entitlement—and not a bonus—based on the "relative value" of Plaintiff's contribution to a case. *Id.*

Plaintiff accepted Cuneo's offer by e-mail that same day, *id.* ¶ 31, and on June 30, 2008, Plaintiff began working at CGL from its New York City office, as CGL's sole New York presence, *id.* ¶ 32. Upon starting, Plaintiff was informed "she would not in fact have to complete a trial period but rather would work full time under the 'standard deal' immediately." *Id.*

According to Plaintiff, she was treated as a partner at CGL "from the beginning of her affiliation with that firm." *Id.* ¶ 33. She alleges she "regularly attended partnership lunches . . . where issues of strategy were discussed" with the Cuneo Defendants, *id.* ¶ 34, and that CGL "regularly represented to others, including multiple courts, that Plaintiff was a partner at the firm and Plaintiff believed these representations to be true." *Id.* ¶¶ 35–43. Plaintiff asserts the Flannery Defendants were similarly represented as partners, *id.* ¶¶ 11–16, although these Defendants, in affidavits attached to Plaintiff's Second Amended Complaint, have since disavowed their status as partners, *see id.* Ex. 11.

Plaintiff nevertheless alleges that CGL—and Jonathan Cuneo in particular—"sought to nullify the promises made under" Plaintiff's employment contract with CGL. *Id.* ¶ 44. In her Second Amended Complaint, Plaintiff recounts a litany of instances in which Cuneo first encouraged Plaintiff to develop clients and cases, only to "subvert" Plaintiff's work and "expropriate" it for himself and other members of CGL. *See id.* ¶¶ 44–98. Plaintiff alleges that Cuneo repeatedly assured her "that no one at CGL would work on another attorney's idea/lead for a case without consent of the other attorney," *id.* ¶ 59, but that Cuneo frequently gave cases and clients developed by Plaintiff to other CGL attorneys, minimized the credit she received for her work, offered to pay only a small fraction of the origination and lodestar profits to which she was

3

entitled, and refused to use clients developed by Plaintiff despite adopting her legal theories. *Id.*
¶¶ 44–98. As is necessary, the Court will address specific allegations of expropriation and
subversion in the Discussion, *infra*.

Plaintiff also alleges that Cuneo, in addition to subverting and expropriating her case
origination efforts, "repeatedly threatened and humiliated Plaintiff on the basis of her Indian
nationality." *Id.* ¶ 99. For instance, she claims that Cuneo repeatedly, and in the presence of others,
"mocked and denigrated Plaintiff's accent, claiming that he 'could not understand' her . . . even
though Plaintiff is a native English speaker," and told her that "'we treat you like a foreigner' and
that 'we never take you seriously,'" despite never making such statements to others. *Id.* ¶¶ 100–
101. At one firm meeting in the summer of 2011, Plaintiff asserts that Cuneo remarked, "'we don't
take this girl seriously' and 'we just treat her as a foreigner,'" admitting openly that "'we should
be ashamed of ourselves' for how the firm treated Plaintiff." *Id.* ¶ 102. Similarly, in September of
2011, after Plaintiff "told Cuneo that she felt she was often treated as a foreigner and not given
proper respect for that reason," Cuneo purportedly "responded, 'I have repeatedly told you that
you are treated as a foreigner and that nobody takes you seriously.'" *Id.* ¶ 103. Plaintiff alleges that
another attorney "stopped Cuneo from making any further discriminatory comments" during this
meeting, and then "instructed Plaintiff to leave the room." *Id.*

By this conduct, Plaintiff claims "Cuneo created a hostile work environment by depriving
Plaintiff of her opportunities and giving her work opportunities/credit of her work to other
attorneys at CGL, and deliberately leaving Plaintiff out of meetings and conferences." *Id.* ¶ 104.
Plaintiff further alleges that Cuneo, "with the intent to demoralize and harass Plaintiff, deliberately
and intentionally ordered repeated investigations and Plaintiff was issued numerous threats," *id.* ¶
105, including repeated threats to "Plaintiff's status as a resident of the United States as well as

4

standing as an attorney qualified to practice in the State of New York," *id.* ¶ 106. These threats included a conversation with Cuneo in which he "implied to Plaintiff that Cuneo himself [had] gotten [an] attorney disbarred and implied that anyone who fought with Cuneo could expect a similar fate," *id.* ¶ 108, and a purportedly improper demand to see Plaintiff's Green Card, despite CGL having "no valid reason to have this information and no legal basis to demand it," *id.* ¶ 110. Plaintiff also alleges that CGL launched a "bogus" investigation into expenses from a client recruitment trip to India that Plaintiff took at Cuneo's request, *id.* ¶ 107, and that Davidow at one point "threatened Plaintiff that all of the antitrust clients that Plaintiff had brought into the firm were 'the firm's clients' and that if she left and took the clients with her, she would be prosecuted for ethical violations and disbarred," *id.* ¶ 109.

Plaintiff alleges that on May 7, 2012, she received a telephone call from Gilbert, who instructed Plaintiff "not to come to her office in New York." *Id.* ¶ 112. Plaintiff was informed "her office had been sealed and office equipment confiscated, and if she came to the office she would be barred from entering." *Id.* Plaintiff was then "summoned to attend a meeting" with LaDuca and Gilbert at the office of a third-party attorney, where she was told she was under investigation for purportedly ghost-writing a brief for a *pro se* litigant, Elizabeth Thomas. *Id.* ¶¶ 114, 125–26.[1] When Plaintiff asked for further information, she was told she "had better talk with" her lawyer. *Id.* ¶ 114.

At the same meeting, Plaintiff was informed she had been placed on administrative leave, and was instructed "not to have any contact with anyone at the firm, or any of the firm's clients other than the administrator," *id.* ¶ 115, and that she could not "claim any affiliation with CGL from this point forward," *id.* ¶ 116. Plaintiff alleges she was "given no rights to explain herself and

---

[1] Thomas' attempts to intervene in this action were denied by Magistrate Judge Pitman. Dkt. 93.

5

no say in the decision to terminate her affiliation with the firm." *Id.* ¶ 117. Nor, Plaintiff contends, was she "given any warning," or represented by counsel. *Id.* ¶ 118. Later that day, "Plaintiff called Gilbert to confirm that her position had been terminated. Gilbert confirmed that Plaintiff no longer had a position at the firm." *Id.* ¶ 120.

According to Plaintiff, upon her dismissal from CGL, the firm launched a "groundless" investigation of her conduct and then attempted to recoup the costs of this investigation from her. *Id.* ¶¶ 124–131. Defendants' investigation "uncovered no evidence of misconduct," as, Plaintiff alleges, even "a cursory review of the case law would have established." *Id.* ¶¶ 129–130. Plaintiff contends the investigation was "simply an opportunity to intimidate and frighten Plaintiff in order to induce her not to vindicate her rights, and an excuse for dismissing her from the firm on a basis that would make Plaintiff, rather than CGL, appear to be at fault." *Id.* ¶ 131.

In sum, Plaintiff alleges that Defendants "illegally squeezed [her] out" of CGL after inducing her to "become a partner in their firm, for the purpose of expropriating the substantial value of her interest in the firm." *Id.* ¶ 1. She contends that "Defendants illegally threatened and intimidated [her], engaged in gross acts of discrimination, violated her rights as a partner in the firm, interfered with her opportunities to obtain other work, deprived her of her means of livelihood, and unjustly enriched themselves at her expense." *Id.* Plaintiff seeks $6,000,000 in compensatory damages, as well as punitive and treble damages, an array of injunctive and equitable relief, and an accounting to determine the value of her partnership interest in CGL. *Id.* ¶ 239.

After Defendants filed the instant motion to dismiss and for partial summary judgment, Dkt. 51, Magistrate Judge Pitman issued an order indicating that Plaintiff had withdrawn the cause

of action on which Defendants sought summary judgment and that all remaining claims were to be assessed under the motion to dismiss standard, Dkt. 89. The Court now addresses these claims.

## DISCUSSION

### I.     Motion to Dismiss for Lack of Personal Jurisdiction

#### A.     Legal Standard

Defendants seek dismissal of the Flannery Defendants for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). "When responding to a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999). Prior to discovery, this burden is met "by pleading in good faith, legally sufficient allegations of jurisdiction," a showing that "may be established solely by allegations." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84-85 (2d Cir. 2013) (citation omitted). Importantly, however, a "plaintiff must plead personal jurisdiction with respect to each claim asserted." *Hanly v. Powell Goldstein, L.L.P.*, 290 F. App'x 435, 437 (2d Cir. 2008) (summary order).

Because this is a federal question case in which those defendants seeking dismissal for lack of personal jurisdiction reside outside of New York, the Court must look to New York's jurisdictional rules. Fed. R. Civ. P. 4(k)(1).[2] *See also Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014) ("Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons."). "First, we determine whether the defendant is subject to jurisdiction under the law of the forum state—here, New York. Second, we consider whether the exercise of personal

---

[2] As to subject matter jurisdiction, federal question jurisdiction is proper under 28 U.S.C. § 1331 on the basis of Plaintiff's Title VII and RICO claims. The parties also do not dispute that diversity jurisdiction exists pursuant to 28 U.S.C. § 1332.

7

jurisdiction over the defendant comports with the Due Process Clause of the United States Constitution." *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 224 (2d Cir.), *cert. denied*, 134 S. Ct. 2888 (2014).

## B.   Legal Analysis

Defendants appear to concede that jurisdiction is proper over CGL and the Cuneo Defendants, but contend that the exercise of personal jurisdiction is improper as to the Flannery Defendants.

There are two possible statutory bases for the exercise of personal jurisdiction over the Flannery Defendants under New York law: N.Y. C.P.L.R. 301, New York's general jurisdiction statute, and N.Y. C.P.L.R. 302, New York's long-arm statute. Although Defendants address—at some length—whether jurisdiction is proper under Rule 301, Plaintiff contends only that jurisdiction is proper under Rule 302. The Court will thus address personal jurisdiction under Rule 302 only.

Plaintiff argues that the exercise of personal jurisdiction over the Flannery Defendants is proper under Rule 302(a)(1), which provides, in relevant part:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent:
>
> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state . . . .

Plaintiff contends that personal jurisdiction over the Flannery Defendants is proper pursuant to this subsection under two distinct theories: an agency theory and an individual—or personal—theory. Pl.'s Opp. 3–8. Both theories fail as to each of the Flannery Defendants, except for Davidow, over whom jurisdiction is proper on an individual theory.

8

First, there is no basis for the Court's exercise of personal jurisdiction over the Flannery Defendants on an agency theory. Plaintiff argues that the Flannery Defendants are partners of CGL by estoppel, and that because CGL and "certain of its partners are concededly subject to this Court's jurisdiction, and because partners are agents of one another, the Flannery Defendants are subject to New York jurisdiction also." *Id.* 3–5.

As an initial matter, it is unclear whether the exercise of jurisdiction over a partnership establishes jurisdiction over all of its partners under New York law. *Compare Somer & Wand, P.C. v. Rotondi*, 642 N.Y.S.2d 937, 939 (N.Y. App. Div. 1996) ("[J]urisdiction over a professional corporation does not result in personal jurisdiction over the shareholders thereof, any more than does jurisdiction over a partnership result in personal jurisdiction over its partners.") *with Friedson v. Lesnick*, No. 91 Civ. 2133 (JSM), 1992 WL 51543, at *2 (S.D.N.Y. Mar. 9, 1992) ("[C]ourts have personal jurisdiction over general partners if the court has jurisdiction over the partnership itself, and the lawsuit arises out of partnership affairs.") *and Wichita Fed. Sav. and Loan Ass'n v. Comark*, 586 F. Supp. 940, 943 (S.D.N.Y. 1984) ("New York case law establishes that non-resident general partners may properly be sued in the courts of this state as a result of forum activities of a partnership.").

Ultimately, it is unnecessary to reach this question, as Plaintiff has not properly alleged that the Flannery Defendants are partners of CGL. In affidavits submitted by the Flannery Defendants and attached to Plaintiff's Second Amended Complaint, they expressly deny that they are partners. *See* SAC Ex. 11. In response, Plaintiff does not appear to contest this assertion, arguing only that the Flannery Defendants are partners by estoppel. Pl.'s Opp. 3. Under District of

9

Columbia law, partnership by estoppel is a statutory matter. *See* D.C. Code § 29-603.08.[3] Section

29-603.08 provides as follows:

> If a person, by words or conduct, purports to be a partner, or
> consents to being represented by another as a partner, in a
> partnership or with one or more persons not partners, the purported
> partner shall be liable to a person to whom the representation is
> made, if that person, relying on the representation, enters into a
> transaction with the actual or purported partnership.

D.C. Code § 29-603.08(a). *See also Geier v. Conway, Homer & Chin-Caplan, P.C.*, 983 F. Supp.

2d 22, 35 n.7 (D.D.C. 2013). Thus, an injured party asserting partnership by estoppel must, in

addition to showing that the other party was actually represented as a partner, demonstrate that

they relied on such representations.

Plaintiff has alleged that the Flannery Defendants were represented as CGL partners. SAC

¶¶ 11–16. She also argues, in her opposition papers, that "she relied on these representations to her

detriment because she believed . . . that she and others like her would be treated with the fair

dealing that partners owe to one another." Pl.'s Opp. 5. This argument is unavailing. In her Second

Amended Complaint, Plaintiff alleges only that she relied on the representations of CGL and the

Cuneo Defendants that *she* was a partner, *see, e.g.*, SAC ¶¶ 35–43, not that she relied on such

representations as to the Flannery Defendants. Because Plaintiff has not alleged that she relied on

representations that they were partners, the Flannery Defendants are not partners by estoppel under

---

[3] The parties have not briefed choice of law as to the preliminary question of whether the Flannery Defendants and Plaintiff were CGL partners. Ordinarily, this choice of law question is resolved by reference to the partnership agreement, which typically contains a choice-of-law provision. In the absence of such an agreement, New York law provides that "the laws of the jurisdiction that govern a foreign limited liability partnership shall determine its internal affairs and the liability of partners for debts, obligations and liabilities of, or chargeable to, the foreign limited liability partnership." N.Y. P'ship Law § 121-1502(I). Because CGL is a partnership organized under District of Columbia law, the Court will apply District of Columbia law to those questions that concern partnership affairs. The Court will apply New York law as to Plaintiff's state-law contract and tort claims, however. In their motion papers, the parties have assumed that New York law applies, which is sufficient to resolve the choice of law question in favor of New York for these claims. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000).

District of Columbia law. This outcome would be no different under New York partnership law, which contains a nearly identical estoppel provision. *See* N.Y. P'ship Law § 27.

The Flannery Defendants, as employees of CGL, were indisputably agents of the firm, and their litigation work in New York is thus imputed to CGL under the clear language of Rule 302(a). But because the partnership by estoppel theory does not apply to the Flannery Defendants given that they were not partners, the jurisdictional status of CGL and the Cuneo Defendants cannot be imputed to them. Jurisdiction over the Flannery Defendants is thus proper under Rule 302(a) only if it can be exercised on an individual basis.

The individual theory similarly provides no ground for personal jurisdiction over the Flannery Defendants—except as to Davidow. Plaintiff sufficiently alleges that each Defendant transacted business in New York through their work litigating a number of matters in Federal and State court, SAC ¶¶ 11–16, but she has not alleged—except as to Davidow—that her causes of action arise from these transactions.

Under Rule 302(a), a "claim 'arises out of' a defendant's transaction of business in New York when there exists 'a substantial nexus' between the business transacted and the cause of action sued upon." *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 31 (2d Cir. 1996) (quotation omitted). Unlike with the other Flannery Defendants, Plaintiff has alleged such a substantial nexus between Davidow's work in New York and her causes of action.

Plaintiff alleges "Cuneo and CGL sought to squeeze Plaintiff out of any involvement in antitrust cases" after hiring Davidow, an expert in antitrust law, in March of 2011. SAC ¶ 61. According to Plaintiff, Davidow, in his role as one of the firm's lead antitrust lawyers, "deliberately excluded Plaintiff from the conference calls and meetings" regarding the so-called Auto Parts case—even though Plaintiff first developed the theory on which CGL sued. *Id.* ¶¶ 67, 69. The

11

Auto Parts case, moreover, is among those matters litigated by Davidow in New York. *Id.* ¶ 11. Because Plaintiff has alleged that Davidow was directly involved in excluding Plaintiff from a case on which she may have been entitled to fees, the exercise of personal jurisdiction over Davidow is proper.

Otherwise, Plaintiff fails to allege a substantial nexus between the New York work of the other Flannery Defendants and her causes of action. Her Second Amended Complaint recounts decisions undertaken by the Cuneo Defendants in the District of Columbia, but she has not alleged any specific facts from which the Court can impute these decisions to the Flannery Defendants individually, or establish a New York nexus. Plaintiff claims only that these Defendants worked on litigation matters and attended meetings in New York. Although some of these New York litigation matters are the subject of the current litigation, nowhere does Plaintiff allege that these individual Defendants expropriated her work or otherwise engaged in the tortious conduct on which she has sued.

Because Plaintiff has not alleged that her causes of action arose out of the individual work of the Flannery Defendants in New York, excluding Davidow, the Court cannot exercise personal jurisdiction on this basis.[4] There is thus no statutory basis for the exercise of personal jurisdiction over these Defendants. Defendants' Fed. R. Civ. P. 12(b)(2) motion is denied as to Davidow, and granted as to the remaining Flannery Defendants.

---

[4] Even if the Court could exercise personal jurisdiction over these Flannery Defendants on an individual basis, Plaintiffs' claims against them fail for the same reasons they ultimately fail against Davidow. *See* Discussion, *infra* Part II.

12

## II.        Motion to Dismiss for Failure to State a Claim

### A.        Legal Standard

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and be "plausible on its face," *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In ruling on a motion to dismiss, a Court may look at any document attached to the complaint as an exhibit, as well as the allegations of the complaint itself. *See* Fed. R. Civ. P. 10(c); *Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 138 (2d Cir. 1999). Plaintiff is *pro se*, but because she is also "an experienced attorney . . . the Court is not obligated to read [her] pleadings liberally," as would otherwise be required. *Chira v. Columbia Univ. in New York City*, 289 F. Supp. 2d 477, 482 (S.D.N.Y. 2003).

### B.        Legal Analysis

In her Second Amended Complaint, Plaintiff brings thirteen separate causes of action, including federal Title VII and RICO claims, as well as a variety of state-law contract and torts claims. In her opposition papers, however, Plaintiff has indicated she no longer intends to pursue her Title VII claim, or those for infliction of emotional distress, unlawful threats, and interference with contractual relations. Pl.'s Opp. 14 n.7. *See also* Dkt. 89.

Remaining in this action are Plaintiff's state-law claims for breach of contract (Count One), breach of the implied covenant of good faith and fair dealing (Count Two), breach of fiduciary duty (Count Three), unjust enrichment (Count Four), fraudulent inducement (Count Six), violations of state and city human rights law (Count Eight), and unfair competition (Count Ten),

13

as well as her RICO claims (Count Thirteen). The Court will first address whether Plaintiff's state-law claims can properly be maintained against the Cuneo Defendants, before turning to the merits of these claims. It will then address Plaintiff's RICO claims.

## 1. Personal Liability of the Cuneo Defendants

Defendants argue that Plaintiff cannot maintain her state-law tort and contract claims against the Cuneo Defendants,[5] as they are shielded from personal liability for such claims by District of Columbia ("D.C.") Code § 29-603.06(c), which provides:

> An obligation of a partnership incurred while the partnership is a limited liability partnership, whether arising in contract, tort, or otherwise, shall be solely the debt, obligation, or other liability of the partnership. A partner shall not be personally liable, directly or indirectly, by way of contribution or otherwise, for such a debt, obligation, or other liability solely by reason of being or so acting as a partner.

Plaintiff correctly notes, however, that D.C. Code § 29-604.08(b) permits actions by a partner against the partnership or another partner, including actions to enforce any rights arising under the partnership agreement. Thus, if Plaintiff was a CGL partner, she can maintain her state-law claims against the Cuneo Defendants, but if she was not, she cannot.

Under District of Columbia law, "[a] partnership is frequently described as a contract of two or more competent persons to place their money, effects, labor, and skill, or some or all of them, in lawful commerce or business, and to divide the profit *and bear the loss* in certain proportions." *Georgia Cas. Co. v. Hoage*, 59 F.2d 870, 872 (D.C. Cir. 1932) (emphasis added). *See also* D.C. Code § 29-604.01(b) ("Each partner shall be entitled to an equal share of the

---

[5] In her Second Amended Complaint, Plaintiff asserts state-law contract claims (Counts One and Two) against CGL only. SAC 34–35. In her opposition papers, however, she indicates that the Second Amended Complaint "erroneously limits" those counts to CGL, and that she intended to assert these claims against the Cuneo Defendants as well. Pl.'s Opp. 28. It is ultimately unnecessary for the Court to address this purported error, as District of Columbia partnership law bars Plaintiff from asserting either claim against the Cuneo Defendants individually, for the reasons explained below.

partnership profits and *shall be chargeable with a share of the partnership losses* in proportion to the partner's share of the profits.") (emphasis added). Similarly, while a "person that receives a share of the profits of a business shall be presumed to be a partner in the business," this presumption does not apply where the profits were received as "wages or other compensation to an employee." D.C. Code § 29-602.02(c)(3).

Plaintiff has properly alleged that she shared in the profits of CGL. She asserts that her initial conversations with Jonathan Cuneo about joining CGL led her to believe she "would be entitled to a share in the profits of any case she worked on, with an extra share for cases that she brought into the office." SAC ¶ 24. The purported employment offer Cuneo sent Plaintiff by e-mail on June 18, 2008 reflects this understanding, promising Plaintiff an hourly wage for client development activities, plus "ten percent of work [she] originate[d], plus twelve percent of [her] lodestar contribution." *Id.* ¶ 30.

Plaintiff has not properly alleged, however, that she shared in the losses of the firm, or that she had any equity at stake such that she could plausibly bear any loss. *Georgia Cas. Co.*, 59 F.2d at 872. *Accord Kidz Cloz, Inc. v. Officially For Kids, Inc.*, 320 F. Supp. 2d 164, 171 (S.D.N.Y. 2004) ("To demonstrate the existence of a partnership, a plaintiff must prove four elements: (1) the parties' sharing of profits *and losses*; (2) the parties' joint control and management of the business; (3) the contribution by each party of property, financial resources, effort, skill, or knowledge to the business; and (4) the parties' intention to be partners.") (emphasis added); *Zeising v. Kelly*, 152 F. Supp. 2d 335, 348 (S.D.N.Y. 2001) (finding "the requirement that there be a provision in the agreement for the sharing of profits *and losses* . . . [a]n indispensable essential of a contract of partnership.") (quotation omitted) (alterations in original) (emphasis added); *Steinbeck v. Gerosa*, 151 N.E.2d 170, 178 (N.Y. 1958) ("An indispensable essential of a contract

15

of partnership or joint venture, both under common law and statutory law, is a mutual promise or undertaking of the parties to share in the profits of the business and submit to the burden of making good the losses.") (emphasis added).[6]

Indeed, that Plaintiff was paid an hourly wage for aspects of her work suggests just the opposite: she was at least partially insulated from downside risk, such that the profits promised her in good times—even if considered an entitlement and not a bonus, *id.* ¶ 30—are best classified as profits received "as wages or other compensation to an employee." D.C. Code § 29-602.02(c)(3). *Accord* N.Y. P'ship Law § 11 ("The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment: . . . (b) As wages of an employee."). Plaintiff has thus not plausibly alleged she was a partner at CGL.

Plaintiff has also not plausibly alleged she was a CGL partner by estoppel. *See* D.C. Code § 29-603.08(a). Although she has asserted both that she was represented as a partner and that she relied on those representations, *see, e.g.* SAC ¶¶ 35–43, by its plain language, the District of Columbia's estoppel provision applies only as between a person represented as a partner and a person relying on this representation. *See* D.C. Code § 29-603.08(a). Here, because Plaintiff is both the purported partner and the person claiming reliance, the District of Columbia's estoppel provision cannot apply. Nor can it estop the Cuneo Defendants from claiming that Plaintiff was not a partner. The District of Columbia's estoppel provision requires that the person to whom the partnership representation is made rely on that representation when entering "into a transaction with the . . . purported partnership." *See* D.C. Code § 29-603.08(a). Plaintiff, however, has not

---

[6] As noted in footnote 3, *supra*, the Court applies District of Columbia law to the internal affairs of CGL, although, as the above citations make clear, the result would remain the same under New York law.

16

alleged that she was led to believe she would become a partner upon joining the firm, instead claiming only that she was represented as a partner once at CGL.

Because Plaintiff has not properly alleged that she was a CGL partner, she cannot bring suit against the Cuneo Defendants individually. Her state-law claims are dismissed as to each of these three Defendants, and remain only as against CGL and, where applicable, Davidow.

### 2.  Plaintiff's Breach of Contract Claim

In Count One of her Second Amended Complaint, Plaintiff alleges that Defendants' conduct breached her employment agreement with CGL and deprived her of the benefits of that bargain. SAC ¶¶ 140–145. Defendants concede that Plaintiff has stated a viable claim for breach of contract as to CGL, Defs.' Mem. 3, the only party Plaintiff names in this cause of action, *see* SAC 34.

In light of the Court's finding that the Cuneo Defendants are insulated from suit and that it lacks jurisdiction over all of the Flannery Defendants but for Davidow, Davidow is the only remaining individual Defendant against whom Plaintiff could possibly assert her breach of contract claim. Plaintiff has not named Davidow in this cause of action, however, and even if she had, because her employment contract was with CGL, *Id.* ¶ 31, and because Davidow is not a CGL partner, he was not a party to the contract and cannot be held personally liable for its breach. *See Blank v. Noumair*, 658 N.Y.S.2d 88, 88 (N.Y. App. Div. 1997). Plaintiff's breach of contract claim is dismissed as to Davidow, and remains only as to CGL.

### 3.  Plaintiff's Breach of the Implied Covenant of Good Faith and Fair Dealing Claim

In Count Two, Plaintiff alleges that Defendants' conduct breached the implied covenant of good faith and fair dealing. (SAC ¶¶ 146–51.) This count, as with Count One, names only CGL as a Defendant.

17

"In New York, all contracts imply a covenant of good faith and fair dealing in the course of performance." *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002). This covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995) (quotation omitted).

The implied covenant "does no more" than this, however; "it works only to ensure that a party with whom discretion is vested does not act arbitrarily or irrationally." *Id.* at 296. "For this to occur, a party's action must directly violate an obligation that may be presumed to have been intended by the parties." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407–08 (2d Cir. 2006) *certified question accepted*, 857 N.E.2d 528 (N.Y. 2006) and *certified question answered*, 864 N.E.2d 1272 (N.Y. 2007) (quotation omitted). The covenant "does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract." *Id.* at 408.

Indeed, "New York law is clear that the implied covenant cannot be used to create independent obligations beyond the contract." *ARI & Co. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 523 (S.D.N.Y. 2003). Nor does "New York law . . . recognize a separate cause of action for breach of the implied covenant . . . when it is based on the same facts as the breach of contract claim," or where "the relief sought . . . is intrinsically tied to the damages allegedly resulting from the breach of contract." *Goldblatt v. Englander Commc'ns, L.L.C.*, No. 06 Civ. 3208 (RWS), 2007 WL 148699, at *5 (S.D.N.Y. Jan. 22, 2007). *See also Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 365 (S.D.N.Y. 2012).

Despite the limited availability of claims for breach of the implied covenant under New York law, Plaintiff has sufficiently alleged such a claim here. As alleged, Plaintiff's implied

18

covenant claim depends on facts distinct from those underlying her claim for breach of contract. To prove the latter, Plaintiff will need to demonstrate that the cases she originated and those to which she contributed generated actual fees, and that CGL failed to pay Plaintiff a percentage of any such fees as required pursuant to the plain terms of her employment agreement. To prove the former, Plaintiff will need to demonstrate that Defendants sought to subvert and expropriate her work, that they did so in bad faith, and that—but for this subversion and expropriation—her work would have resulted in fees. Thus, the damages stemming from Plaintiff's implied covenant claim would not be "intrinsically tied to the damages allegedly resulting from the breach of contract," *Goldblatt*, 2007 WL 148699, at *5.

Plaintiff has sufficiently alleged multiple instances of CGL partners and other attorneys acting in less than good faith, whether by taking credit themselves for clients and cases Plaintiff brought to the firm, interfering with Plaintiff's ability to work on key cases, or assigning other attorneys to lead litigation initially developed by Plaintiff. SAC ¶¶ 44–98. In short, she portrays CGL as a firm designed to maximize the narrow self-interest of the three named partners, and few others. Plaintiff is correct, moreover, that in similar circumstances such conduct has amounted to a viable claim for breach of the implied covenant. *See* Pl.'s Opp. 29; *Kapsis v. American Home Mortg. Servicing Inc.*, 923 F. Supp. 2d 430, 452 (E.D.N.Y. 2013) ("[The implied] covenant is violated when a party promises commissions or profits and then does not act in good faith to permit such commissions or profits to be earned, thereby depriving the other party of the benefit of the bargain.").

Plaintiff has thus stated a claim for breach of the implied covenant, and Defendants' motion to dismiss this claim is denied.

19

### 4. Plaintiff's Breach of Fiduciary Duty Claim

In Count Three, Plaintiff alleges that, as partners, "Defendants owed fiduciary obligations" to her, and that they violated these obligations by "depriving her of the opportunity to develop her career . . . while expropriating [the cases she brought to CGL] for themselves." SAC ¶¶ 152–57. Under New York law, "[b]reach of fiduciary duty is a tort that arises from a violation of a relationship of trust and confidence." *Vione v. Tewell*, 820 N.Y.S.2d 682, 686 (N.Y. Sup. Ct. 2006). "In order to succeed on a cause of action to recover damages for breach of fiduciary duty, a plaintiff must do more than make allegations of unscrupulous acts." *Robert I. Gluck, M.D., LLC v. Kenneth M. Kamler, M.D., LLC*, 904 N.Y.S.2d 151, 152 (N.Y. App. Div. 2010). Instead, a plaintiff "must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages directly caused by the defendant's misconduct." *Id.*

Here, Plaintiff cannot show that CGL owed her a fiduciary obligation. District of Columbia partnership law does provide for a limited fiduciary relationship between and among partners, *see* D.C. Code § 29-604.07, but because Plaintiff was not a CGL partner, *see* Discussion, *supra*, 14–17, no such relationship was formed. New York law is no different. *See, e.g., Orderline Wholesale Distribs., Inc. v. Gibbons, Green, van Amerongen, Ltd.*, 675 F. Supp. 122, 128 (S.D.N.Y. 1987) ("Since . . . plaintiffs fail to make a showing sufficient to establish the existence of an enforceable . . . partnership agreement with [defendant], they also fail to make a showing sufficient to establish the existence of a fiduciary obligation to them by [defendant].").

Instead, Plaintiff was a CGL employee, and under New York law mere "employment relationships do not create fiduciary relationships." *Rather v. CBS Corp.*, 886 N.Y.S.2d 121, 125 (N.Y. App. Div. 2009). *See also Mendelsohn v. Ferber*, 887 N.Y.S.2d 494, 498 (N.Y. Sup. Ct. 2009), *aff'd*, 903 N.Y.S.2d 427 (N.Y. App. Div. 2010) ("Even an employer-employee relationship

providing for the division of profits will not give rise to a fiduciary duty on the part of the employer without an agreement to also share losses.").[7] For similar reasons, there was also no fiduciary relationship between Plaintiff and Davidow, another CGL employee, as a matter of law.

Because even taking Plaintiff's allegations as true, no fiduciary obligation was owed to her by CGL or Davidow, Defendants' motion to dismiss this claim is granted.

### 5.  Plaintiff's Unjust Enrichment Claim

In Count Four, Plaintiff alleges that Defendants unjustly enriched themselves at her expense. SAC ¶¶ 158–162. "The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement." *Goldman v. Metro. Life Ins. Co.*, 841 N.E.2d 742, 746 (N.Y. 2005). *See also Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter. A 'quasi contract' only applies in the absence of an express agreement.") Plaintiff contends her unjust enrichment claim is nonetheless viable, arguing that it does not merely duplicate her contract claims. Pl.'s Opp. 32. This argument is unavailing.

Here, there is a written contract—a contract that expressly concerns the terms of Plaintiff's employment relationship with CGL. Because there is a contract concerning the terms of her employment, Plaintiff is not entitled to quasi-contractual relief for injuries that arose as a consequence of her employment. Plaintiff may not bring a claim for unjust enrichment, and Defendants' motion to dismiss is granted as to this claim.

---

[7] Whereas the existence of a fiduciary relationship between CGL partners is a matter of internal affairs and thus a question of District of Columbia law, the existence of a fiduciary relationship between employers and employees is a question of New York law. *See* Discussion *infra* n.3.

### 6. Plaintiff's Fraudulent Inducement Claim

In Count Six, Plaintiff alleges she was fraudulently induced to join CGL—and then to remain with the firm—by repeated promises of success, but that "Defendants never intended to provide Plaintiff with the compensation to which she was entitled." SAC ¶¶ 169–74.

"[U]nder New York law [i]t is elementary that where a contract or transaction was induced by false representations, the representations and the contract are distinct and separable . . . . Thus, fraud in the inducement of a written contract is not merged therein so as to preclude an action for fraud." *Stewart v. Jackson & Nash*, 976 F.2d 86, 88–89 (2d Cir. 1992) (quotation omitted). In general, promissory statements as to what will be done in the future give rise only to a claim for breach of contract, whereas false representations of present fact are what give rise to a separate claim for fraudulent inducement. *See id.* at 89 (citing *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 502 N.E.2d 1003, 1004 (N.Y. 1986)). There is at least one exception to this rule, however: even where representations relate "to something which was to occur in the future," they may constitute false representations of present fact if the defendant "has fraudulently and positively as with personal knowledge stated that something was to be done when he knew all the time it was not to be done and that his representations were false." *Sabo v. Delman*, 143 N.E.2d 906, 908 (N.Y. 1957); *see also Deerfield*, 502 N.E.2d at 1004.

Plaintiffs bear a high burden as to fraudulent inducement claims, as they are subject to the strict pleading standards of Fed. R. Civ. P. 9(b). *See Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 246 (S.D.N.Y. 2011). Thus, the complaint "must specify the time, place, speaker, and content of the alleged misrepresentations, explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference that the defendant[ ] had an intent to

22

defraud, knowledge of the falsity, or a reckless disregard for the truth." *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013) (alteration in original).

Plaintiff asserts that after joining CGL, Jonathan Cuneo and other Defendants induced her to remain at the firm "for more than four years . . . by repeatedly indicating how successful the firm was, how wealthy the senior partners were, and how much money Plaintiff could expect when her cases paid off." *Id.* ¶¶ 171–72. But because Plaintiff entered into only one agreement with Defendants—her initial employment agreement—these allegations add little, except insofar as they provide context for statements made prior to her joining CGL. Later actions by Defendants could not have unlawfully induced her to join the firm.

Regarding her decision to join CGL, Plaintiff alleges that Jonathan "Cuneo boasted about CGL's law practice, the nature of its activities, and how successful and profitable the firm was. Cuneo touted how much money he and his partners were making and indicated that if Plaintiff were to join the firm she, too, would enjoy a lucrative practice." SAC ¶ 23. Cuneo, she alleges, also told her that if she joined the firm, her compensation would "exceed what she could earn at a conventional firm." *Id.* ¶ 24. In sum, Plaintiff claims that Cuneo and other Defendants induced her to "forego other potentially lucrative opportunities by promising that she could achieve a significantly higher income doing interesting, socially valuable work at CGL. *Id.* ¶ 170. Importantly, Plaintiff also alleges that "Defendants never intended to provide Plaintiff with the compensation to which she was entitled." *Id.* ¶ 173.

Many of these statements—those relating to CGL's profitability and the lucrativeness of Cuneo's practice, for instance—are representations of present fact and thus relevant to Plaintiff's fraudulent inducement claim. Nevertheless, as Defendants contend, they are best characterized as inactionable puffery. *See, e.g., Rombach v. Chang*, 355 F.3d 164, 174–75 (2d Cir. 2004)

23

("'[P]uffery' or 'misguided optimism' is not actionable as fraud."); *Cellular S. Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 516 F. App'x 30, 33 (2d Cir. 2013) (citing same and affirming dismissal) (summary order).

Cuneo's comments regarding how much money Plaintiff would make if she worked at CGL, though also relevant to Plaintiff's fraudulent inducement claim, may similarly amount to mere puffery. *Sabo*, 143 N.E.2d at 908. Even if they do not, Plaintiff's allegations, while more particularized, nevertheless do not support an inference that Cuneo never intended to deliver on these promises or that he had a "reckless disregard for the truth" at the time of their making. *Cohen*, 711 F.3d at 359. Plaintiff thus cannot satisfy Fed. R. Civ. P. 9(b)'s heightened pleading standard.

It is true that Plaintiff alleges a systematic and purposeful effort to subvert and expropriate her work recruiting clients to CGL and developing novel legal theories on which to sue. She has alleged that on multiple occasions Defendants promised her work, but then cut deals that would assign the value of this work to others, unbeknownst to her, SAC ¶¶ 44–57; assigned other attorneys to manage cases she developed, *id.* ¶¶ 62–65; refused to give her credit for developing actionable legal theories, *id.* ¶¶ 67–90; and filed lawsuits on the basis of theories she developed shortly after her termination from CGL, *id.* ¶¶ 95–98. Plaintiff, moreover, has alleged that it was Defendants—particularly the Cuneo Defendants—who benefitted from this subversion and expropriation. *Id.* ¶¶ 44–98. These allegations, taken on their own, might suggest that Defendants never intended to deliver on those promises made to Plaintiff prior to her joining CGL.

But many of Plaintiff's other allegations evince no such ill intent, particularly those regarding her initial time at CGL. On her first day of work, for instance, Plaintiff was informed that she "would not in fact have to complete a trial period but rather would work full time under the 'standard deal' immediately," *id.* ¶ 32; she was "treated as a partner at CGL from the

24

beginning," including regularly attending "partnership lunches," *id.* ¶¶ 33–34; and she was represented as a partner, and received at least some compensation as a consequence of these representations, from the beginning of her time at the firm until her termination on May 7, 2012, *see id.* ¶¶ 35–43, 217–226. Plaintiff, moreover, remained at CGL for nearly four years and departed, not over CGL's failure to fulfill Cuneo's promises to her, but because she was terminated. These allegations at least undermine Plaintiff's contention that Cuneo never intended to deliver on his promises to her.

When considered in their totality, Plaintiff's allegations do not sufficiently bolster her otherwise conclusory contention that "Defendants never intended to provide Plaintiff with the compensation to which she was entitled," *id.* ¶ 173, and thus do not satisfy the strict pleading standards of Fed. R. Civ. P. 9(b). Defendants' motion to dismiss this claim is granted as to CGL. It is also granted as to Davidow, as Plaintiff has not alleged his involvement in inducing her to join the firm.

### 7. Plaintiff's State and City Human Rights Law Claims

Plaintiff alleges in Count Eight that Defendants discriminated against her on the basis of national origin and race in violation of New York State Human Rights Law, N.Y. Exec. Law § 290, *et seq.*, and New York City Human Rights Law, N.Y.C. Admin. Code § 8–101, *et seq.* SAC ¶¶ 178–81. Plaintiff claims that Defendants violated each of these statutory provisions in two ways: by discharging her from CGL on the basis of her status as a member of a protected class, and by creating a hostile work environment. *Id.*

A plaintiff claiming employment discrimination need not "allege facts establishing each element of a prima facie case of discrimination to survive a motion to dismiss," and such claims are subject only to the pleading standards of Fed. R. Civ. P. 8. *E.E.O.C. v. Port Auth. of New York*

25

*& New Jersey*, 768 F.3d 247, 254 (2d Cir. 2014). Courts, however, look to the elements of a prima facie case for guidance in evaluating discrimination claims.

To establish a prima facie case of employment discrimination, a plaintiff must allege: "(1) [she] is a member of a protected class; (2) [she] was qualified for the position [she] held; (3) [she] suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to [an] inference of discrimination." *Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) (setting out the framework first established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).[8]

Similarly, to establish a hostile work environment claim, a plaintiff "must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014) (quotation omitted) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Because "[i]solated instances of harassment ordinarily do not rise to this level," a plaintiff must "demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000). This is a totality of the circumstances inquiry. *Raspardo*, 770 F.3d at 114.

Defendants first argue that Plaintiff's claims under State and City Human Rights Law are statutorily precluded, as CGL at no time had more than four employees in New York State or New

---

[8] "[C]ourts in this Circuit analyze discrimination claims brought under Title VII, [and] the New York Human Rights Law . . . in the same manner." *Tappe v. Alliance Capital Mgmt., L.P.*, 198 F. Supp. 2d 368, 372 (S.D.N.Y. 2001). Since a 2005 statutory revision, however, "courts must analyze [New York City Human Rights Law] claims separately and independently from any federal and state law claims." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).

26

York City, as is required for an employer to fall within the ambit of these laws. Defs.' Mem. 25 (citing N.Y. Exec. Law § 292(5); N.Y.C. Admin. Code §8-102(5)). Neither of the provisions cited by Defendants indicate that they are limited to employees within New York State or New York City, however, nor have Defendants identified any cases that stand for this proposition. Because Plaintiff has clearly alleged that she worked at CGL in New York and that CGL employed more than four employees in its interstate operations, CGL is subject to State and City Human Rights Law. Similarly, because Plaintiff has not properly alleged that she was a partner of CGL, the Court rejects Defendants' contention that Plaintiff cannot avail herself of the protection of these laws. *See* Defs.' Mem. 24. Nevertheless, Plaintiff has not met her burden as to her claim of discriminatory termination under State or City Human Rights Law.

As to her State Human Rights Law claims, Plaintiff has alleged she was a member of a protected class, that she was qualified for the position she held, and that she suffered an adverse employment action, namely, her termination from CGL. She has not properly alleged, however, that her termination took place under circumstances giving rise to an inference of discrimination. Her allegations, if true, suggest that Jonathan Cuneo made reprehensibly discriminatory comments related to Plaintiff's national origin, but not that discrimination played a role in her termination. Rather, as to her termination, her Second Amended Complaint mentions only that she was terminated for alleged misconduct in connection with her representation of a *pro se* litigant. SAC ¶¶ 112–31.

Plaintiff's claim of discriminatory termination is also barred under New York City Human Rights Law. Although New York City Human Rights Law is to be "construed liberally for the accomplishment of [its] uniquely broad and remedial purposes," N.Y.C. Admin. Code §8-130, a plaintiff must still allege that a defendant's "conduct is caused at least in part by discriminatory or

27

retaliatory motives." *Mihalik*, 715 F.3d at 113. Because Plaintiff has not in any way linked her termination to Cuneo's discriminatory comments, she cannot satisfy even this more liberal pleading standard.

Plaintiff has, however, met her burden as to her hostile work environment claim under both State and City Human Rights Law. She alleges that Cuneo "repeatedly" insulted and harassed her on the basis of her national origin. SAC ¶¶ 99–104. The frequency with which these comments were made and the context in which they were delivered—in large, firm-wide meetings—support an inference that they were calculated to shame and embarrass Plaintiff, and that they altered the conditions of her work environment. The purported hostility of Plaintiff's work environment is exacerbated by CGL's alleged efforts to subvert and expropriate her work, as well as the many threats Plaintiff claims she received—including a June 27, 2012 request for her Green Card that Plaintiff claims was without "legal basis" or "valid reason." *Id.* ¶ 110.

Defendants' motion is granted as to Plaintiff's discriminatory termination claims, but denied as to Plaintiff's hostile work environment claims. Both claims are dismissed as to Davidow, however, as Plaintiff has not alleged that he made any discriminatory comments on the basis of national origin, or that any of his threats toward Plaintiff were motivated by such bias.

**8.  Plaintiff's Unfair Competition Claims**

In Count Ten, Plaintiff alleges that Defendants unfairly competed with her by routinely expropriating her "hardwork/ideas/leads" for themselves, or by giving them to other CGL attorneys; by "deliberately and intentionally" filing cases on the basis of legal theories developed by Plaintiff after dismissing her from the firm; by doing so despite assurances that "no one [would] use her ideas/leads without her consent"; and by improperly keeping Plaintiff's e-mail account

open, "with intent to contact potential clients and unfairly compete" after her termination. SAC ¶¶ 187–198.

"The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another." *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980). *See also Dior v. Milton*, 155 N.Y.S.2d 443, 451 (N.Y. Sup. Ct.) *aff'd*, 156 N.Y.S.2d 996 (N.Y. App. Div. 1956) ("The general principle . . . is that commercial unfairness will be restrained when it appears that there has been a misappropriation, for the commercial advantage of one person, of a benefit or property right belonging to another.") "Central to this notion is some element of bad faith." *Saratoga Vichy Spring Co.*, 625 F.2d at 1044. Courts also require that the commercial advantage or property that is misappropriated belong exclusively to the plaintiff. *See Bongo Apparel, Inc. v. Iconix Brand Grp., Inc.*, 856 N.Y.S.2d 22 (N.Y. Sup. Ct. 2008); *Miller v. Walters*, 997 N.Y.S.2d 237, 246 (N.Y. Sup. Ct. 2014) (dismissing unfair competition claim where plaintiff sports management firm could not allege that misappropriated client was its property).

It is not clear, however, that the doctrine of unfair competition applies in the circumstances alleged here. Although the parties to an unfair competition claim need not be in direct competition with one another, *Dior*, 155 N.Y.S.2d at 454, Plaintiff has not cited any cases in which a viable claim has arisen between two agents of a single partnership, nor has the Court identified any such cases. Instead, the tort appears to be limited to conflicts between distinct commercial entities— two separate businesses in direct or indirect competition with one another. *See id.* (collecting cases). Even if it were possible to state a claim for unfair competition between two agents of a partnership, moreover, Plaintiff has not satisfied her burden here.

Plaintiff's Second Amended Complaint does allege considerable bad faith by CGL in the pervasive efforts by Jonathan Cuneo and other Defendants to subvert and expropriate Plaintiff's work. *See* SAC ¶¶ 44–98. She has also alleged that it was Defendants—particularly the Cuneo Defendants—who benefitted from this subversion and expropriation. *Id.* ¶¶ 44–98. Nevertheless, Plaintiff has not plausibly alleged that the clients and theories she brought to the firm were her property, and certainly not that these clients and theories were her *exclusive* property. Plaintiff's employment contract entitled her only to a percentage of those profits generated by the cases she originated or to which she otherwise contributed. The profits were to accrue to CGL and then be distributed to Plaintiff according to the precise terms of her employment agreement. In other words, Plaintiff was entitled—at most—to a contingent property interest in a fixed percentage of partnership profits. Thus, while CGL may have failed to pay Plaintiff the share of partnership profits to which she was entitled, it did not misappropriate property that was exclusively hers.

Defendants' motion to dismiss is thus granted as to Plaintiff's claim for unfair competition.

### 9. The RICO Claims

Lastly, in Count Thirteen, Plaintiff alleges that the Cuneo Defendans violated the RICO statute, and conspired to do the same. *See* 18 U.S.C. §§ 1962(a), (b) and (c), and 2. They did so, she alleges, by "falsely represent[ing] in numerous courts around the country that attorneys associated with CGL were 'partners' when the RICO Defendants and the involved attorneys knew that they were not in fact partners or members of CGL." SAC ¶ 216. Plaintiff also claims that the Cuneo Defendants invested the income they received from this scheme back into CGL, and that they "acquired and maintained an interest in CGL." *Id.* ¶ 235.

Plaintiff's RICO allegations fail to state a claim upon which relief can be granted. Defendants' motion to dismiss is therefore granted as to these claims.

Congress has provided a private right of action to "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964. "To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001) (quotation omitted). At bottom, however, all RICO claims—whether premised on a violation of Section 1962(a), (b), or (c)—require a showing that each defendant was engaged in a "pattern of racketeering activity." *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (reciting elements of a Section 1962(c) claim); *Ouaknine v. MacFarlane*, 897 F.2d 75, 83 (2d Cir. 1990) (reciting elements of a Section 1962(a) claim); *Wood v. Inc. Vill. of Patchogue of New York*, 311 F. Supp. 2d 344, 355 (E.D.N.Y. 2004) (reciting elements of a Section 1962(b) claim).

"Racketeering activity" encompasses a variety of state and federal offenses, enumerated in 18 U.S.C. § 1961(1), while a "pattern" of such activity requires at least two such predicate acts or offenses, 18 U.S.C. § 1961(5). Here, Plaintiff alleges that each of the Cuneo Defendants committed the following predicate acts in connection with the filing of fee applications in seven different federal court actions: obstruction of justice in violation of 18 U.S.C. § 1503; wire fraud in violation of 18 U.S.C. § 1341; and mail fraud in violation of 18 U.S.C. § 1333. Specifically, Plaintiff alleges certain CGL attorneys were represented as partners in fee applications submitted by the Cuneo Defendants, even though these attorneys were not actually partners. SAC ¶¶ 211–238. Plaintiff's allegations are insufficient.

To make out violations of the mail and wire fraud statutes, a plaintiff must allege: "(1) the existence of a scheme to defraud, (2) defendants' knowing participation in such a scheme, and (3) the use of wire or mail communications in interstate commerce in furtherance of that scheme."

*MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 737 F. Supp. 2d 137, 142 (S.D.N.Y. 2010), *aff'd in part*, 431 F. App'x 17 (2d Cir. 2011), and *aff'd*, 651 F.3d 268 (2d Cir. 2011). The elements of a scheme to defraud, in turn, are: "(1) the existence of a scheme to defraud; (2) fraudulent intent on the part of the defendant; and (3) the materiality of the representations." *Boritzer v. Calloway*, No. 10 CIV. 6264 (JPO), 2013 WL 311013, at *6 (S.D.N.Y. Jan. 24, 2013). Similarly, a plaintiff alleging obstruction of justice must allege, in part, "that the defendant acted with the wrongful intent or improper purpose to influence the judicial or grand jury proceeding, whether or not the defendant is successful in doing so—that is, that the defendant corruptly intended to impede the administration of that judicial proceeding." *United States v. Quattrone*, 441 F.3d 153, 170 (2d Cir. 2006) (quotation omitted).

Allegations of mail and wire fraud are subject to heightened pleading standards. *See* Fed. R. Civ. P. 9(b); *Cruz*, 720 F.3d at 120 n.2. Plaintiff has not met this standard. She has not properly alleged fraudulent intent on behalf of the Cuneo Defendants, nor has she properly alleged the "scheme to defraud" prerequisite to violations of the mail and wire fraud statutes, or the wrongful intent prerequisite to obstruction of justice.

Taken in its entirety, Plaintiff's Second Amended Complaint alleges only that CGL, like many firms, was comprised of what modern lawyers would refer to as equity partners—partners as defined under state partnership law—and non-equity partners, who possess the skills and qualifications necessary to command high billing rates, but who are not "partners" under state partnership law. *See, e.g., In re GSC Grp., Inc.*, 502 B.R. 673, 735 n. 227 (Bankr. S.D.N.Y. 2013) ("[T]wenty-first century law firms include equity partners, non-equity partners, contract partners, shareholders, associates, contract associates, counsel, of counsel, senior counsel, and the list goes on."). The Court simply cannot infer intent to defraud—or corrupt intent to impede judicial

administration—from the disjuncture between the Flannery Defendants' disavowal of their status as partners, *see* SAC Ex. 11, and the fee applications filed by the Cuneo Defendants indicating that Plaintiff and the Flannery Defendants were partners.

In any event, Plaintiff has not properly alleged that she was injured by Defendants' purported racketeering conduct. *See* 28 U.S.C. § 1964(c) (requiring personal injury to "business or property" as a prerequisite to a proper civil RICO action). *See also Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) ("[P]laintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation."). Thus, Plaintiff's allegation that the courts approving Defendants' fee applications were injured is insufficient. And although Plaintiff has also asserted that, "[a]s a result of" these fee applications, Defendants "expropriated for themselves fees and other economic benefits properly belonging" to her, SAC ¶ 231, these injuries were not proximately caused by Defendants' alleged violations of the RICO statute. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 462 (2006). ("[A] claim is cognizable under § 1964(c) only if the defendant's alleged violation proximately caused the plaintiff's injury."); *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992).

Here, the economic benefits to which Plaintiff was entitled under her employment contract did not turn on her classification in fee applications; Defendants could just as easily have expropriated those benefits had they classified her as an associate or counsel. Thus, although her classification as partner may have enabled the Defendants to garner fees higher than they may otherwise have been entitled to, Plaintiff has not alleged the direct relationship between Defendants' fee applications and her conduct that RICO's proximate causation requirement demands. *Anza*, 547 U.S. at 461 ("When a court evaluates a RICO claim for proximate causation,

the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.").

Because Plaintiff has not plausibly alleged that Defendants engaged in the racketeering activity prerequisite to any violation of the RICO statute, or that she was harmed within the meaning of this statute, her RICO claims are dismissed. As Plaintiff's RICO claims were the sole remaining claims pending against the Cuneo Defendants, these Defendants are now dismissed from this action.

## CONCLUSION

For the reasons stated, Defendants' motion to dismiss is granted in part and denied in part, as follows:

- Plaintiff's RICO claims are dismissed, as are her state-law claims for breach of fiduciary duty, unjust enrichment, unfair competition, fraudulent inducement, and discriminatory termination under State and City Human Rights Law.
- Plaintiff's breach of contract, breach of the implied covenant, and hostile work environment claims under State and City Human Rights Law survive.
- Because none of these remaining claims are properly asserted against Davidow, however, he is dismissed from this action, as are the Cuneo Defendants, and the remaining Flannery Defendants.

The Clerk of Court is requested to close the motion pending at Dkt. 51, and to terminate all parties from the case but for Cuneo Gilbert & LaDuca LLP. The Court will hold a status conference in this matter on Thursday, July 30, 2015 at 10:00 a.m. No later than July 23, 2015, the parties shall submit to the Court a revised case management plan and a joint letter as to the status of discovery.

SO ORDERED.

Dated:    July 7, 2015
           New York, New York

                                        Ronnie Abrams
                                        United States District Judge