UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 03/31/2017

PREETPAL GREWAL,

                Plaintiff,

v.

CUNEO GILBERT & LADUCA LLP,

                Defendant.

No. 13-CV-6836 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Preetpal Grewal brings this action against her former employer, Cuneo Gilbert & LaDuca LLP ("CGL"), asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and hostile work environment on the basis of her national origin. Before the Court are the parties' cross-motions for summary judgment and CGL's motion to strike Grewal's reply briefs and other reply submissions. For the reasons set forth below, Grewal's motion for summary judgment is denied, CGL's motion for summary judgment is granted in part and denied in part, and CGL's motion to strike is denied.

## BACKGROUND[1]

---

[1] These facts are drawn from the parties' submissions in connection with their respective motions for summary judgment, including Plaintiff's Rule 56.1 Statement ("Pl. 56.1") (Dkt. 195), Defendant's Response to Plaintiff's Rule 56.1 Statement ("Def. Resp. to Pl. 56.1") (Dkt. 216), Defendant's Rule 56.1 Statement ("Def. 56.1") (Dkt. 193-1), Plaintiff's Motion for Summary Judgment and accompanying exhibits ("Pl. MSJ") (Dkt. 195), Defendant's Memorandum of Law in Support of Motion for Summary Judgment and accompanying exhibits ("Def. MSJ") (Dkt. 192), Defendant's Response in Opposition to Plaintiff's Motion for Summary Judgment and accompanying exhibits ("Def. Opp.") (Dkt. 214), and the Declaration of Jonathan W. Cuneo in Support of Defendant's Motion for Summary Judgment ("Cuneo Decl.") (Dkt. 215), as well as exhibits accompanying Plaintiff's Second Amended Complaint ("SAC") (Dkt. 44). Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Rule 56.1(c)–(d).

**A.  Grewal's Employment Agreement**

Preetpal Grewal, who was born in India, is an attorney licensed to practice law in India and New York.  *See* Pl. 56.1 ¶ 2.  CGL is a law firm based in Washington, D.C.  Def. 56.1 ¶ 1.

On June 17, 2008, Jonathan W. Cuneo, a partner at CGL, e-mailed Grewal to offer her a position at CGL.  *See* Pl. 56.1 ¶ 10; Def. 56.1 ¶ 1; Pl. MSJ Ex. 6.  Grewal responded that evening, expressing enthusiasm and seeking further information about her potential role at the firm.  *See* Pl. 56.1 ¶¶ 10–11; Pl. MSJ Ex. 6.  Cuneo responded the next day, clarifying several terms of the offer. *See* Pl. 56.1 ¶¶ 12–14; Pl. MSJ Ex. 6.  Among other things, Cuneo's response explained that "[a]ll our employees are legally employees at will."  Pl. MSJ Ex. 6; *see also* Def. 56.1 ¶ 44.  In response to Grewal's question as to whether she would receive "a bonus based on the number of hours worked," Cuneo stated, "The 'bonus' is an entitlement (so not really a bonus) based on your relative value of contribution to a case (based on lodestar) when and if, and only if, we get paid." Pl. MSJ Ex. 6.  In response to Grewal's questions regarding whether she would "be permitted/expected to develop clients for the firm" and the extent to which "client development activities" would be compensated, Cuneo responded:

> You would be compensated for this activity hourly, plus 10 percent of the work you originate plus twelve percent of your lodestar contribution.  For example, on immigration you brought in and did exclusively you would get 22 percent, plus $60 per hour.

Pl. MSJ Ex. 6; *see* Pl. 56.1 ¶ 13.  On June 18, 2008, Grewal accepted Cuneo's offer.  *See* Pl. 56.1 ¶ 15; Pl. MSJ Ex. 6.

**B.  Grewal's Work at CGL**

On June 30, 2008, Grewal joined CGL.  Pl. 56.1 ¶ 17.  As discussed below, Grewal claims that she was denied lodestar or origination compensation for her work on several matters during her time at the firm.

1.  *In re Air Cargo*

Soon after joining CGL, Grewal began working on *In re Air Cargo Shipping Services Litigation*, a global antitrust action brought against approximately thirty airlines for allegedly fixing the prices of fuel and other surcharges.  Grewal claims that she attempted to identify international clients as potential claimants in this dispute.  *See* Pl. 56.1 ¶ 23; Pl. MSJ Ex. 16 ("Cuneo Dep. Tr.") at 20:8–18; Cuneo Decl. ¶ 7.  To that end, Grewal made at least three trips to India, where she signed retainer agreements with approximately forty businesses.  *See* Pl. 56.1 ¶¶ 26, 28–29; Pl. MSJ Exs. 9, 17.  According to Cuneo, however, CGL decided not to pursue claims on behalf of these businesses because "Grewal had asked to avoid further trips to India" and, as a result, "CGL could not effectively handle the claims."  Cuneo Decl. ¶ 10(d).  Cuneo claims that "CGL has not received any fees in connection with cases related to clients located in [India]."  Cuneo Decl. ¶ 22; *see also* Def. Resp. to Pl. 56.1 ¶¶ 23, 28–29.

In connection with the *Air Cargo* litigation, Grewal claims that she performed document review work that resulted in fees to CGL.  *See* Pl. 56.1 ¶¶ 49–50.  Grewal claims that she "brought" this work to the firm after she "signed the international retainers" and spoke to Brian Ratner, a partner at Hausfeld LLP, "about getting some work to the firm."  *Id.* ¶¶ 49–50.  On May 3, 2011, CGL submitted a fee application in *In re Air Cargo Shipping Services Antitrust Litigation* (No. 16-MD-1775), a multidistrict litigation in the United States District Court for the Eastern District of New York, requesting $723,393.75 in lodestar compensation and $66,918.21 in unreimbursed expenses.  *See* SAC Ex. 3; Pl. 56.1 ¶ 50.  The application indicates that Grewal worked 444 hours on the matter, for a lodestar total of $154,840.  SAC Ex. 3.  Grewal claims that she is entitled to origination compensation for this work.  *See* Pl. 56.1 ¶ 50.  CGL disagrees, arguing that the firm "obtained that work because Cuneo had a long-standing friendship and professional relationship

with Michael Hausfeld . . . and had referred a client to Hausfeld's firm."  Def. Resp. to Pl. 56.1 ¶ 50.

### 2.  *In re Automotive Parts Antitrust Litigation*

Grewal next claims that she originated several cases brought against automotive parts manufacturers.  *See* Pl. 56.1 ¶¶ 41, 47.  On or about September 28, 2010, Grewal circulated a memorandum, which relied on news articles of investigations by antitrust authorities in the United States and Europe, discussing possible claims against manufacturers for fixing the prices of automotive electrical distribution systems, sometimes known as "wire harness" products.  *See* Pl. 56.1 ¶ 41; Pl. MSJ Ex. 31.  In subsequent e-mails to Cuneo, Grewal proposed several potential plaintiffs, including one business located in India.  *See* Pl. MSJ Ex. 32.  According to CGL, however, Grewal "failed to obtain a client to serve as a plaintiff."  Def. Resp. to Pl. 56.1 ¶ 41.

On October 11, 2011, approximately one year after Grewal circulated the memorandum on potential claims related to the wire harness price-fixing, Grewal e-mailed Cuneo asking him to confirm "that if someone brings an idea for a case to the table, and such a case is filed, one is entitled to 10 percent of the attorneys['] fees."  Pl. MSJ Ex. 31; *see* Pl. 56.1 ¶ 42.  Cuneo immediately forwarded Grewal's e-mail to CGL's other principals, Charles LaDuca and Pamela Gilbert, with the message, "Clearly relates to wire harness."  Pl. MSJ Ex. 31.

Grewal claims that CGL thereafter brought actions against automotive parts manufacturers "on the very theory" she proposed.  Pl. 56.1 ¶ 43.  On October 27, 2011, for example, one of Grewal's colleagues e-mailed Cuneo and others indicating that CGL had "just filed a wire harness complaint" on behalf of Martens Cars of Washington in the United States District Court for the District of Columbia.  *See* Pl. MSJ Ex. 32.  According to an internal memorandum dated April 6, 2012, CGL hosted an all-day meeting with counsel in "the wire harness case" on April 2, 2012.

4

*See* Def. MSJ Ex. 4.  This memorandum indicates that, in a conversation with Cuneo following

the meeting, Grewal became "heated" and "began to cry," in part because she "felt that she had

been excluded from the Wire Harness case," which, in her view, she "had brought" to the firm.  *Id.*

The memorandum explains that, in response, Cuneo told Grewal that she "had been awarded 5

percent of the fee." *Id.*; *see also id.* ("I told her . . . she had gotten a 5% credit on wire harness and

she was welcome to work on it.").

   In addition to the wire harness case, CGL ultimately filed more than thirty separate actions

on behalf of franchised auto dealers for fixing the prices of various automotive parts.  *See* Def.

56.1 ¶ 48; Def. Resp. to Pl. 56.1 ¶ 43.  At least some of these actions were consolidated as *In re*

*Automotive Parts Antitrust Litigation* and transferred to the United States District Court for the

Eastern District of Michigan.  *See* Pl. MSJ Exs. 33–34.  On December 7, 2015, the district court

awarded the auto dealers in this action $18,500,168 in attorneys' fees, to be paid on a pro rata basis

from settlement funds available for each settlement before the court, $1,661,945.95 in past

litigation expenses, and $2,947,395 in future litigation expenses.  *See* Pl. MSJ Ex. 34; Pl. 56.1

¶ 46.

   Grewal claims that she originated the automotive parts cases but received no origination

compensation.  *See* Pl. 56.1 ¶¶ 41, 47.  CGL responds that Grewal was not entitled to origination

credit for any of these cases because she did not obtain a client to serve as a plaintiff.  *See* Def.

Resp. to Pl. 56.1 ¶¶ 43–46.  According to Cuneo, "Grewal was not responsible for originating those

cases because she was never retained by any auto dealer, a prerequisite to qualify for origination

pay."  Cuneo Decl. ¶ 20.

### 3. Mortgage Modification Cases

Grewal next claims that she worked on several "mortgage cases," which appear to be actions filed against banks for illegally modifying mortgages. *See* Pl. 56.1 ¶¶ 51–58.[2] As part of her work on these cases, Grewal claims that she also "originated" the "trial payment plan," which she describes as a standardized form given to mortgagors to modify their mortgages. Pl. 56.1 ¶ 51; *see also* Pl. MSJ Exs. 36, 38. With respect to one of the mortgage cases, Grewal claims that a district court awarded CGL attorneys' fees and that she "has not received her percentages." Pl. 56.1 ¶ 58; *see* Pl. MSJ Ex. 41. CGL agrees that Grewal "worked on various aspects of the mortgage cases" but denies that Grewal brought these cases to the firm. *See* Def. Resp. to Pl. 56.1 ¶¶ 53–54. CGL asserts that Grewal is not entitled to any origination compensation for her work because she did not obtain clients to serve as plaintiffs. *See id.* ¶¶ 51, 53–54. CGL further claims that the mortgage modification cases "did not generate any fee awards or yielded awards too small to pay compensation to any . . . attorneys who worked on that litigation." Def. 56.1 ¶ 50; *see also id.* ¶ 51.

### 4. Sony Optical Disk Drive Case

Grewal next asserts that she "originated" the "Sony Optical Disk Drive case." Pl. 56.1 ¶ 48. In support of this claim, Grewal points to a September 8, 2010 e-mail she sent to Barbara Darne, in which Grewal states that "[t]he Sony Optical case has been filed in CA." Pl. MSJ Ex. 35. CGL denies that "the firm ever filed such a case against Sony." Def. Resp. to Pl. 56.1 ¶ 48. Cuneo's declaration states that "CGL had little, if any, internal discussion of this case," and "Grewal did not draft a complaint and procure a client to serve as a plaintiff." Cuneo Decl. ¶ 10(e).

---

[2] Grewal specifically identifies two "mortgage cases" on which she worked: (1) *In re JPMorgan Chase Mortgage Modification Litigation*, No. 11-MD-2290 (D. Mass.), and (2) *Beals v. Bank of America, N.A.*, No. 2:10-CV-5427 (D.N.J.). *See* Pl. 56.1 ¶¶ 56, 59–60; *see also* Pl. MSJ Exs. 41, 43, 44.

### 5.   Servicemembers Class Action

Grewal claims that she also drafted a class action complaint on behalf of several servicemembers, alleging violations of the Servicemembers Civil Relief Act.  Pl. 56.1 ¶ 61; Pl. MSJ Ex. 45.  Grewal claims that she was told that CGL would not pursue this claim.  Pl. 56.1 ¶ 62.  CGL responds that it did not pursue claims on behalf of servicemembers after determining that these claims were not well-suited for class action litigation.  *See* Def. Resp. to Pl. 56.1 ¶ 62; *see also* Cuneo Decl. ¶ 10(b).

### 6.   Shaw Laminate Case

Grewal next claims that she proposed bringing a products liability case against Shaw Industries, Inc., a manufacturer of laminate flooring.  *See* Pl. 56.1 ¶¶ 63–65; Pl. MSJ Ex. 46.  Grewal prepared a memorandum on possible claims that could be asserted against Shaw Industries and drafted a proposed complaint.  *See* Pl. 56.1 ¶ 63; Pl. MSJ Ex. 46.   CGL did not pursue this case because, according to Cuneo, the firm "did not believe the case was strong enough on the merits."  Cuneo Decl. ¶ 10(a); *see also* Def. Resp. to Pl. 56.1 ¶¶ 64–65.

### 7.   Hip Replacement Cases

Grewal asserts that she "brought to the firm" product defect cases against various manufacturers of hip replacement systems.  Pl. 56.1 ¶ 66; Pl. MSJ Ex. 48.  Grewal explains that LaDuca advised her that claims of this type could only be brought as individual actions, rather than as class actions.  Pl. 56.1 ¶ 66.

### 8.   Overdraft Fee Cases

Finally, Grewal claims that she "originated" cases against financial institutions for charging excessive overdraft fees.  Pl. 56.1 ¶¶ 67–69.  Grewal supports this claim by noting that she and another CGL attorney, Matthew Weiner, had several phone conversations about the

possibility of bringing such claims.  *See id.* ¶ 67.  Grewal claims that, after she left the firm, CGL

served as interim co-lead counsel in consolidated litigation against HSBC Bank USA, N.A., which

challenged HSBC's overdraft practices and policies.  *See* Pl. 56.1 ¶ 68.  CGL denies that Grewal

originated any case related to overdraft fees against HSBC.  *See* Def. Resp. to Pl. 56.1 ¶ 67–68.

Cuneo's declaration indicates that the firm did not participate in litigation against HSBC until

"long after Grewal had left" the firm and did not pursue the legal theory Grewal had proposed.

Cuneo Decl. ¶ 18.

## C.  Statements Regarding Grewal's National Origin

Grewal claims that she was "harass[ed]" on the basis of her national origin while working

at CGL.  *See* Pl. 56.1 ¶¶ 73, 83.  Grewal identifies two instances in which she claims to have

experienced such harassment.  The first occurred at an internal litigation meeting in the summer

of 2011.  Pl. 56.1 ¶ 73; Def. 56.1 ¶ 8.  At this meeting, Grewal asserts that Cuneo remarked that

"we don't take this girl seriously," "we just treat her as a foreigner," and "we should be ashamed

of ourselves."  Pl. 56.1 ¶ 73; *see also* Grewal Dep. Tr. at 54:7.  At his deposition, Cuneo testified

that he "remember[ed] saying words that were like that."  Cuneo Dep. Tr. at 63:20–21.  Cuneo

testified, however, that he made these statements shortly after a meeting with attorneys from other

firms, at which Grewal had made a "very good" point that was "not taken seriously enough" by a

"group of largely white males."  Cuneo Dep. Tr.  at 67:21–68:2; *see also* Def. 56.1 ¶¶ 7–8.  Cuneo

explained that he was "appalled" by the conduct of the other attorneys, and related this experience

to members of his own firm to explain that "racism, sexism, nativism, are not dead in America,

and it's something that even among educated people, we have to combat, period."  Cuneo Dep. Tr.

at 68:4–10.  Thus, Cuneo testified, "I said those words . . . to identify with [Grewal] and to express

solidarity with [her]."  *Id.* at 64:2–4; *see also id.* at 64:21–65:8.

Following Cuneo's comments at the firm meeting, Grewal sent Cuneo an e-mail thanking him "for all the wonderful things [he] said at the meeting today."  Def. MSJ Ex. 19; *see also* Def. 56.1 ¶ 9.  Asked why she thanked Cuneo, Grewal testified at her deposition that she wanted to "acknowledge, you know, that they had done something good for me," Grewal Dep. Tr. at 55:25–56:2, and that "they said something nice in that meeting for me, and it really felt good," *id.* at 56:33–23.  Grewal further testified that Cuneo's statement "acknowledged that he should take me seriously, which is a big thing for me," and "acknowledged that I have ability."  *Id.* at 57:5–10.

Several other CGL employees provided testimony regarding Cuneo's statements at the meeting.  Pamela Gilbert, for example, testified that she recalled Cuneo "wanting to use something that occurred with [Grewal] . . . in a meeting with other attorneys as a teachable moment for all of us to sit back and take stock of how professionals, and particularly professional lawyers, can sometimes mistreat people and not take people seriously just based on either their gender or their age or their nationality."  Pl. MSJ Ex. 57 ("Gilbert Dep. Tr.") at 44:7–16.  Gilbert further testified that Cuneo was "outraged" and "livid," finding it "shameful" that, even though Grewal had done "a great job" and "brought up very good points in the meeting," her arguments "weren't being taken seriously."  *Id.* at 45:6–17.  LaDuca similarly testified that Cuneo, who was "one of [Grewal's] biggest cheerleaders and supporters," was "really upset and protecting [Grewal] and supportive of [her]."  LaDuca Dep. Tr. at 21:20–22:7.

The second incident of alleged harassment occurred while Grewal was meeting with Cuneo and Wiener.  Grewal testified that she told Cuneo, "sometimes I feel I am treated as a foreigner." Grewal Dep. Tr. at 68:10–11.  Grewal testified that Wiener then "told [Cuneo] not to say anything." *Id.* at 68:19–21.  Grewal further testified that, during this conversation, Cuneo told her that "we don't understand your accent."  *Id.* at 52:7–8.  At his deposition, Wiener testified that he did not

recall this incident.  *See* Def. 56.1 ¶ 11.

**D.  Grewal's Departure**

By early 2012, Grewal's relationships with CGL's partners had begun to sour.  Cuneo and other CGL partners criticized Grewal for missing deadlines and failing to submit time records.  *See* Def. 56.1 ¶ 53; Def. MSJ Exs. 28, 40.  Most damaging to Grewal's status at CGL, however, was her alleged decision to provide legal assistance to a *pro se* litigant in an action in the Eastern District of New York.  *See* Def. 56.1 ¶ 27; Def. MSJ Ex. 5 ("Ross Decl.") ¶ 9.  On May 4, 2012, the *pro se* litigant telephoned LaDuca, claiming that Grewal "had been secretly representing her for a year."  Def. 56.1 ¶ 31.  On May 8, 2012, the litigant filed an emergency order to show cause in her case, alleging that Grewal had engaged in "ghostwriting" pleadings and asking the court to order CGL to withdraw from representation.  *See* Ross Decl. ¶¶ 2, 7.  CGL retained an outside attorney, who notified the court in that action that CGL had not authorized Grewal to represent the litigant and that CGL's principals—Cuneo, Gilbert, and LaDuca—were not advised that Grewal was providing any informal advice to the litigant.  *See* Def. 56.1 ¶¶ 32–34; Def. MSJ Ex. 3 ("Gilbert Decl.") ¶ 6; Ross Decl. ¶¶ 3, 15.  CGL claims that it was "concerned about the ethical implications and potential liability" arising from Grewal's assistance.  Def. 56.1 ¶ 32; *see* Gilbert Decl. ¶ 6.  In May 2012, Grewal left the firm.  *See* Gilbert Decl. ¶ 7.

**E.  Procedural History**

On September 25, 2013, Grewal initiated this action against CGL, Cuneo, LaDuca, Gilbert and other individual defendants.  Dkt. 1.  On December 20, 2013, Grewal filed her Second Amended Complaint ("SAC"), in which she asserted thirteen causes of action.  *See* SAC ¶¶ 140–238.  On July 7, 2015, the Court dismissed all claims against the individual defendants and all but three claims against CGL.  *See* Opinion & Order (Dkt. 98).  The surviving claims against CGL are

for (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, and (3) hostile work environment under the New York State Human Rights Law and the New York City Human Rights Law.   *See id.*   On July 21, 2015, CGL filed an answer and asserted counterclaims for breach of contract, breach of loyalty and fiduciary duty, and declaratory judgment.   *See* Answer (Dkt. 99), Counterclaim (Dkt. 100).   On January 25, 2016, the Court dismissed CGL's counterclaims.   *See* Opinion & Order (Dkt. 141).

On July 22, 2016, CGL moved for summary judgment.   Dkt. 191.   On July 25, 2016, Grewal cross-moved for summary judgment.   Dkt. 195.   CGL filed a response to Grewal's motion on August 30, 2016, Dkt. 214, and a reply in further support of its motion on September 9, 2016, Dkt. 218.   On September 16, 2016, Grewal submitted, under seal, an opposition to CGL's motion for summary judgment and a reply in further support of her own.

## LEGAL STANDARD

To prevail on a motion for summary judgment, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016).   "The movant bears the burden of demonstrating the absence of a question of material fact."   *Chaparro v. Kowalchyn*, No. 15-CV-1996 (PAE), 2017 WL 666113, at *3 (S.D.N.Y. Feb. 17, 2017).   "When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'"   *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting

Fed. R. Civ. P. 56(e)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  In determining whether to grant summary judgment, the Court must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor."  *Mitchell v. City of New York*, 841 F.3d 72, 77 (2d Cir. 2016) (quoting *Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011)).

## DISCUSSION

### A.  Breach of Contract

Grewal first claims that CGL breached her employment agreement.  The Court finds that genuine disputes of material fact preclude summary judgment to either party on this claim.

"Under New York state law, a breach of contract claim must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages."  *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016) (internal quotation marks omitted).[3]  "Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous."  *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000); *see also JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009) ("[T]he meaning of the ambiguous contract is a question of fact for the factfinder.").  "Whether or not a writing is ambiguous is a question of law to be resolved by the courts."  *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (citation omitted).

"In interpreting a contract under New York law, words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions."  *Portfolio Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 133 (2d Cir.

---

[3] The parties do not dispute that New York law applies to Grewal's claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

2016) (alteration omitted) (internal quotation marks omitted).  "A contract is ambiguous under New York law if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Orchard Hill*, 830 F.3d at 156–57.  By contrast, a contract term is unambiguous if "it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion."  *Orlander*, 802 F.3d at 294–95 (internal quotation marks omitted).

"To the extent the moving party's case hinges on ambiguous contract language, summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case."  *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008); *see also Eastman Kodak Co. v. Ricoh Co., Ltd.*, No. 13-CV-3109 (DLC), 2013 WL 4044896, at *7 (S.D.N.Y. Aug. 9, 2013) ("A court may resolve the ambiguity as a matter of law only where there is no extrinsic evidence to support one party's interpretation of the ambiguous language or if the extrinsic evidence is so one-sided that no reasonable factfinder could decide contrary to one party's interpretation." (internal quotation marks omitted)).

Grewal's June 2008 e-mail exchange with Cuneo constitutes a binding employment agreement.  *See* Def. Resp. to Pl. 56.1 ¶¶ 10–15; Pl. MSJ Ex. 6; *see generally Rubinstein v. Clark & Green, Inc.*, 395 F. App'x 786, 788 (2d Cir. 2010) (summary order) ("[A]n exchange of emails may constitute a binding contract under New York law."); *Naldi v. Grunberg*, 908 N.Y.S.2d 639, 640 (1st Dep't 2010); *Stevens v. Publicis, S.A.*, 854 N.Y.S.2d 690, 692 (1st Dep't 2008).  Pursuant

13

to this agreement, Grewal is an "employee[] at will" who "would be compensated for [client development] activity hourly, plus 10 percent of the work [she] originate[s] plus twelve percent of [her] lodestar contribution."  Pl. MSJ Ex. 6.[4]  The parties' dispute here centers on the meaning of the term "originate."  CGL argues that origination necessarily involves "procur[ing] clients to initiate cases which generate[] fees for CGL."  Def. Opp. Mem. at 9.  CGL also asserts that the firm "does not pay its attorneys compensation in addition to their annual salaries for contributing ideas for use in connection with existing cases."  Def. 56.1 ¶ 49.  Grewal does not propose an alternative definition but gives the term a broader construction—encompassing, for example, the proposal of potential claims to other members of the firm.

The Court finds that the term "originate" is ambiguous.  The agreement does not define the term, and the parties do not argue that the agreement incorporated any other document—such as an employee handbook—that might shed light on its meaning.  To be sure, the context of the term in Grewal's e-mail exchange with Cuneo is somewhat helpful.  Cuneo explained that Grewal would receive origination compensation in response to the question, "[t]o what extent if any would client development activities be compensated?"  *Id.*  This context suggests that origination is tied, at least in part, to "client development activities."  Cuneo's example of origination compensation is also somewhat illuminating: by explaining that Grewal would receive origination compensation for a case she "brought in," Cuneo suggested that "originate" and "bring in" are roughly

---

[4] "Under New York's employment-at-will doctrine, an employer has a nearly unfettered right to discharge an employee."  *Jones v. Dunkirk Radiator Corp.*, 21 F.3d 18, 21 (2d Cir. 1994).  However, "an employer's virtually unfettered power to terminate an at-will employee does not negate its duty to abide by promises made prior to termination."  *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000); *see also Broyles v. J.P. Morgan Chase & Co.*, No. 08-CV-3391 (WHP), 2010 WL 815123, at *3 (S.D.N.Y. Mar. 8, 2010) ("[R]eference to an employment at will policy does not bar the Offer Letter from operating as a valid contract.").  Thus, although Grewal's status as an employee-at-will may have provided CGL broad discretion to terminate her employment, Grewal may maintain a breach of contract action for CGL's failure to abide by terms in her employment agreement—including its promise to award origination compensation.

synonymous in this agreement. *Id.* In addition, Cuneo's statement that a "bonus" award based on the hours an employee works, which is distinct from origination compensation, would be paid "when and if, and only if, we get paid" suggests that all non-salary compensation, including origination compensation, is awarded when and only when CGL receives fees. *Id.* Viewing the term "originate" in the context of the entire agreement, therefore, helps narrow the term's meaning.

Even with this context in mind, however, the Court cannot conclude that the term "originate" has a "definite and precise" meaning. Most relevant to this dispute, the agreement does not identify those activities that constitute origination. For example, it is unclear whether origination compensation is only available when an attorney initiates business with a new client, or whether it may also be awarded in the context of a new matter for an existing client, or whether—as Grewal suggests—it may be awarded for identifying a potential claim and bringing it to the attention of other members of the firm. The agreement also fails to specify whether origination compensation may be given to multiple attorneys for their work for a single client. The timing of origination compensation is similarly unclear: the agreement does not indicate whether the firm must actually receive payment, as is the case for the "bonus" based on the hours an employee works on a case, rather than simply bill a client or receive a fee award from a court, to award origination compensation.[5]

Adding to the ambiguity of the term "originate" is the fact that within the legal profession—

---

[5] CGL's memorandum of law asserts that Grewal's e-mail exchange with Cuneo is not an enforceable agreement because it did not contain certain "terms," such as "the criterion to be used to determine the amount of credit Grewal would receive for cases brought to CGL." *See* Def. Mem. at 15. The absence of such a "criterion," however, demonstrates the ambiguity of this agreement, not the absence of an agreement. CGL has not disputed that the requirements for contract formation—offer, acceptance, and consideration—have been satisfied here. *See* Def. 56.1 ¶ 44 ("A series of emails sent and received by Grewal in June 2008 show that she was offered and accepted a position at CGL . . . ."). Accordingly, CGL has not raised a triable issue regarding the enforceability of this agreement, and its discussion of the missing "terms" in the agreement only reinforces the Court's conclusion that the agreement is ambiguous.

the "particular trade or business" in which this agreement arises—the term has no fixed meaning. *Orchard Hill*, 830 F.3d at 157.  As most lawyers know, the meaning of "origination" varies from firm to firm—indeed, the term's flexibility is a common source of confusion or disagreement within law practices.  *See, e.g.*, James D. Cotterman, *Recognizing Origination*, Compensation & Benefits for L. Off., Mar. 2010, at 1 ("Possibly the most often asked about issue regarding law firm partner compensation [concerns] origination."); Joel A. Rose, *Determining Partner Compensation: Identifying and Defining Criteria*, N.Y. St. B.J., Oct. 2015, at 26, 27 (describing "several types of origination credit"); Joan C. Williams & Veta Richardson, *New Millennium, Same Glass Ceiling? The Impact of Law Firm Compensation Systems on Women*, 62 Hastings L.J. 597, 633 (2011) (noting that many attorneys "did not know how origination credit works at their firms, which, given the complexity of some firms' systems and the ambiguities in the way origination credit is defined, probably is not surprising").  Thus, in this case, the Court cannot draw a more precise definition of the term "originate" by looking to the customs or practices in the legal profession.

In concluding that the term "originate" is ambiguous, the Court is also guided by cases addressing contract ambiguity in the related context of disputes over sales commissions.  In that context, courts applying New York law have routinely found that summary judgment on breach of contract claims is not appropriate where the parties dispute the meaning of "origination" or the terms of commission compensation.  In *Apple Mortgage Corp. v. Barenblatt*, 162 F. Supp. 3d 270 (S.D.N.Y. 2016), for example, Judge Koeltl found that there were genuine disputes of fact as to the method of awarding commissions to mortgage loan originators, where the compensation agreements "do not specify when the commission is earned, indicating only that it 'will be based on 50% of the loan amount.'" *Id.* at 290.  Likewise, in *Yudell v. Ann Israel & Associates, Inc.*, 669

N.Y.S.2d 580 (1st Dep't 1998), the First Department held that an employment agreement providing that an at-will employee was entitled to a percentage "of all fees actually received by us in cash from placements which are clearly identified as originated by you" was ambiguous because "[t]he words 'placements . . . originated by you' do not, by themselves, specify when or how the placement must be completed for plaintiff to become entitled to a commission." *Id.* at 580–81. Similarly here, because Grewal's employment agreement simply invokes the term "originate" and provides a percentage, the requirements for earning origination compensation are ambiguous.

The Court is unable to resolve this ambiguity through extrinsic evidence. CGL's evidence in support of its interpretation of "originate" consists mainly of declarations and testimony from its partners. Cuneo's declaration, for example, states that "[a]n attorney at CGL generally qualifies for origination compensation only by obtaining a viable client, drafting a complaint, and commencing litigation." Cuneo Decl. ¶ 17. Other testimony and declarations appear to respond to Grewal's conception of the term; for example, Cuneo testified in his deposition that "lawyers are expected to do their work on a day-to-day basis and don't get credit for initiated issues." Cuneo Dep. Tr. at 45:7–12. Gilbert's declaration similarly states that "[a]ll the firm's attorneys understand" that "CGL does not pay its attorneys compensation in addition to their annual salaries for contributing ideas for use in connection with existing cases." Gilbert Decl. ¶ 9.

While CGL's evidence supports its view that the term "originate" has a fairly fixed meaning, at least some extrinsic evidence suggests that, in practice, the term may be applied more broadly, at least in the context of Grewal's employment agreement. In particular, the record contains evidence indicating that CGL decided that Grewal was eligible for origination compensation for her work in the wire harness antitrust litigation—even though there is no real dispute that Grewal did not "obtain[] a viable client, draft[] a complaint, and commenc[e]

17

litigation" in that case.  Cuneo Decl. ¶ 17.  Rather, as the parties appear to agree, Grewal's work in the wire harness litigation consisted mainly of preparing a memorandum on the opportunity and sharing it with her colleagues at CGL.  *See* Pl. 56.1 ¶ 41; Pl. MSJ Ex. 31.  Nonetheless, an internal memorandum dated April 6, 2012 states that Grewal "had been awarded 5 percent of the fee" in the case.  *See* Def. MSJ Ex. 4.  CGL's decision to award Grewal origination compensation in the wire harness case appears inconsistent with its definition of the term—suggesting that, at least with respect to Grewal, the meaning of the term "originate" is not what CGL claims it to be.  Thus, because the evidence in this case is not itself capable of only one interpretation and does not uniformly support CGL's interpretation, the Court cannot resolve the ambiguity of the term "originate" through extrinsic evidence.  *See Topps*, 526 F.3d at 68; *see also Salesky v. David Peyser Sportswear, Inc.*, No. 94-CV-9036 (JSM), 1996 WL 262985, at *3 (S.D.N.Y. May 17, 1996) (denying summary judgment in dispute over sales commission based on evidence that, "despite the language" in an employment agreement, the firm "had a practice" of paying commissions for certain sales "that the salesperson did not originate").

Because the meaning of the term "originate" is genuinely disputed, the extent to which Grewal is entitled to origination compensation for her work at CGL may not be decided on summary judgment.  The Court need not, therefore, address Grewal's performance in each of the many cases on which she worked at CGL.

Even if the Court were to adopt CGL's definition of "originate," summary judgment would nonetheless be inappropriate, for even under CGL's definition, there is a genuine dispute as to whether Grewal was entitled to origination compensation for her work in the *Air Cargo* litigation. *See* Pl. 56.1 ¶¶ 49–50.   In support of her claim that she originated this work, Grewal claims that, after she "signed the international retainers," she spoke to Brian Ratner, a partner at Hausfeld LLP,

"about getting some work to the firm." *Id.* ¶ 49.  Grewal claims that she thereafter "brought to the firm document review work" in connection with the *Air Cargo* litigation.  *Id.* ¶ 50.

Viewing the evidence in the light most favorable to Grewal and drawing all inferences in her favor, the Court concludes that a reasonable juror could find that she originated at least some of CGL's work in the *Air Cargo* litigation.  First, CGL's billing records for the *Air Cargo* matter indicate that, as Grewal claims, she made several trips to India, where she met with dozens of prospective clients for the purpose of obtaining them as plaintiffs or claimants in the Air Cargo dispute.  *See* Pl. MSJ Ex. 9.  Second, Grewal signed retainer agreements with approximately forty businesses located in India, in which CGL agreed to "pursue legal claims" on behalf on of these businesses to recover damages arising from the alleged price-fixing scheme.  *See* Pl. MSJ Ex. 17. Third, CGL's billing records indicate that Grewal billed time for several telephone calls and meetings with Ratner in 2008 and 2009 in connection with the *Air Cargo* litigation.  *See* Pl. MSJ Ex. 9.  Fourth, at least some of these *Air Cargo* billing records note that Grewal and Ratner discussed Grewal's "trip to India." *Id.*  Fifth, CGL and Ratner's law firm, Cohen Milstein Hausfeld & Toll, LLP, signed a "Responsibility and Fee Sharing Agreement," in which the two firms agreed to split fees in connection with certain disputes and agreed that Grewal "will be managing client contacts" and will "be the first point of contact and guidance."  Pl. MSJ Ex. 11.  On the basis of this evidence, a fact-finder could reasonably infer that Grewal originated billable work in the *Air Cargo* litigation through her marketing efforts in India and her coordination with Ratner.

The evidence also permits a reasonable fact-finder to conclude that CGL received fees for its work, including work performed by Grewal.  For example, Grewal has pointed to CGL's May 3, 2011 application for attorneys' fees in the *Air Cargo* multidistrict litigation, in which CGL requested $723,393.75 in lodestar compensation and $66,918.21 in unreimbursed expenses.  *See*

SAC Ex. 3.  The application states that Grewal worked 444 hours on the matter.  *See id.*  The application also indicates that, as the parties appear to agree, the majority of this work involved document review, labeled in the application as "Discovery from Defendants and Third Parties." *See id.*  Viewed in the light most favorable to Grewal, this evidence suggests that Grewal's efforts to secure work in the *Air Cargo* litigation resulted in fees to CGL.

However, it is entirely possible, as CGL argues, that Grewal is not entitled to origination compensation for this work.  The record leaves several questions about her work on this matter unanswered.  For starters, the identity of CGL's client in the *Air Cargo* matter is unclear: the fee application was submitted on behalf of "Plaintiffs Counsel."  *See* SAC Ex. 3.  It is thus unclear whether CGL represented a client with whom Grewal signed a retainer agreement, or a client of Ratner's who was referred to Grewal, or an existing CGL client with whom Grewal had no meaningful contact.  To the extent that CGL secured this work as a referral from Ratner or others at his firm, it is also unclear whether the reference resulted from the efforts of Grewal or from, as CGL argues, Cuneo's "long-standing personal and professional relationship" with another partner at Ratner's firm.  Cuneo Decl. ¶ 21.  Finally, because the record contains only CGL's fee application, rather than a fee award, it is not clear whether CGL was actually compensated for the work it performed.  At trial, these questions may be resolved.  At this stage, however, the evidence demonstrates at least a genuine dispute as to whether Grewal is entitled to origination compensation for her work in the *Air Cargo* litigation.

In sum, the Court concludes that genuine disputes of material fact preclude granting either party summary judgment on Grewal's claim for breach of contract.[6]

---

[6] CGL also argues that Grewal is barred from obtaining equitable relief, as a matter of law, under the doctrine of unclean hands. Def. Opp. at 21–22.  The Court disagrees.  "The doctrine of unclean hands applies when the complaining party shows that the offending party is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter in litigation

**B.  Breach of the Implied Covenant of Good Faith and Fair Dealing**

Grewal next claims that CGL breached an implied covenant of good faith and fair dealing in her employment agreement.  This claim fails as a matter of law.

In general, a contract contains an implied covenant of good faith and fair dealing under New York law.  *See Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 817 (2d Cir. 2014).  However, "well-settled New York law holds that no implied covenant of good faith and fair dealing attaches to at-will employment contracts."  *Nunez v. A-T Fin. Info. Inc.*, 957 F. Supp. 438, 443 (S.D.N.Y. 1997) (collecting cases); *see also, e.g.*, *Campeggi v. Arche Inc.*, No. 15-CV-1097 (PGG), 2016 WL 4939539, at *6 (S.D.N.Y. Sept. 14, 2016) ("Plaintiff's at-will employment status . . . is fatal to . . . her claim for breach of the implied covenant of good faith and fair dealing."); *De Petris v. Union Settlement Ass'n, Inc.*, 657 N.E.2d 269, 271 (N.Y. 1995) ("This State neither recognizes a tort of wrongful discharge nor requires good faith in an at-will employment relationship.").  "The basis for this rule is that an obligation to abide by an implied covenant of good faith and fair dealing would be inconsistent with the employer's unfettered right to terminate an at-will employee."  *Nunez*, 957 F. Supp. at 438.  Here, there is no dispute that Grewal was an at-will employee.[7]  Accordingly, she cannot maintain a claim for breach of the implied duty of good faith and fair dealing.  *See id.*

---

and the party seeking to invoke the doctrine was injured by such conduct."  *TufAmerica, Inc. v. Codigo Music LLC*, 162 F. Supp. 3d 295, 328 (S.D.N.Y. 2016) (citation omitted).  To the extent that CGL seeks to assert an unclean hands defense, the question of whether Grewal's conduct, in representing a *pro se* client or otherwise, is "immoral" or "unconscionable" is a question of fact that may not be resolved on summary judgment.  *See id.*

[7] Grewal's Second Amended Complaint asserted that she was a partner at CGL.  In ruling on Defendants' motion to dismiss, however, the Court concluded that Grewal "has not properly alleged that she was a CGL partner."  Opinion & Order at 17 (Dkt. 98).  Grewal does not explicitly challenge that ruling here.

### C.  Hostile Work Environment

Finally, Grewal asserts hostile work environment claims under the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL").  The Court concludes that CGL is entitled to summary judgment on these claims.

#### 1.  New York State Human Rights Law

To establish a hostile work environment claim under the NYSHRL, as under Title VII, "a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Littlejohn v. City of N.Y.*, 795 F.3d 297, 320–21 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).[8]  "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive."  *Id.* at 321.  "As a general rule, incidents must be more than 'episodic'; they must be sufficiently continuous and concerted in order to be deemed pervasive."  *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015) (citation omitted).  Thus, "a plaintiff alleging a hostile work environment 'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.'"  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)).  Finally, "[i]t is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic."  *Tolbert*, 790 F.3d at 439.

---

[8] "Claims under the New York Human Rights Law are generally governed by the same standards as federal claims under Title VII."  *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 151 n.6 (2d Cir. 2014) (internal quotation marks omitted).

Grewal identifies two specific incidents in which she claims she experienced "harassment" on the basis of her national origin.  Pl. 56.1 ¶ 83.  First, at a litigation meeting in the summer of 2011, Grewal claims that Cuneo stated "we don't take this girl seriously," "we just treat her as a foreigner," and "we should be ashamed of ourselves."  Pl. 56.1 ¶ 73; Grewal Dep. Tr. at 54:7. There is no dispute that Cuneo made these or similar statements.  Second, Grewal claims that, during a conversation with Cuneo and Matthew Weiner, another CGL attorney, she told Cuneo, "sometimes I feel I am treated as a foreigner," and that Cuneo responded, at some point during this conversation, "we don't understand your accent."  Grewal Dep. Tr. at 52:7–8.  The parties dispute whether this incident occurred: Weiner testified that he did not recall any such conversation.  *See* Weiner Dep. Tr. at 40:12–14.  Viewed in the light most favorable to Grewal, this evidence is not sufficient to support a claim for hostile work environment under the NYSHRL.

Cuneo's statements at the 2011 litigation meeting do not support a hostile work environment claim under the NYSHRL because there is no dispute that these statements reflected no "discriminatory intimidation, ridicule, and insult."  *Littlejohn*, 795 F.3d at 320.  Indeed, it is undisputed that his statements communicated the opposite message: a sharp condemnation of any discrimination against Grewal on the basis of her national origin.  Cuneo testified that he chose to address the issue of Grewal's status as a "foreigner" with his staff after he and Grewal attended a meeting with attorneys from another firm—a "group of largely white males," he says—who had, in Cuneo's view, failed to take Grewal's "very good" points seriously enough.  Recalling that this episode left him "appalled" and "mad as hell," Cuneo testified that he wished to address the incident with his colleagues to explain that "racism, sexism [and] nativism are not dead in America," and that "it's something that even among educated people, we have to combat, period." Cuneo further testified that he intended "to identify with [Grewal] and to express solidarity" with

her in his statements. Cuneo Dep. Tr. at 64:2–4.

The testimony of other participants at the 2011 litigation meeting uniformly supports Cuneo's view of the events.  Gilbert, for instance, testified that Cuneo had addressed Grewal's national origin at the firm's meeting because he viewed the way in which non-CGL attorneys had treated Grewal "as a teachable moment for all of us to sit back and take stock of how professionals, and particularly professional lawyers, can sometimes mistreat people and not take people seriously just based on either their gender or their age or their nationality."  Gilbert Dep. Tr. at 44:7–16.  LaDuca likewise testified that, as he understood Cuneo's statements, Cuneo was "protecting [Grewal] and supportive of [her]."  LaDuca Dep. Tr. at 21:20–22:7.   The thrust of Cuneo's statements, according to the testimony of all other CGL employees who testified about the meeting, was that Grewal deserved equal treatment and that anything less would not be tolerated at the firm.

Critically, it is not disputed that Grewal shared this positive impression of Cuneo's statements regarding her national origin.  Indeed, immediately after the meeting at which Cuneo made these statements, Grewal sent him an e-mail thanking him "for all the wonderful things [he] said at the meeting today."  Grewal Dep. Ex. 2.  During her deposition, Grewal testified that she thanked Cuneo because she wanted to "acknowledge, you know, that they had done something good for me."  Grewal Dep. Tr. at 55:25–56:2.  Grewal further testified that Cuneo had "said something nice in that meeting for me, and it felt really good."  *Id.* at 55:25–56:2.  In Grewal's view, Cuneo's statements "acknowledged that he should take me seriously, which is a big thing for me" and "acknowledged that I have ability."  *Id.* at 57:5–20.  Thus, the evidence in this case reveals no dispute that, far from permeating the workplace with discriminatory intimidation, Cuneo's statements served to praise Grewal's performance and to demand that other CGL

employees treat her with fairness and respect, irrespective of her nation of origin.[9]

The Court recognizes that, in many cases, summary judgment is inappropriate where a plaintiff's account of an incident of alleged harassment conflicts with that of her co-workers or supervisors.  *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (explaining that a "question of 'he said, she said,'" in the discrimination context, is one on which the court cannot "take a side at the summary judgment stage").  This is not such a case.  Grewal's deposition testimony and contemporaneous communications with her supervisors leave no dispute that she, like all other CGL employees present at the litigation meeting, did not view Cuneo's statements as insulting, intimidating, or biased in any way.  Rather, Grewal and her co-workers at CGL tell the same story: Cuneo discussed her national origin to encourage his employees to "combat" workplace discrimination.

The Court also recognizes that an employee may initially brush off discriminatory comments in the workplace, but upon reflection consider them—or, with a dose of courage, even publicly declare them—intimidating, insulting, or offensive.  If that were the case, the significance of the allegedly discriminatory statements may well be an issue to resolve at trial, rather than on summary judgment.  But again, that is not the case here.  Immediately after Cuneo made the comments in question, Grewal thanked him—characterizing his statements as "wonderful."  And throughout this litigation, Grewal has continued to describe these statements as "nice" and "good," failing to explain how they created a hostile work environment.

Moreover, even if Cuneo intended to communicate that employees of CGL did, in fact, "just treat [Grewal] as a foreigner," this single statement would nonetheless fail to qualify as an

---

[9] Grewal rightly notes that Cuneo referred to her as a "girl" in the 2011 litigation meeting.  Grewal does not, however, claim that Cuneo's use of the term "girl," however ill-advised, related in any way to her national origin.  Nor does she claim that she was subjected to a hostile work environment on the basis of her sex.  *See* SAC ¶¶ 178–81.

"extraordinarily severe" incident that could alter the conditions of Grewal's employment.  *Alfano*, 294 F.3d at 374; *see Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." (alteration omitted) (internal quotation marks omitted)); *see, e.g.*, *Daniel v. T & M Prot. Res. LLC*, 87 F. Supp. 3d 621, 627, 635–36 (S.D.N.Y. 2015) (finding that a supervisor's use of explicit racial epitaphs during a "profanity-laced tirade," although "reprehensible," was not sufficiently severe to survive summary judgment on hostile work environment claim).

The second incident Grewal identifies, in which Cuneo told her that "we don't understand your accent," is also not sufficient to support a hostile work environment claim under the NYSHRL.  Even when this statement is viewed in combination with Cuneo's statements at the 2011 litigation meeting, no reasonable juror could find that incidents of discrimination on the basis of Grewal's national origin were "continuous and concerted" or constituted a "steady barrage of opprobrious . . . comments." *Tolbert*, 790 F.3d at 439 (internal quotation marks omitted); *see, e.g.*, *Lessambo v. PricewaterhouseCoopers, L.P.*, No. 08-CV-6272, 2010 WL 3958787, at *11 (S.D.N.Y. Sept. 27, 2010) (holding supervisor's "three offensive remarks" about employee's national origin did not create a hostile work environment), *aff'd*, 451 F. App'x 57 (2d Cir. 2011) (summary order); *Manessis v. N.Y. City Dep't of Transp.*, No. 02-CV-359 (SAS), 2003 WL 289969, at *5–6 (S.D.N.Y. Feb. 10, 2003) (finding evidence of two incidents that arguably showed discriminatory bias against employee on the basis of his national origin insufficient to survive summary judgment on hostile work environment claim), *aff'd sub nom. Manessis v. Chasin*, 86 F. App'x 464 (2d Cir. 2004) (summary order); *cf. Rivera v. Rochester Genesee Reg'l Transp. Auth.*,

26

743 F.3d 11, 20–21, 23 (2d Cir. 2014) (finding evidence that co-workers referred to a plaintiff with a racial epitaph "probably like three times" and led a racially insensitive chant against him "about five times" presented a "close call" and was "(barely) enough" to survive summary judgment). Nor is this second incident severe enough for a reasonable juror to find that Grewal's work environment was hostile or abusive.  *See, e.g.*, *Boza–Meade v. Rochester Hous. Auth.,* 170 F. Supp. 3d 535, 547 (W.D.N.Y. 2016) (finding that allegations that the co-workers of a Panamanian plaintiff "made fun of her accent," without further factual information as to the context and frequency of the remarks, were not sufficient to state a claim for hostile work environment); *Daniel*, 87 F. Supp. 3d at 627, 636 (finding evidence of incidents in which a supervisor "imitated" the English accent of an employee from St. Vincent and the Grenadines and told the employee to "go back to England" insufficient to survive summary judgment on hostile work environment claim).

Finally, none of the other workplace slights Grewal identifies is sufficient, even viewed collectively and in the light most favorable to her, to establish that she was subjected to a hostile work environment on the basis of her Indian origin.  For example, Grewal claims that Joel Davidow, another CGL attorney, threatened her with disbarment in a dispute over the firm's representation of an international engineering and electronics company.  *See* Pl. 56.1 ¶¶ 39–40, 76.  Grewal further claims that CGL "created a hostile work environment" by "giving work originated by Plaintiff to other attorneys, repeatedly giving credit of her work to others, deliberately leaving Plaintiff out of meetings," as well as "order[ing] repeat investigations and issu[ing] numerous threats." *Id.* ¶ 74.  Grewal, however, has not alleged that any of these incidents, which she describes as demoralizing, related in any way to her national origin.  As a result, she may not maintain a claim under the NYSHRL on the basis of these incidents.  *See, e.g.*, *Brown v.*

*Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable . . . only when it occurs *because of* an employee's sex, or other protected characteristic." (emphasis added)); *see also Bliss v. MXK Rest. Corp.*, No. 16-CV-2676, 2016 WL 6775439, at *2 (S.D.N.Y. Nov. 14, 2016) (dismissing an NYSHRL hostile work environment claim where the plaintiff "fail[ed] to establish the necessary causal link between Defendants' offensive conduct and her gender").[10]

Accordingly, there is no genuine dispute of fact precluding summary judgment on Plaintiffs' claim for hostile work environment under the NYSHRL.

### 2.  New York City Human Rights Law

Grewal next asserts a claim for discrimination or hostile work environment under the NYCHRL.  As with Grewal's claim under the NYSHRL, there is no genuine dispute of material fact with respect to this claim, and summary judgement to CGL is appropriate.

Under the NYCHRL, it is unlawful for an employer to discriminate against an individual "in compensation or in terms, conditions, or privileges of employment" because of the individual's national origin.  N.Y.C. Admin. Code § 8-107(a).  Pursuant to the New York City Council's revisions to the NYCHRL in the Local Civil Rights Restoration Act of 2005 (the "Restoration Act"), N.Y.C. Local L. No. 85, "courts must analyze NYCHRL claims separately and independently from any federal and state law claims." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).  Courts must "constru[e] the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably

---

[10] Grewal's claim that CGL created a hostile work environment by requesting her green card following her departure from the firm also lacks merit, as any events that occurred after Grewal left CGL's employ may not support her hostile work environment claim.

possible." *Id.* (quoting *Albunio v. City of New York*, 947 N.E.2d 135, 137 (N.Y. 2011)). "[E]ven if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standard." *Id.*; *see also LeBlanc v. United Parcel Serv.*, No. 11-CV-6983 (KPF), 2014 WL 1407706, at *21 (S.D.N.Y. Apr. 11, 2014) ("Hostile work environment claims under the NYCHRL are governed by a more permissive standard for liability." (internal quotation marks omitted)).

To prevail on an NYCHRL claim, a "plaintiff need only show differential treatment—that she is treated 'less well'—because of a discriminatory intent." *Mihalik*, 715 F.3d at 110; *see also Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 39 (1st Dep't 2009).[11]  Like Title VII and the NYSHRL, however, the NYCHRL is "not a 'general civility code,' and 'petty slights and trivial inconveniences' are not actionable." *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 671 (S.D.N.Y. 2012) (quoting *Campbell v. Cellco P'ship*, 860 F. Supp. 2d 284, 298 (S.D.N.Y. 2012)). "In determining whether a claim of hostile work environment survives summary judgment, the relevant consideration is whether there is a triable issue of fact as to whether the plaintiff 'has been treated less well than other employees because of [her protected characteristic].'" *Barounis v. N.Y. City Police Dep't*, No. 10-CV-2631 (SAS), 2012 WL 6194190, at *9 (S.D.N.Y. Dec. 12, 2012) (quoting *Williams*, 872 N.Y.S.2d at 39).

Here, summary judgment is appropriate on Grewal's NYCHRL claim because she has failed to provide evidence that she was treated "less well" than other CGL employees on the basis of her national origin.  As discussed above, it is undisputed that Cuneo's 2011 statements regarding Grewal's status as a "foreigner" did not reflect any intent to single out Grewal for less favorable

---

[11]  "The NYCHRL does not differentiate between discrimination and hostile work environment claims; rather, both are governed by N.Y.C. Admin. Code § 8–107(1)(a)." *Russo v. N.Y. Presbyterian Hosp.*, 972 F. Supp. 2d 429, 449–50 (E.D.N.Y. 2013).

treatment than her colleagues.  To the contrary, the uncontroverted evidence shows that Cuneo discussed Grewal's national origin with CGL employees to insist that she receive the *same* respect as all her colleagues, regardless of her national origin.   Thus, Cuneo's 2011 statements do not support any inference that Grewal was treated "less well" on the basis of her national origin.

Moreover, Grewal cannot create a triable issue of fact by characterizing Cuneo's statement that "we don't take this girl seriously" as an admission that CGL employees had, in fact, failed to take her as seriously as her colleagues.  The undisputed evidence demonstrates that Cuneo's use of "we" referred *not* to CGL employees but rather to a "group of largely white males" from another law firm who had, in Cuneo's view, failed to take Grewal as seriously as they should.  Under the circumstances of this case, the fact that Grewal may have encountered bias or discrimination in a meeting with others outside her firm does not suggest that she was treated less well on the basis of her national origin by her own employer.  Indeed, the evidence suggests the opposite: Cuneo highlighted the conduct of other attorneys to send a clear message to his own staff that such behavior was unacceptable at CGL.

Furthermore, the broad remedial purpose of the Restoration Act does not support Grewal's claim that Cuneo's statements should be actionable under the NYCHRL, even though they are not under state or federal law.  In passing the Restoration Act, the New York City Council emphasized the "need to make sure that discrimination plays *no* role" in the work environment.  *Williams*, 872 N.Y.S.2d at 38 (emphasis in original).  Far from frustrating this objective, Cuneo's statements promoted it: the undisputed evidence demonstrates that Cuneo sent his employees a clear message that discrimination in any form—whether on the basis of race, gender, or national origin—is unacceptable.  Moreover, like the New York City Council, Cuneo expressly acknowledged that workplace discrimination remains an intractable problem—and one from which "educated people"

and the legal profession are not immune. Cuneo's statements thus reflect the very goals and concerns that lay behind the Restoration Act, and subjecting CGL to liability on the basis of these statements would do little to further the Act's purpose.

Grewal's claim that Cuneo separately stated "we don't understand your accent," viewed in the context of this case, also cannot support a claim under the NYCHRL. To be sure, this statement may be viewed as a reference to Grewal's national origin, as she testified that she does speak with an accent. Standing alone, however, this statement does not indicate that Grewal was treated any less well than her colleagues—Cuneo did not, for instance, mock Grewal or suggest that she was any less capable an employee because she spoke with an accent. Absent further evidence, this statement is not sufficient for a fact-finder to reasonably conclude that Grewal was treated "less well" than her colleagues on the basis of her national origin. *See, e.g.*, *Pena v. Bd. of Elections in City of N.Y.*, No. 16-CV-00427 (VEC) (BCM), 2017 WL 722505, at *7, 11 (S.D.N.Y. Feb. 6, 2017) (dismissing a hostile work environment claim under NYCHRL for failure to state a claim where the plaintiff alleged that a co-worker arguably "denigrated her Dominican origin" by asking "jokingly, 'on which boat did I come'"), *report and recommendation adopted*, 2017 WL 713561 (S.D.N.Y. Feb. 22, 2017); *Mullins v. Consol. Edison Co. of N.Y, Inc.*, No. 13-CV-6800 (LGS), 2015 WL 4503648, at *5 (S.D.N.Y. July 22, 2015) (granting summary judgment to defendants on an NYCHRL claim where plaintiff, a black man who was born in Barbados, claimed that his white supervisor stated, "you speak well," which he perceived as a comment regarding his race or national origin).[12]

---

[12]As with Grewal's NYSHRL claim, the other incidents of which she complains—including Davidow's alleged threat of disbarment and CGL's alleged failure to give her credit or include her in meetings—cannot support an NYCHRL claim because Grewal has not provided evidence that any of these incidents was a result of her national origin. *See, e.g.*, *Russo*, 972 F. Supp. at 451 (explaining that, under the NYCHRL, "a plaintiff must still establish that she suffered a hostile work environment *because of her* [protected characteristic]" (emphasis in original)).

Accordingly, CGL is entitled to summary judgment on Grewal's NYSHRL and NYCHRL claims.

### D.  Motion to Strike

CGL moves to strike Grewal's submissions in opposition to CGL's motion for summary judgment and in further support of her own for summary judgment.  *See* Def. Mot. to Strike (Dkt. 220).  CGL argues that Grewal's submissions should be stricken because they contain inadmissible evidence, make new arguments, and were filed and served one week late.  The Court disagrees.

First, rather than striking Grewal's submissions on inadmissibility grounds, the Court has declined to consider evidence that appears inadmissible.  Federal Rule of Civil Procedure 56(c)(4) provides that, on a motion for summary judgment, an "affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is  competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  "A court may therefore strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements."  *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999), *abrogated on other grounds by Schnabel v. Abramson*, 232 F.3d 83 (2d Cir. 2000); *see also New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 304–05 (S.D.N.Y. 2015).  Alternatively, a court may "simply decline to consider those aspects of a supporting affidavit that do not appear to be based on personal knowledge or are otherwise inadmissible."  *Smeraldo v. City of Jamestown*, 512 F. App'x 32, 34 (2d Cir. 2013) (summary order).  The "principles governing admissibility of evidence do not change on a motion for summary judgment."  *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (citation omitted).  Here, CGL correctly notes that Grewal's reply submissions include evidence of settlement offers and negotiations between the parties, apparently as evidence

32

of the amount of her disputed claims, which is inadmissible under Federal Rule of Evidence 408.

*See* Fed. R. Evid. 408.  The Court has not considered this evidence.  CGL also argues that Grewal

has submitted inadmissible hearsay evidence, such as statements from non-CGL attorneys

regarding the quality of Grewal's work.  *See* Def. Mot. to Strike at 3–4.  The Court has not

considered these statements, which in any event do not appear relevant to any issue in this action.

Accordingly, the Court has not considered the inadmissible evidence CGL has identified but

concludes that striking all of Grewal's submissions, which include at least some admissible

evidence, is not an appropriate remedy.

Second, the Court does not find that any new arguments in Grewal's submissions provide

a basis for striking the submissions.  It is true that "arguments or requests for relief raised for the

first time in reply briefs need not be considered."  *In re Various Grand Jury Subpoenas*, No. 12-

MC-381, 2017 WL 361685, at *9 (S.D.N.Y. Jan. 24, 2017) (citing *ABN Amro Verzekeringen BV*

*v. Geologistics Ams., Inc.*, 485 F.3d 85, 100 n.16 (2d Cir. 2007)).  "However, the Second Circuit

has made it abundantly clear that a district court has *discretion* to consider a belatedly-raised

argument."  *Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co.*, 611 F. Supp. 2d 373, 375

(S.D.N.Y. 2009) (emphasis in original), *aff'd*, 374 F. App'x 71 (2d Cir. 2010).  The Court agrees

that Grewal has raised at least one new argument in her reply submissions; specifically, Grewal

has asserted an unlawful retaliation claim in her brief in opposition to CGL's motion for

summary judgment.  *See* Pl. Opp. Mem. at 12–14.  The Court does not consider this claim, which

Grewal did not include in her Second Amended Complaint.  The Court also does not consider

Grewal's discriminatory discharge claim, *see id.* at 9–12, which the Court dismissed on July 7,

2015, *see* Opinion and Order at 27–28, 34 (Dkt. 98).  While Grewal's assertion of at least one

new claim and one claim that the Court has previously dismissed was improper, the Court does

not find that this conduct warrants the harsh sanction of striking all Grewal's reply submissions.

Finally, the Court exercises its discretion to excuse the untimely filing and service of Grewal's reply submissions.  Under Rule 6(b)(1)(B) of the Federal Rules of Civil Procedure, a district court "may, for good cause, extend the time . . . if the party failed to act because of excusable neglect."  Fed. R. Civ. P. 6(b)(1)(B).  "To determine whether a party's neglect is excusable, a district court should take into account: '[1] [t]he danger of prejudice to the [opposing party], [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was in the reasonable control of the movant, and [4] whether the movant acted in good faith.'"  *Tancredi v. Metro. Life Ins. Co.*, 378 F.3d 220, 228 (2d Cir. 2004) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship,* 507 U.S. 380, 395 (1993)); *accord In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 129 (2d Cir. 2011).  "As these factors suggest, 'excusable neglect' is an 'elastic concept,' that is 'at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission."  *Tancredi*, 378 F.3d at 228 (quoting *Pioneer*, 507 U.S. at 392, 395).  "'Excusable neglect' . . . may encompass delays caused by inadvertence, mistake, or carelessness, at least when the delay was not long, there is no bad faith, there is no prejudice to the opposing party, and movant's excuse has some merit.'"  *LoSacco v. City of Middletown*, 71 F.3d 88, 93 (2d Cir. 1995) (quoting *Pioneer*, 507 U.S. at 388).

These considerations weigh in favor of finding that Grewal's delay in filing her reply submissions constitutes excusable neglect.  First, there is no danger of prejudice to CGL, as CGL has no further right of reply—and has, in any event, submitted a substantive response to Grewal's reply in its motion to strike and supporting memorandum of law.  *See, e.g.*, *Mascaro Const. Co. L.P. v. Local Union No. 210*, 391 F. App'x 13, 16 (2d Cir. 2010) (summary order)

34

(finding that "no prejudice could have resulted" from a petitioner's untimely submission of reply brief "since respondent had no further right of reply").  Second, the length of Grewal's delay—seven days—was not substantial, particularly in light of the fact that she had submitted "an earlier version" of her reply materials on time.  *See, e.g.*, *Tancredi*, 378 F.3d at 228 (holding that a party's "seven-day delay was minimal"); *Brown v. City of N.Y.*, No. 11-CV-1068 (AJN), 2014 WL 896737, at *2 (S.D.N.Y. Feb. 27, 2014) ("[T]he length of the delay—seven days—was not significant.").  Third, while the reason for Grewal's delay was an inadvertent mistake—she claims she "mistakenly submitted an earlier draft" of the submissions—there is no indication that she acted in bad faith.  *See In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 135 (2d Cir.1998) ("Excusable neglect may be found where the relevant circumstances reveal inadvertent delays, mistakes, or carelessness.").  Accordingly, the Court excuses Grewal's untimeliness in filing and serving her reply submissions.

CGL's motion to strike is therefore denied.

### E.  Sealed Documents

The Court notes that Grewal has submitted several documents under seal in connection with the parties' motions for summary judgment.  These documents include:

1. Exhibits appended to Grewal's motion for summary judgment.  CGL has submitted redacted versions of several of these exhibits, which CGL claims contain confidential information, *see* Dkts. 211, 217;

2. Plaintiff's Response to Defendant's Statement of Material Facts and Counterstatement in Further Support of Plaintiff's Motion for Summary Judgment;

3. Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment;

4. Plaintiff's Declaration and Rule 56.1 Statement in Further Support of Plaintiff's Motion for Summary Judgment and Counter to Defendant's Motion for Summary Judgment; and

5.  Plaintiff's Declaration in Further Support of Plaintiff's Motion for Summary Judgment and in Counter to Defendant's Rule 56.1 Statement, along with accompanying exhibits.

Within one week of the filing of this Opinion and Order, the parties are to advise the Court whether they oppose the filing of (1) the redacted exhibits to Grewal's motion for summary judgment, as filed at Docket No. 217, along with unredacted versions of all other exhibits submitted by Grewal in support of her motion for summary judgment, and (2) each of the other submissions listed above.  If the Court receives no opposition within this time period, the Court shall file these documents on the public docket.  Any request for sealing or redacting these documents must address the standard set forth in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006).

## CONCLUSION

For the reasons set forth above, Grewal's motion for summary judgment is denied; CGL's motion for summary judgment is granted in part and denied in part; and CGL's motion to strike is denied.  CGL's motion for oral argument is denied.  The Clerk of Court is respectfully directed to close the motions pending at Docket Nos. 191, 195, 220, and 221.

A conference is hereby scheduled for April 13, 2017 at 2:00 p.m. in Courtroom 1506 at the United States Courthouse, 40 Foley Square, New York, New York 10007.

SO ORDERED.

Dated:    March 31, 2017
          New York, New York

_____
Ronnie Abrams
United States District Judge

36