UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 9/28/2018

PREETPAL GREWAL,

                Plaintiff,

      v.

CUNEO GILBERT & LADUCA LLP,

                Defendant.

No. 13-CV-6836 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Preetpal Grewal, proceeding *pro se*, sued her former employer, the law firm Cuneo Gilbert & LaDuca LLP, asserting an assortment of claims. After fully briefed summary-judgment motions, this Court dismissed all but Ms. Grewal's claim for breach of contract. The Court held a bench trial on that claim and now enters judgment for CGL.

## BACKGROUND AND PROCEDURAL HISTORY

### I.    Overview

This case, generally speaking, arises from Ms. Grewal's employment and termination at CGL, where she worked as an attorney for approximately four years. Ms. Grewal first filed her complaint in this action on September 25, 2013, alleging that CGL, its employees, and its leadership—including the named partners Jonathan W. Cuneo, Pamela Gilbert, and Charles J. LaDuca—had a "scheme" to "illegally squeeze[] out" Ms. Grewal from the firm. *See* Compl. ¶¶ 1, 138–88 (Dkt. 1). That complaint and Ms. Grewal's two amended complaints, *see* First Am. Compl. (Dkt. 8), Second Am. Compl. (Dkt. 44), ultimately asserted thirteen claims, including claims that Defendants had interfered with her work at the firm in violation of their purported fiduciary duties

to her, negligently and intentionally inflicted emotional distress on her, and breached her employment contract by failing to compensate her properly.

The only count of the Second Amended Complaint that survived CGL's motion for summary judgment was for breach of contract. Second Am. Compl. ¶¶ 140–45. In that count, Plaintiff alleged that she "entered into a contractual agreement with CGL" that entitled her to "a percentage of fees in cases on which she worked or that she had brought to the firm" and "a reasonable opportunity to work on cases which she had identified or brought to CGL." *Id.* ¶ 142. According to the Second Amended Complaint, CGL breached that contract by, among other things, "repeatedly denying Plaintiff credit for cases she brought to the firm" and "subverting," "refusing," or "manipulating" matters such that Ms. Grewal was denied proper compensation. *Id.* ¶ 143. CGL contested Ms. Grewal's allegations, asserting various defenses and counterclaims. *See* Dkts. 99, 100. For example, CGL argued that Ms. Grewal herself was in breach of her employment agreement in several ways, including by working *pro bono* for a woman named Elizabeth Thomas without the firm's consent. Ms. Grewal, in turn, disputed these allegations.

As described further below, this Court's rulings on various motions in this case ultimately whittled the issues down to the one that went to a bench trial: whether CGL violated its employment agreement with Ms. Grewal by failing to pay her "origination" credit for her work on certain cases that she argues she brought to the firm.[1] The trial lasted six days.

## II.    Pretrial Motions and Proceedings

Defendants filed a motion to dismiss the Second Amended Complaint and for partial summary judgment. *See* Dkt. 51. This Court granted in part and denied in part that motion,

---

[1] CGL's first, second, third, and fifth affirmative defenses also remained in the case. *See* January 2016 Op. & Order at 8 (Dkt. 141). Because the Court concludes that Ms. Grewal failed to prove all the elements of her breach of contract claim on the merits, the Court does not address these affirmative defenses.

dismissing several of Ms. Grewal's claims and dismissing all Defendants except CGL. *See* July 2015 Op. & Order at 34–35 (Dkt. 98).  Among other things, the Court held that Ms. Grewal had failed to adequately allege that she was a partner in CGL as a matter of law, which in turn required the Court to dismiss her claims against the individual CGL named partners and for breach of fiduciary duty. *See id.* at 14–17, 20.

CGL, the sole remaining defendant, filed an answer and counterclaims. *See* Dkts. 99, 100. In response, Ms. Grewal filed a motion for reconsideration of the July 2015 Opinion, as well as a motion to strike CGL's affirmative defenses and to dismiss its counterclaims. *See* Dkt. 114, 121. The Court denied Ms. Grewal's motion for reconsideration, granted her motion to dismiss CGL's counterclaims, and granted in part and denied in part her motion to strike CGL's affirmative defenses. *See* January 2016 Op. & Order at 18 (Dkt. 141).  Three affirmative defenses survived that decision, including one asserting that Ms. Grewal had committed a "substantial and material" breach of her contract with CGL that barred her recovery for damages. *See* Answer at 17 (Dkt. 99).  The Court also addressed and rejected again Plaintiff's arguments with respect to her partnership status at the firm. *See* January 2016 Op. & Order at 4, 11–12.

Following discovery, the parties filed cross motions for summary judgment. *See* Dkt. 191, 195.  On March 31, 2017, this Court denied Ms. Grewal's motion for summary judgment and granted in part CGL's motion, dismissing all of Ms. Grewal's remaining claims except her claim for breach of contract. *See* March 2017 Op. & Order at 20, 36 (Dkt. 226).

The case proceeded to a bench trial. *See* Dkts. 238, 242, 243.  The Court ordered the parties to submit their joint pretrial submissions no later than November 6, 2017, and it scheduled the final pretrial conference for November 21, 2017. Dkt. 240.  Defendant submitted its portion of the joint pretrial order, its exhibits, and a motion in limine that sought to bar Ms. Grewal from making any

arguments at trial "predicated on her allegations that she was an equity partner," because the Court

had already granted Defendant's motion to dismiss—and denied Ms. Grewal's motion to

reconsider—on that subject. *See* Dkt. 262. Ms. Grewal did not file her pretrial submissions by

November 6, 2017.[2] At the final pretrial conference, the Court granted Ms. Grewal an extension

of time to submit her exhibits and other pretrial materials. *See* Dkt. 267. The Court further advised

Ms. Grewal that it would not be further reconsidering its prior opinions—including its ruling that

Plaintiff was not a partner at CGL as a matter of law—and that it would "disregard any testimony

or evidence presented that is irrelevant to Plaintiff's claim for breach of contract." *Id.* This ruling

effectively granted Defendant's motion in limine.

On November 22, 2017, Ms. Grewal requested an additional extension of time to file her

pretrial and trial materials, which the Court granted. Ms. Grewal ultimately emailed the Court and

opposing counsel five PDFs containing her exhibits.[3] CGL objected to several of the exhibits as

irrelevant or inadmissible, asked that untimely exhibits be excluded, and requested that all of

Defendant's trial exhibits be admitted as a sanction against Ms. Grewal. *See* Dkts. 277, 278.

### III.   Trial

On the first day of trial, CGL raised the issue of Ms. Grewal's repeated failures to comply

with Court deadlines and requested a ruling on whether Ms. Grewal would be permitted to use the

---

[2] In response to Ms. Grewal's failure to file those materials and otherwise comply with various Court orders, *see generally* Dkts. 260, 261, 263, 266, 267, CGL filed two letters requesting that the Court dismiss the case, *see* Dkts. 259, 265. The Court declined to do so.

[3] The exhibits were sent in five "Parts" by email to the Court's law clerk and to Defendant's counsel between 6:02 p.m. and 10:08 p.m. on November 22, after the 6:00 p.m. deadline the Court had set. The relevant emails are gathered at Court Exhibit 1, with the law clerk's name redacted. Ms. Grewal's requested that the Court keep these emails "Confidential." That request is denied, as is any request to seal her trial exhibits. She has made no argument justifying a restriction on the public's right of access to those materials. *See generally Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006); *Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*, No. 96-CV-8414 (CBM), 2003 WL 1878235, at *3 (S.D.N.Y. Apr. 11, 2003).

exhibits that she did not provide to CGL in a timely manner. *See* Tr. Trans. at 16.[4] The Court

reserved ruling on the admissibility of Ms. Grewal's exhibits.[5] Ms. Grewal did not object to any

of Defendant's exhibits, which were then admitted. *See id.* at 109.

The trial began with Ms. Grewal's direct testimony. She did not call any other witnesses

at that time. *Id.* at 96–97. After the completion of Plaintiff's case, CGL moved for judgment, Ms.

Grewal responded, and the Court reserved ruling. *See id.* at 191. Over the next two days of trial,

CGL called Jonathan Cuneo, Elizabeth Thomas, and Alexandra Warren to testify. *See id.* at 244.

When it became clear that trial would not finish on schedule, and in light of the Court's and the

parties' schedules, the remainder of trial was adjourned until January 2018. The Court granted Ms.

Grewal time during that hiatus to submit her trial materials and any additional impeachment

evidence she wished to submit with respect to Ms. Thomas's testimony. *See id.* at 343; Dkt. 282.[6]

Trial resumed on January 29, 2018. Tr. Trans. at 406.[7] Defendant then called Mr. Cuneo

back to the stand to finish his direct examination, which concluded before the lunch recess. *Id.* at

---

[4] The Trial Transcript in this matter is paginated sequentially in six docket entries, one for each day of trial. *See* Dkts. 283, 284, 285, 294, 296, 298. The Court cites it as one document.

[5] The Court did, however, expressly exclude Plaintiff's Exhibit 5, which was part of settlement discussions between Plaintiff and Defendant earlier in the case. *See* Tr. Trans. at 39–40. Plaintiff's Exhibits 33 and 57 also contain duplicate pages from Exhibit 5. The Court thus excludes Plaintiff's Exhibits 33 and 57 on the same grounds as Plaintiff's Exhibit 5 and further disregards any references to them at trial.

[6] Ms. Grewal did not submit any additional documents to the Court. On January 17 and 25, Defendant submitted to the Court two letter motions in which CGL requested that the Court dismiss the case in light of Ms. Grewal's "contumacious" behavior including "(1) repeatedly ignoring Court orders and rules; (2) failing to appear for trial sessions, hearings, and conferences on time or at all; (3) refusing to cooperate with [defense counsel] in preparing joint pretrial submissions; and (4) launching into outbursts during trial that were so loud, angry, aggressive, and disrespectful that Your Honor brought marshals into the courtroom[.]" *See* Dkts. 290, 291; *see also, e.g.,* Tr. Trans. at 406-36. The Court ordered that trial would proceed as scheduled and later warned Ms. Grewal about her behavior. *See* Dkt. 292; Tr. Trans. at 433.

[7] The morning proceedings began with Ms. Grewal raising various concerns with the Court, including a request that the Court recuse itself from presiding over the trial, which the Court denied. *See* Tr. Trans. at 406-33. Ms. Grewal's recusal motion appeared to be based on her discontent with this Court's previous rulings in the case, particularly with regard to the Court's conclusion that Ms. Grewal was not a partner at CGL as a matter of law. *Id.* at 412-32. Ms. Grewal also emphasized that she was an attorney and wished to be treated as one. *Id.* at 435–36. As the record in this case reflects, this Court has treated Ms. Grewal leniently and as a *pro se* litigant to take into account the difficulties inherent in representing oneself. The Court's statements regarding Ms. Grewal's *pro*

443, 482. Ms. Grewal began her cross-examination of him after lunch, and she continued for

approximately four hours over the rest of that day and the following morning. *Id.* at 482, 523, 554,

609. After the lunch recess on the fifth day of trial, the Court informed Ms. Grewal that her cross-

examination of Mr. Cuneo would be limited to the end of the day—by which point it would have

lasted for seven hours—to "avoid the presentation of cumulative evidence[,] delay[,] and wasting

time." *Id.* at 609 (citing Fed. R. Evid. 403, 611, and related cases).[8]  She used that time, and she

requested more at the end of the day.  The Court granted her one additional hour—from 10:00 a.m.

until 11:00 a.m. the next morning—to complete her cross. *Id.* at 713.[9]  Ms. Grewal completed her

cross-examination of Mr. Cuneo at 11:00 a.m. the next day.

At this point and others during the trial, Ms. Grewal said that she would file "a motion for

sanctions with all the perjury" and attach "documents produced by defendants" to impeach Mr.

Cuneo (or other witnesses) and she requested "time to do that." *See id.* at 745; *see also, e.g., id.*

at 138–39, 181–82, 753.  The Court addressed these requests with the following ruling:

> I know that Ms. Grewal has repeatedly expressed interest in submitting
> additional documents to the court for various purposes, including impeachment.
> But now you've had over two months to put the documents together and submit
> them to the court, and you haven't done so in spite of repeated warnings that failure

---

*se* status were intended only to explain why the Court was willing to forgive her various failures—they were of
course never meant to disparage, "abuse," or "mock" her, as Ms. Grewal claimed during trial, nor were they
meant to suggest that she was not an attorney. *See* Tr. Trans. at 339, 427–35, 438.

[8] Before formally setting this deadline, the Court had already warned Ms. Grewal several times that the Court
expected Mr. Cuneo's testimony to end on the fifth day of trial. *See* Tr. Trans. at 539, 542–43, 554–58, 578, 606.
The Court viewed the deadline as necessary because much of Mr. Cuneo's cross-examination up to that point
had been of tenuous, if any, relevance, in addition to being cumulative.  Rather than focus on the issues most
pertinent to Ms. Grewal's claim for origination fees or most responsive to Cuneo's direct testimony, Ms. Grewal
spent significant time questioning Mr. Cuneo about cases that had arisen before Ms. Grewal joined the firm,
about the history of his law practice, and about general principles of antitrust law.  Ms. Grewal also had Mr.
Cuneo read long portions of exhibits into the record without any obviously related questions, despite the Court's
requests that she move things along.

[9] The Court warned Ms. Grewal that, if she were late again the next morning, it would "cut into [her] hour of
cross-examination." Tr. Trans. at 716.  Ms. Grewal commented that she "really [didn't] care" about only having
until 11:00 a.m. *Id.*  Ms. Grewal was late the next morning by 18 minutes—time which the Court took from her
remaining hour of cross-examination. *See id.* at 720.

> to submit documents in a timely fashion would mean that the court wouldn't
> consider them.
>
> So I'm not going to consider any evidentiary documents. As I noted earlier,
> this week, I will allow you to either make closing arguments orally and/or make a
> posttrial submission to me in writing. So I'll allow that. And, in addition, I am
> allowing Ms. Grewal to use the documents that she e-mailed to the court in
> November as well as all of the defendants' exhibits and, as I said, submit a posttrial
> brief.

*Id.* at 752–54.[10]  Defendant called just one other witness, Chris Fisher, after which Defendant

rested its case. *See id.* at 784–86. Ms. Grewal then called Pamela Gilbert, one of the name partners

at CGL, as a rebuttal witness. *Id.* at 786.[11]  Finally, Ms. Grewal took the stand once more, and the

Court permitted her testimony to act as a summation as well. *See id.* at 848–55. The Court then

scheduled post-trial briefing, setting a firm deadline of April 16, 2018. *See id.* at 858; *see also*

Dkt. 293. Trial adjourned.  Defendant filed a post-trial brief by the April 16 deadline; Ms. Grewal

did not.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Ms. Grewal's sole remaining legal claim is one for breach of contract under New York Law.

The Court finds the following facts and makes the following conclusions of law as to that claim,

as is required by Federal Rule of Civil Procedure 52.

This Court has already exercised diversity jurisdiction under 28 U.S.C. § 1332 and

concluded that New York law applies to Ms. Grewal's breach of contract claim. *See March 2017*

Op. & Order at 12 n.3; July 2015 Op. & Order at 7 n.2. The elements of a breach of contract claim

---

[10] The Court also agreed to give Ms. Grewal some additional "leeway" to produce some portions of undesignated deposition transcripts and noted that it would take judicial notice of documents as necessary and appropriate. Tr. Trans. at 491, 618, 756, 791, 813. Ms. Grewal never submitted any additional documents.

[11] Ms. Grewal also asked about the location of Charles LaDuca, another name partner at CGL, who had left the city prior to the last afternoon of trial. *See* Tr. Trans. at 838. Ms. Grewal later accused Defendant of "refus[ing] to produce Mr. Charles LaDuca as a witness in this trial." *Id.* at 845. Ms. Grewal never informed the Court that she wanted to call Mr. LaDuca—although she had advance and frequent notice (and herself acknowledged) that Defendant did not intend to call him, and even when the Court directly asked her whether she had additional witnesses to call. *See id.* at 276, 338–39, 479, 663, 785–86.

under New York law are well established: "to recover from a defendant for breach of contract, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between [herself] and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). Under New York law, breach of contract claims present mixed questions of law and fact. *See New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F.3d 101, 111 (2d Cir. 2006).

## I.    Contract Formation

As an initial matter, CGL argues that there is no sufficiently definite contract to enforce against them. Whether a contract (or an implied contract) exists is a question of fact. *See id.* at 111–12. "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004) (citation omitted). That mutual assent or "meeting of the minds" must be expressed as to all "essential terms." *See Kowalchuk v. Stroup*, 873 N.Y.S.2d 43, 46 (N.Y. App. Div. 2009). "If essential terms of an agreement are omitted or are phrased in too indefinite a manner, no legally enforceable contract will result." *See Brookhaven Hous. Coal. v. Solomon*, 583 F.2d 584, 593 (2d Cir. 1978); *see also Adams v. Suozzi*, 433 F.3d 220, 227 (2d Cir. 2005). "[A] court should consider the broad framework of a contract in determining whether missing terms are actually essential—that is, necessary to make the agreement legally binding." *Shann v. Dunk*, 84 F.3d 73, 79 (2d Cir. 1996).

Specifically, CGL contends that "Grewal has not introduced evidence that CGL and she had a meeting of the minds on the criteria for obtaining origination credit," and that those criteria

were "essential contract term[s]." D's Post-Trial Br. at 6 (Dkt. 300). CGL has made this argument

before, and it is no more persuasive now than it was then. As the Court explained:

> CGL's memorandum of law asserts that Grewal's e-mail exchange
> with Cuneo is not an enforceable agreement because it did not
> contain certain "terms," such as "the criterion to be used to
> determine the amount of credit Grewal would receive for cases
> brought to CGL." *See* Def. Mem. at 15. The absence of such a
> "criterion," however, demonstrates the ambiguity of this agreement,
> not the absence of an agreement. CGL has not disputed that the
> requirements for contract formation—offer, acceptance, and
> consideration—have been satisfied here. *See* Def. 56.1 ¶ 44 ("A
> series of emails sent and received by Grewal in June 2008 show that
> she was offered and accepted a position at CGL . . . ."). Accordingly,
> CGL has not raised a triable issue regarding the enforceability of this
> agreement, and its discussion of the missing "terms" in the
> agreement only reinforces the Court's conclusion that the agreement
> is ambiguous.

*See* March 2017 Op. & Order at 15 n.5. That decision binds CGL as the law of the case. *See*

*generally Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001). Neither CGL nor the

proceedings at trial have given this Court a "good reason" to reconsider it. *See Black v. Anheuser-*

*Busch In Bev*, 220 F. Supp. 3d 443, 449 (S.D.N.Y. 2016), *appeal dismissed*, No. 16-4028, 2017

WL 5988456 (2d Cir. Mar. 3, 2017). The criteria for assessing and defining "origination" was not

so essential to Ms. Grewal's employment contract with CGL that those terms' absence bars Ms.

Grewal from suing on her contract with CGL now. *See generally Elite Tech. N.Y. Inc. v. Thomas*,

894 N.Y.S.2d 420, 421 (N.Y. App. Div. 2010) (listing the essential elements of an effective

employment agreement). Moreover, terms under New York law are not rejected as indefinite

unless "the agreement cannot be rendered reasonably certain by reference to an extrinsic standard

that makes its meaning clear." *See Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*,

548 N.E.2d 203, 206 (N.Y. 1989). Here, the contract came into existence and is enforceable. It

also entitled Ms. Grewal to origination credit under certain circumstances.  The question for trial was what those circumstances were.

## II.    Contractual Ambiguity

As described above, this Court found at the summary judgment stage that Ms. Grewal's employment contract was ambiguous.  *See* March 2017 Op. & Order at 12–20.  After trial, this Court harbors no doubt as to that conclusion's correctness.  "[A]mbiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire agreement." *Peterson v. Islamic Republic of Iran*, 876 F.3d 63, 83 (2d Cir. 2017) (citation and internal alterations omitted).  "In determining whether the contract is ambiguous, a court looks at the contract as a whole 'in light of the circumstances present when the contract was entered.'" *Steiner v. Lewmar, Inc.*, 816 F.3d 26, 33 (2d Cir. 2016) (citation omitted).  As the Court has previously held, the term "origination" is susceptible to multiple reasonable interpretations, requiring this Court to delve into the evidence submitted at trial to determine its meaning.

## III.    Contractual Interpretation

Contract interpretation presents questions of fact when "the contract is ambiguous and relevant extrinsic evidence as to its meaning is available." *Meyers*, 442 F.3d at 111 (citation omitted).  The Court may look to such extrinsic evidence to determine the meaning of ambiguous or seemingly indefinite terms.  "The cardinal principle" of interpreting contracts "is that the intentions of the parties should control." *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, 467 F.3d 107, 125 (2d Cir. 2006) (citation omitted).  Under New York law, courts look to "the objective manifestations" of the parties' intent "as gathered by their expressed words and deeds." *See id.* (quoting *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 361 N.E.2d

10

999, 1001 (N.Y. 1977)). Such "communicated expressions" must be "interpreted objectively" to give effect to the parties' reasonable expectations—"not necessarily their actual expectations." *Id.* at 126. To determine what expectations are "reasonable," courts look to the circumstances attendant to the formation of the agreement, prior negotiations between and the situations of the parties, and the parties' objectives. *See id.* at 125–26 (gathering cases). Courts may also consider "commercial practice or trade usage," and "subsequent conduct of the parties" to define ambiguous or seemingly indefinite terms. *See Capital Dist. Enterprises, LLC v. Windsor Dev. of Albany, Inc.*, 861 N.Y.S.2d 816, 819 (N.Y. App. Div. 2008); *see also Hoyt v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006) (explaining that, under New York law, the factfinder may consider "extrinsic evidence such as the parties' course of conduct throughout the life of the contract"). When the parties manifest conduct "for any considerable length of time" after a contract is formed but before its meaning is disputed, the parties' "practical interpretation of [the] contract . . . is entitled to great weight." *Stone Key Partners LLC v. Monster Worldwide, Inc.*, No. 17-CV-3851 (JMF), 2018 WL 3821629, at \*5 (S.D.N.Y. Aug. 10, 2018) (citation and internal marks omitted). At no point, however, can "a party's uncommunicated subjective intent . . . supply the ultimate meaning of an ambiguous contract." *SR Int'l Bus. Ins. Co.*, 467 F.3d at 125.

### A.     The Parties' Objective Intent and Related Factual Findings

Before delving into precisely what the ambiguous terms of the contract meant in this case, an overview some of the relevant factual findings is necessary.

Preetpal Grewal is an attorney licensed to practice law in both India and New York, who has for quite some time lived and worked in New York. In 2006, a mutual friend introduced Ms. Grewal to Jonathan Cuneo, a founding and named partner of CGL. *See* Tr. Trans. at 120. In the spring of 2008, Mr. Cuneo reached out to Ms. Grewal to talk about possibly hiring her. *Id.* at 120–

21.   He knew that she had worked as a lawyer in India and had been "tremendously successful" there. *Id.* at 121.  On April 15, 2008, he met Ms. Grewal for a "breakfast meeting" at which he "explained the work in the firm and the terms" for working there, including the "percentages" for origination fees. *Id.* at 18; *see also id.* at 22, 122, 126–27.  This was Mr. Cuneo's "standard pitch" for compensation at CGL, which included the fact that CGL compensated lawyers "at 10 percent for the work that they actually bring in, including clients." *Id.* at 127.  Ms. Grewal testified that Mr. Cuneo described "his practice" with respect to origination and left her with the impression that such compensation "was going to be very lucrative" and "it was not something that was just a compensation structure that was limited in any manner." *Id.* at 25.  She also admitted, however, that she did not know if she "fully understood" what origination meant at the time and that she did not remember well the conversations she had with Mr. Cuneo about what "origination" meant. *See id.* at 25, 28.

Ms. Grewal did not remember any other specific conversations with Mr. Cuneo about what origination meant before he offered to hire her in June 2008. *Id.* at 28.  Over the course of that month, Mr. Cuneo and Ms. Grewal exchanged a series of emails solidifying their employment relationship.  Between June 17 and 18 in particular, Ms. Grewal asked Mr. Cuneo seven questions and Mr. Cuneo provided his answers. *See* P's Ex. 3; D's Ex. 101.  Her sixth and seventh questions related to her pay at the firm and potential business development activities:

> 6. I recall that . . . salary would be 10,000 per month to start plus a bonus based on the number of hours worked, is that right?

> 7. Would I be permitted/expected to develop clients for the firm as discussed? To what extent if any would client development activities be compensated?

*See* D's Ex. 101 at 3.  Mr. Cuneo responded with like-numbered paragraphs:

6. The "bonus" is an entitlement (so not really a bonus) based on your relative value of contribution to a case (based on lodestar) when and if, and only if, we get paid.

7. YES, and yes again. You would be compensated for this activity hourly, plus 10 percent of work you originate plus twelve percent of your lodestar contribution. For example, on immigration work you brought in and did exclusively you would get 22 percent, plus [an hourly rate].

*See* D's Ex. 101 at 2; *see also* Tr. Trans. at 122–24. Ms. Grewal responded that "[e]verything looks permit [sic] and I formally accept your offer." *See* D's Ex. 101 at 1. It is undisputed that these emails constitute the core "agreement" at issue here.

Ms. Grewal began working at CGL on June 30, 2008. Tr. Trans. at 23. Throughout her time there, the firm held regular weekly "litigation meetings." *See, e.g., id.* at 29, 112, 117, 143, 269–70, 289. Ms. Warren (who was an associate at CGL) and Mr. Cuneo testified credibly about these meetings. Ms. Warren began working at CGL before Ms. Grewal, in 2006, and explained that the meetings had occurred since she was hired. *See id.* at 267, 269–70, 289. Ms. Warren further testified that Ms. Grewal was reliably present at the meetings. *See id.* at 270. Both Ms. Warren and Mr. Cuneo explained that those meetings included frequent discussions about origination and its requirements, which were (and were communicated to be) "[f]inding a client, drafting a complaint, and coming up with a case." *See id.* at 269–70; *see also id.* at 105–06, 478, 579, 594. The understanding at these meetings and the firm's general practice was that lawyers who complied with these requirements—assuming that their originated cases were ultimately profitable—would get origination fees. *See id.* at 104–05, 108, 476; *see* D's Ex. 33. Ms. Grewal's testimony that participants "discussed cases generally in litigation meetings" but "did not discuss what [others] did or how they originated their work" is not to the contrary. *See* Tr. Trans. at 143. It may well be that participants at the litigation meetings did not discuss specifically how and when

13

others at the firm were awarded origination credit, but the Court nonetheless credits that those meetings frequently included discussions of the three prerequisites for receiving such credit, that Ms. Grewal regularly attended those meetings from when she started at the firm in 2008, and that she accordingly would have been part of and aware of the discussions of the three-prong origination test.

On October 11, 2010, Mr. Cuneo reminded Ms. Grewal of the three-prong requirement for origination credit in an email where he told her plainly that, "[t]o establish leadership in any case, you need a complaint – and a client – and a conflict free, good, case." D's Ex. 33 at 1. Ms. Grewal responded on the same day to say that she had "generated" a case, had "others in the pipeline," and was "working on it to find the client and information needed to file a complaint." *See id.* She did not object to Mr. Cuneo's recitation of the requirement that she have a complaint, a client, and a good idea for a "conflict free" case. One year later, however, Ms. Grewal emailed Mr. Cuneo the following message:

> It has always been my understanding that if someone brings an idea for a case to the table, and such a case is filed, one is entitled to 10 percent of the attorneys fees.
>
> Please confirm.

P's Ex. 30. It is unclear whether Mr. Cuneo responded to this email, which appears to have been the first time that Ms. Grewal expressed her apparent understanding of the term origination to anyone at CGL. Ms. Grewal also sent a few emails in December 2011 in which she seemed to indicate an expectation that she would get origination fees for her ideas on existing cases. *See* D's Ex. 26; P's Ex. 43-2.[12] Mr. LaDuca and Mr. Cuneo responded by email, informing Ms. Grewal

---

[12] P's Ex. 43-2 is labelled as such because Ms. Grewal submitted two exhibits numbered P's Ex. 43. P's Ex. 43-2 includes an email chain from December 2011 (Bates No. Cuneo 11771) where Ms. Grewal claims both to have brought "the idea" for filing "TPP" cases, discussed below, and to have drafted two complaints in those cases.

that the firm could not and did not pay "lawyers a percentage for ideas or work product in existing cases," because "[i]t is their job to make the cases better." *See* D's Ex. 26; Tr. Trans. at 198. Moreover, from attending the same litigation meetings that Ms. Grewal had been attending for quite some time, Ms. Warren had concluded that it was "[d]efinitely no[t]" sufficient under the firm's practices for origination credit if a lawyer simply suggested a theory that was later used in a case. *See* Tr. Trans. at 271. In April 2012, Mr. Cuneo again told Ms. Grewal that it was not enough simply to sign a client. *See id.* at 85.

It is true, as Mr. Cuneo testified, that CGL's application of its three-prong rule was not entirely consistent—the firm sometimes paid attorneys percentages on cases even when they did not technically meet the standard definition of origination.[13] Based on Mr. Cuneo's testimony as a whole, and finding that testimony to be credible, the Court concludes that any deviations from the standard three-prong rule to pay fees more liberally were in the firm's discretion, distributed effectively as a discretionary bonus or as a result of individual one-off negotiations with specific employees. According to Mr. Cuneo, the firm distributed such bonuses when the firm was "short of business" to incentivize more active client development. *Id.* at 622. It also distributed such bonuses or credits to placate employees (including Ms. Grewal) when a dispute over fees arose, even when it appeared to the firm that the relevant attorney had not satisfied the three-prong rule. *See id.* at 106, 227–28, 477–78, 622, 637.

**B.   Meaning of the Term Origination**

Based on the terms of the agreement (*i.e.*, the emails exchanged between Ms. Grewal and Mr. Cuneo) and the parties' surrounding manifestations of intent, there are some essentially

---

[13] There is no indication in the record, however, that the firm ever failed to pay someone origination fees when it actually profited from a case for which that person had come up with the idea, found the client, and drafted the complaint.

undisputed conclusions that can be drawn. Most relevant here is the basic fact that CGL had no obligation to pay origination fees if the firm lost a case and did not recover its expenses. *See id.* 43–44, 84.[14] The parties more seriously dispute the other prerequisites to receiving origination fees. According to Ms. Grewal, origination fees should have been awarded to her whenever she came up with an idea or a theory that was used in any case brought at any point by anyone by at CGL—even if she did not personally retain a client or file a complaint on behalf of that client, and even if she had left the firm before CGL brought the case. *See id.* at 81–84. According to CGL, the contract required Ms. Grewal to satisfy the three prerequisites for origination: she had to provide an idea, a client, and a complaint. For the reasons explained below, the Court is able to resolve these disputes by examining the conduct of the parties surrounding and subsequent to the formation of Ms. Grewal's contract.

As described above, the parties attended weekly litigation meetings at which the three origination requirements—the idea, client, and complaint—were discussed, Mr. Cuneo communicated that sentiment by email to Ms. Grewal in 2010, and Ms. Grewal apparently did not object to the three-prong test until 2011. These meetings, emails, and the absence of objections from Ms. Grewal demonstrate that, objectively, the "client development" to which Ms. Grewal referred in her emailed question to Mr. Cuneo, and his responses to her regarding bringing in or originating work, meant that Ms. Grewal had to meet all three prongs of the origination test. Then it would be up to the firm whether to bring the case, and the firm would not award origination fees unless the case was ultimately profitable. *See id.* at 84, 569, 579, 583.

---

[14] Although Ms. Grewal conceded that failing to bring a case would not be a breach of contract, *see* Tr. Trans. at 74, she also appeared to argue that she was entitled to origination fees for cases even if they did not produce firm profits, if the reason the case was not profitable was not a "proper" one. *See, e.g., id.* at 31. The Court addresses these arguments below.

CGL's definition of origination is also more consistent with common sense and business practicalities than Ms. Grewal's. Given the firm's focus on bringing class action lawsuits, it would not have made sense to give everyone origination fees who simply brought a client into a preexisting case. *See id.* at 85. Similarly, as Mr. Cuneo explained at trial, it would not have made sense for CGL to pay Ms. Grewal or other attorneys origination fees for making existing cases better—they were being paid salaries and lodestar bonuses for that work. *See id.* at 106, 198.[15]

Ms. Grewal presented two main types of evidence to support her theory of the meaning of origination. First, she offered her own testimony and emails she had written in or after 2011 about her subjective understanding of the term. *See, e.g., id.* at 25, 28, 83–85, 143; P's Ex. 30. For example, she testified that she thought origination "sounded like it was going to be very lucrative," that it did not seem to be "limited in any manner," and that she "[a]bsolutely" was entitled to origination fees if she came up with an idea and shared that idea with others at the firm, even if CGL only brought the case after she left. *See, e.g., id.* at 25, 83–84. This testimony, however, was largely conclusory, uncorroborated, and at least partially contradicted by her own testimony that she did not remember clearly what she thought the meaning of origination was—or what conversations she had had with Mr. Cuneo about its definition—around the time when she signed the contract. *See id.* at 25, 28. She also failed to prove that she shared her subjective understanding of the term with CGL at any time in the years prior to 2011, including when she attended litigation meetings at which the standard three-prong test for origination fees was discussed and when Mr.

---

[15] As described above and as discussed further below, the firm deviated from its three-prong test awarding origination credit only in specific individual negotiations with employees whom the firm wanted to reward or placate, more akin to a discretionary bonus. Ms. Grewal has demonstrated no entitlement to any discretionary bonus, and the failure to give a discretionary bonuses is not generally susceptible to a breach of contract claim regardless. *See generally Guggenheimer v. Bernstein Litowitz Berger & Grossmann LLP*, 810 N.Y.S.2d 880, 885 (N.Y. Sup. Ct. 2006).

Cuneo sent her an email in 2010 explaining what getting credit for "leadership" of a case required. *See* D's Ex. 33 at 1.

Second, Ms. Grewal tried to explain the basis for her subjective understanding by introducing evidence of times when other attorneys had received origination credit when she claimed they had not satisfied all three prongs of the origination test. She focused primarily on another attorney, Joel Joseph, who sued CGL over a compensation dispute and was later granted a 20% fee in a few cases when he settled his lawsuit against the firm. *See* Tr. Trans. at 20, 86, 99–100, 186, 617–22, 625; P's Ex. 4, 43 (relating to Joel Joseph). Ms. Grewal also discussed at least one other instance where Mr. Cuneo apparently promised someone origination fees before the three requirements had been met. *See* Tr. Trans. at 86. Even if Ms. Grewal were correct that CGL employed a broader definition of origination when it negotiated with specific attorneys about origination fees in specific cases, those specific negotiations and concessions—to the extent they are admissible—are not probative of Ms. Grewal's contractual entitlements or lack thereof.[16] When Mr. Cuneo and Ms. Grewal exchanged the emails that compose the contract at issue, Ms. Grewal understood that her previous conversations with Mr. Cuneo had described "his practice," and Mr. Cuneo considered those conversations to be his "standard pitch." *See id.* at 25, 127. Ms. Grewal's contract with CGL thus incorporated the firm's standard definition of origination, which the parties' conduct revealed to include the three requirements discussed above. Any evidence that the firm occasionally departed from that standard in specifically negotiated scenarios does not alter the meaning of origination for the purposes of Ms. Grewal's breach of contract claim.

---

[16] To the extent that Ms. Grewal was relying on the Joel Joseph documents to demonstrate how origination fees were calculated by CGL, the Court need not address the documents' relevance given the Court's conclusion that, regardless of how those fees were ultimately calculated, Ms. Grewal did not prove at trial that she was entitled to any. The allegations and claims made by Mr. Joseph in his lawsuit, *see* P's Ex. 43, are also inadmissible hearsay to the extent they were offered for their truth.

The Court finds Ms. Grewal's evidence be insufficient, not credible, and/or irrelevant such that Ms. Grewal has not persuaded the Court that her subjective understanding of origination—to the extent it was actually her understanding in 2008—was the objectively reasonable intent of the parties when they entered into the contract. *See SR Int'l Bus. Ins. Co.*, 467 F.3d at 125.

## IV. Claimed Breaches of Contract and Damages

### A. Claims for CGL's Purported Failure to Pay Proper Compensation

Based on the above, the Court concludes that Ms. Grewal must prove, for any given matter on which she worked, each of the following by a preponderance of the evidence to demonstrate that she was entitled to origination fees and that CGL's failure to pay those fees was a breach of contract: (1) that she proposed the idea to the firm, found a client, and drafted a complaint for the case, and (2) that the firm ultimately brought the case and profited from it based on Ms. Grewal's work.[17] The Court addresses each of these requirements in the context of the particular cases for which Ms. Grewal seeks fees and sets forth the following findings of fact and conclusions of law accordingly.

#### 1. In re Air Cargo

Soon after joining CGL, Ms. Grewal began working on *In re Air Cargo Shipping Services Litigation*, a global antitrust action brought against various airlines for allegedly fixing the prices of fuel and other surcharges. *See* Tr. Trans. at 128–29. She worked primarily on the international portion of the case, which was brought in London in conjunction with another law firm there, led

---

[17] The second of these requirements serves as a prerequisite to both CGL's contractual obligations to pay Ms. Grewal a cut of its recovery and Ms. Grewal's entitlement to any damages in this action. To prove damages in a contract case like this one, Ms. Grewal must at minimum establish "that the *existence* of damages is reasonably certain" and provide a "stable foundation for a reasonable estimate" of general damages. *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 111 (2d Cir. 2007) (emphasis original). Because CGL did not have to pay Ms. Grewal origination fees for any case in which it did not profit, she must show at least a reasonable certainty that CGL did profit (or would have profited, as explained below) in any given case.

by Michael Hausfeld. *See id.* at 47, 129.  At trial, there was no dispute that Ms. Grewal recruited

nearly 40 clients in India who signed retainer agreements. *See id.* at 32, 50–52, 56–57, 129, 207;

*see also* P's Ex. 7, 13, 14, 15, 59.  Through those retainers, the Indian clients hired CGL and Mr.

Hausfeld's firm "to attempt to settle their cases in a global settlement in London." *See* Tr. Trans.

at 206–07, 700, 702–03.  Mr. Cuneo acknowledged that, if those clients' claims had resulted in

fees for the firm, they would have entitled Ms. Grewal to a 10% origination fee. *Id.* at 129, 206–

07.

Ms. Grewal has not, however, proven by a preponderance of the evidence that her clients'

claims in the Air Cargo case ever resulted in fees to the firm from which she might have been

compensated with origination fees.  She instead conceded that "after three years . . . all the retainer

agreements were terminated." *Id.* at 178.  As Mr. Cuneo explained, "when Ms. Grewal resigned

from the firm, we wrote each and every one of them and Fed Ex'd them a letter saying that Ms.

Grewal had left, saying that CGL was no longer in a position to represent them.  As far as we were

concerned, we would place no attorney's lien on that." *Id.* at 207, 623; *see also id.* at 809 (Gilbert).

Ms. Grewal appeared to argue at trial that this termination was made in bad faith and, thus,

that she should be permitted to proceed with her breach of contract claim even though the firm

never profited from her Air Cargo clients. *See, e.g., id.* at 31, 70, 178, 736–38.  Liberally

construed, this argument appears to invoke something analogous to the "prevention doctrine,"

which forbids a party from "rely[ing] on another party's failure to perform a condition precedent

to discharge that party's obligations under a contract where that party frustrated or prevented the

occurrence of the condition." *See generally Cauff, Lippman & Co. v. Apogee Fin. Grp., Inc.*, 807

F. Supp. 1007, 1022 (S.D.N.Y. 1992).  That doctrine applies, however, only when "a party

*wrongfully prevents* [a] condition from occurring." *See MCI LLC v. Rutgers Cas. Ins. Co.*, No. 06-

CV-4412 (THK), 2007 WL 4258190, at *10 (S.D.N.Y. Dec. 4, 2007) (emphasis original).[18] "[T]he prevention doctrine, where it applies, creates nothing more than an implied contractual obligation, similar to—and perhaps rooted in—the implied covenant of good faith and fair dealing." *Consol. Edison, Inc. v. Ne. Utilities*, 426 F.3d 524, 529 (2d Cir. 2005) (emphasis omitted).

As this Court has already held, Ms. Grewal was an at-will employee whose contract with CGL did not include an implied covenant of good faith and fair dealing under New York law. *See* March 2017 Op. & Order at 21 (gathering cases). Assuming that Ms. Grewal can nonetheless make an argument under the prevention doctrine, that argument fails because the Court finds that CGL's reasons for terminating Ms. Grewal's clients were not wrongful. The Court credits Mr. Cuneo and Ms. Gilbert's explanation that Ms. Grewal had "spent the face time with the clients" such that the firm "did not feel comfortable representing the clients," and "essentially tried to refer them to her" when she left the firm. *See* Tr. Trans. at 208–09, 623, 736–38, 809. Ms. Grewal testified at trial that she was not given the information or tools from CGL that she would have needed to pursue her clients' claims on her own after she left, but she also testified that she "called up" at least some of the "clients in India after the retainer agreements were terminated." *See id.* at 173; *see also id.* at 156, 178–79. Even if Ms. Grewal never received all the relevant materials, that does not mean that CGL decided not to send them to her or that the firm acted wrongfully. The Court instead credits Mr. Cuneo's, Ms. Gilbert's, and Mr. Fisher's testimony that the firm attempted to have Ms. Grewal take the Air Cargo clients with her upon her departure. *See id.* at

---

[18] For these purposes, "wrongful" conduct may be arbitrary, made in bad faith, or otherwise deliberate and aimed at frustrating the contract. *See Ixe Banco, S.A. v. MBNA Am. Bank, N.A.*, No. 07-CV-0432 (LAP), 2009 WL 3124219, at *4 (S.D.N.Y. Sept. 29, 2009) (citing *Trylon Realty Corp. v. Di Martini*, 316 N.E.2d 718, 718 (N.Y. 1974) (mem.)); *see also Stern v. Gepo Realty Corp.*, 289 N.Y. 274, 278 (N.Y. 1942) (noting that the prevention must be "active" and "affirmative" in "prevent[ing] or hinder[ing]" the contract's performance); *Kooleraire Serv. & Installation Corp. v. Bd. of Ed. of City of New York*, 28 N.Y.2d 101, 106–07 (N.Y. App. Div. 1971) (noting that the excuse of a condition precedent must be "justified by the conduct of the other party").

208–10, 623, 736, 760, 768–71, 809.   Accordingly, Ms. Grewal has not shown that the firm wrongfully terminated her Air Cargo clients to avoid paying her origination fees, and she is not excused from proving that she satisfied all conditions precedent to recovering origination fees now—including that the work she purportedly originated resulted in profits for the firm.  She has not made that showing here.

To the extent that Ms. Grewal also argues that she originated the document review work that she did in the Air Cargo cases, she has not proven that claim either.  The Court credits Mr. Cuneo, who explained that the origination of the document review work in question stemmed from Daniel Cohen's relationship with Michael Hausfeld.  *See id.* at 203–07, 517–18; *see also* D's Ex. 110, 111 (showing that Ms. Grewal was assigned the document review work).  Ms. Grewal also has not proven that she ever found and signed a client or otherwise met the origination requirements for the Air Cargo cases in the United States, including the case against Lufthansa, which predated Ms. Grewal's employment at CGL.  *See* Tr. Trans. at 46, 203, 517; P's Ex. 22.

Ms. Grewal also argues that she was entitled to be paid for "all the hours of the independent contractors," but specifically those of a contractor named John (or Jon) Tostrud ("JT") and including the hours he worked on Air Cargo.  *See* Tr. Trans. at 34, 36, 45, 59, 83, 85, 87, 89–90, 437.  Ms. Grewal appears to have based this belief on an email that was sent by the person at CGL who was running the calculations for fees in the Air Cargo cases to Mr. Cuneo.  *See id.* at 653; P's Ex. 6.  That email stated as follows:

> Calc[ulation]s attached.  JT gets 50% of his hours after expenses.
>
> For Danny deducted the expenses and 100% of JT's hours then figured 10%.  Then removed JT's hours from the total and gave Danny 12% of his hours[.]
>
> Preetpal gets 12% of her hours after deducting expenses plus 100% of JT's hours.

Let me know if I can pay these.  Thanks.

*See* P's Ex. 6.  Within minutes of this email being sent, Mr. Cuneo responded that "Ok. It should not say. Attorney payments. Should say Less Tostrud share [sic]," apparently referring to an attached calculations sheet where Ms. Grewal's fees were reduced by the label "Less Attorney Payments," which appears to have been changed to "Less Tostrud share." *Id.*; *see also* P's Ex. 29 (calculations).  The only reasonable reading of these emails was explained by Mr. Cuneo at trial: "It doesn't say [Ms. Grewal] get[s] anything from John Tostrud. . . . The 'plus' there refers to expenses. . . . [A]nother way of phrasing it would be Preetpal gets twelve percent of her hours after deducting expenses and JT's hours."  Tr. Trans. at 656–57.  The alternative explanation by Ms. Grewal—that she is entitled to 12% of her hours plus 100% of JT's hours—is unreasonable.  There is no rationale apparent from the record for Ms. Grewal to be paid for the work done by independent contractors.  It would make sense, however, for both "Danny" (seemingly a reference to Daniel Cohen) and Ms. Grewal to receive their hourly bonus of 12% after deducting both expenses and the independent contractor's hours. *See id.* at 108–09.  Ms. Grewal has not presented the Court with persuasive evidence to the contrary.[19]

For these reasons, the Court remains unpersuaded that there was any error in CGL's calculations of Ms. Grewal's pay—lodestar or origination—with respect to her work on the Air Cargo cases. *See id.* at 203–06; D's Ex. 108–11, 126; P's Ex. 29.

## 2.   In re Automotive Parts Antitrust Litigation

Ms. Grewal was also involved in lawsuits brought against various automotive parts manufacturers.  Sometime around late September 2010, Ms. Grewal circulated a memorandum discussing possible claims against manufacturers for fixing the prices of automotive electrical

---

[19] To the extent Ms. Grewal makes this same argument with respect to other cases, the Court rejects those arguments for the same reasons identified here.

distribution systems, sometimes known as "wire harness" products. *See* Tr. Trans. at 59–60, 82–83, 228–29, 634–35; D's Ex. 15. Over a year later, in October 2011, other attorneys at the firm retained clients and filed the so-called Wire Harness cases in federal court. *See* Tr. Trans. 634–35. They did so only after the Department of Justice's Antitrust Division successfully procured a guilty plea from a company, which made the "wire harness" issue one of "public record." *See id.* Ms. Grewal had no role in finding those clients or in filing that case. *See id.* The Wire Harness cases ultimately expanded to include many "[d]ifferent parts, different functions, different defendants, different conspiracies." *Id.* at 233, 443–45; D's Ex. 31, 74. Ms. Grewal was barely involved in these broader scale Auto Parts cases—at the origination stage or otherwise. *See* Tr. Trans. at 233–34. Even as to Wire Harness, Ms. Grewal has not proven that she retained a client or drafted a complaint used in the case.

Ms. Grewal testified at trial that Mr. Cuneo had at some point told her that she would be entitled to a 10% origination fee for these cases—including all the Auto Parts cases, not just the Wire Harness aspect. *See id.* at 63–65, 91, 180. The Court finds it implausible that Mr. Cuneo would have done so and has not found documentary corroboration for Ms. Grewal's testimony on this point.[20] The Court further credits Mr. Cuneo's testimony that he never offered her 10% of Wire Harness. *See id.* at 232. The firm did, however, enter into negotiations with Ms. Grewal when she complained about not receiving origination fees. CGL ultimately offered her 5% of the Wire Harness cases as a concession, because she "felt so strongly" about it. *See id.* at 231; *see also id.* at 65–66, 224–25, 227–36; D's Ex. 20. As explained above, this concession was not required by the contract here.[21]

---

[20] Mr. LaDuca did send an email in which he commented that Ms. Grewal's request for origination fees for any idea she came up with at the firm "[c]learly relates to wire harness." P's Ex. 30; *see* Tr. Trans. at 633, 746. But that observation does not amount to a concession that Ms. Grewal was entitled to the fees she later requested.

[21] Mr. Cuneo testified that the relevant 5% of Wire Harness is being held in escrow. *See* Tr. Trans. at 231.

### 3.   Mortgage Cases

Ms. Grewal also worked on various "Mortgage" cases brought by CGL against a series of large banks—namely, Bank of America, Citibank/Citigroup, JP Morgan Chase, and Wells Fargo—related to various mortgage issues, including mortgage servicing, mortgage foreclosure, mortgage modifications, and "TPP" issues.   TPP stands for "Trial Payment Plan" and is a reference to a standardized form that was given to mortgagors to modify their mortgages if they were under financial distress.   *See* Tr. Trans. at 61, 195–98.   These cases existed prior to Ms. Grewal's involvement.   *See id.* at 61, 171, 195–98; D's Ex. 26, 28.   According to Ms. Grewal, she "brought" the TPP issue into those cases and persuaded the firm to amend their complaints accordingly.   *See* Tr. Trans. at 61, 171–72, 197–98; P's Ex. 43-2, 101.[22]   She also sought out clients for these cases. *See* Tr. Trans. at 78–80, 145.   As Ms. Grewal conceded, however, CGL did not actually "use" any of the clients Ms. Grewal tried to bring into the litigation, which was already ongoing regardless. *See* Tr. Trans. at 146, 169–72, 174, 177; *see also id.* at 200 (Cuneo).   Thus, Ms. Grewal has not proven that any of the clients she found were parties to any case where she came up with a new idea and drafted a complaint based on which CGL was awarded fees.

Ms. Grewal has also provided no credible evidence that the decision not to pursue her clients' claims in the Mortgage cases was wrongful to the extent that such a showing might matter. The Court does not credit her conclusory accusation that CGL "simply terminated everything and destroyed all the documents or destroyed the clients and the claims of the clients." *Id.* at 31; *see id.* at 171.   It would have made little sense for the firm to decline to pursue meritorious and

---

[22] Plaintiff's Exhibit 43-2 includes a series of emails relating to the mortgage cases and TPP issues, some of which are duplicated in Defendants' Exhibits 26 and 28.   Plaintiff's Exhibit 101 contains some additional emails and a short memo that she wrote for the mortgage foreclosure actions.   It should be noted that P's Ex. 101 is not numbered in order with her other exhibits, but the Court numbers it as 101 because it is proceeded by a page labeling it as such in "Part V" of Ms. Grewal's exhibits.

potentially profitable claims of clients simply because the firm might, after winning the case, have to pay 10% of it to Ms. Grewal. Ms. Grewal has failed to present persuasive evidence that CGL's failure to use her clients was aimed at frustrating the contract's purpose or otherwise wrongful.[23]

Moreover, to the extent that Ms. Grewal seeks damages for any case CGL declined to pursue, including the Mortgage cases, she must at minimum establish that, if CGL *had* pursued the case, the firm would have been reasonably certain to have profited from it. Otherwise she has not shown "that the existence of damages is reasonably certain" or provided a "stable foundation for a reasonable estimate" of general damages because, if the case would not have been profitable and no origination fees would have been available regardless, then Ms. Grewal could not have been damaged by the firm's failure to pursue it. *See Tractebel Energy Mktg., Inc.*, 487 F.3d at 111 (emphasis omitted). Ms. Grewal has failed to prove that at least three of the referenced Mortgage cases—which all proceeded without her clients—were profitable for the firm such that there was any reasonable certainty that she was damaged by the firm's decision not to include her clients. *See* Tr. Trans. at 195, 196, 281. Only the JP Morgan matter appears to have resulted in a settlement, but even as to that case Ms. Grewal conceded that she had "no idea" whether it had resulted in fees or how much. *See id.* at 62–63. In any event, the JP Morgan case and TPP issues existed and were known by CGL before Ms. Grewal became involved and, as explained above, CGL was not obliged to pay Ms. Grewal origination fees for her work improving existing cases. *See id.* at 198–99.

### 4.    Sony Optical Disk Drive Case

As to the "Sony Optical Disk Drive case," Ms. Grewal testified that, "[i]n the month of September–October, or even earlier on," seemingly in 2010, she "had brought to the firm and to

---

[23] CGL, meanwhile, has submitted testimony from Mr. Cuneo and Ms. Warren as well as exhibits demonstrating that CGL as a matter of practice assessed prospective cases and clients for their quality, the firm's expertise or lack thereof, conflicts of interests, and amenability to being brought as a class action. *See, e.g.*, Tr. Trans. at 125, 208–09, 211, 623, 736–38, 809; D's Ex. 1, 33, 113.

[Mr. Cuneo's] attention that there was a potential matter or investigation by the Department of Justice regarding the Sony optical disc drive. . . . Jon Tostrud was asked to bring that case in an email, bring cases in California." *See* Tr. Trans. at 59.

Ms. Grewal based this argument on her claim that she "get[s] all the hours for Jon Tostrud." *Id.* The Court has already rejected that claim, and Ms. Grewal has not otherwise proven that she satisfied the standard for obtaining origination fees for the Sony matter. Indeed, Ms. Grewal's own testimony and exhibits indicate that—even if such a case had been filed by CGL, *but see id.* at 125, 707 (indicating one was not)—people besides Ms. Grewal found the clients and drafted the complaints. *See id.* at 66–67, 707–08; P's Ex. 41 (including emails from Mr. Cuneo regarding his and others' efforts with respect to retainers and a complaint). Ms. Grewal also testified that she never received any information about any settlement of the case that benefited CGL, and she has otherwise failed to establish with reasonable certainty that the firm did, would, or even might have profited from it. *See* Tr. Trans. at 59.

### 5. Other Cases and Clients that CGL Declined to Pursue

As to the each of the following matters, Ms. Grewal has not proven that CGL ever brought any case on behalf of any client of hers. Relatedly, Ms. Grewal has failed to show any "reasonable certainty" that these cases, if filed, would have resulted in any fee recovery for CGL—a showing necessary to satisfy her burden of proving the existence of general damages. *See Tractebel Energy Mktg., Inc.*, 487 F.3d at 111.

First, Ms. Grewal seeks origination credit for a case in which she claims to have represented military service members. According to Ms. Grewal,

> [t]he service members case was a case which Charles LaDuca was
> very interested in. He was interested in it because he was working
> close with Larry Friscia I think his name is. He wanted me to draft
> the complaint. After the complaint was drafted and provided to

27

> them, I don't know if they filed it or not, but there were transactions,
> settlements. . . . I don't know if they filed the case or not because
> they didn't inform me, and I don't know if they got any money or
> not.

Tr. Trans. at 67.  Mr. Cuneo elaborated, credibly testifying that the firm never filed, or recovered

fees in connection with, any class action involving military or service members because the firm

"decided it wasn't suitable for class-wide treatment, so [it] never brought the case." *See id.* at 125;

*see also* D's Ex. 113.  Ms. Grewal has given the Court no reason to believe that CGL's assessment

of the case was incorrect or otherwise wrongful.

Second, Ms. Grewal worked on a potential case regarding purportedly defective laminate

flooring developed by Shaw Industries (the "Shaw Laminate" matter).  *See* March 2017 Op. &

Order at 7.  Ms. Grewal testified to the following with respect to that matter:

> Charles was extremely interested in this case because it covered a
> number of companies that were having the same problems.  There
> were a lot of complaints brought.  At that time he had asked Brendan
> Thompson to pay an agency for $10,000 to get a client.  I
> immediately had questioned that practice because I thought that was
> not right.  We did get a client.  He had asked me to talk to Matt
> Miller at that point, and I did.  Matt Miller had put something up on
> a website to suggest that we were investigating, looking into these
> issues.  And we did have a client or potential client.  We also had an
> expert.  So the issue was that after ousting me from the firm, Mr.
> Smith had sent me an email saying we will not use your client for
> this matter.  I was not given any information on the papers or any
> information regarding the clients.  That is the biggest problem, that
> I couldn't reach anybody . . . because I didn't have them anywhere
> written down.
> . . .
> I had drafted complaints on that.

Tr. Trans. at 67–70; *See* P's Ex 46-2 (including emails relating to the Shaw Laminate matter).  Mr.

Cuneo testified credibly, however, that Shaw Laminate "wasn't a case, to be precise.  It was a

matter that we looked into" before Mr. LaDuca decided that the firm "should not pursue that

matter."  Tr. Trans. at 208, 210.  CGL never filed such a case.  *Id.*  Ms. Grewal has not proven that

28

the firm's decision was made wrongfully, particularly in light of Mr. Cuneo's credible testimony that she "would have been allowed to take" the Shaw Laminate matter with her when she left. *See id.* at 210. Regardless, Ms. Grewal has failed to establish with any reasonable certainty that a Shaw Laminate case brought by CGL with her client would have been profitable to CGL. These findings preclude Ms. Grewal's recovery on this matter.

The same is true for a case contemplated for suing manufacturers of hip replacement systems. Ms. Grewal conceded at trial that the firm did not pursue the case on which she had worked. *See id.* at 73; *see also id.* at 125. She also failed to prove that she found any specific client for any such case or that she drafted any complaints for it. There were some individual cases filed by others at CGL on the hip replacement issue, but the record does not reflect Ms. Grewal's involvement in any of those cases. *See id.* at 126; D's Ex. 116–19. Mr. Cuneo was not aware of any class action filed in connection with the hip replacement issue. *See* Tr. Trans. at 125. The Court remains unpersuaded that any decision not to pursue such an action was wrongful.

Ms. Grewal has failed to establish any breach of contract as to these cases, let alone the reasonably certain existence of damages.

### 6.   Remaining Cases

Ms. Grewal mentioned a few other cases at trial, but none entitled her to origination fees.

Ms. Grewal discussed the "Overdraft Fee cases" against HSBC and a seemingly separate case against Capitol One. The HSBC cases were brought by CGL in 2013, after Ms. Grewal left the firm and without her involvement. *See* Tr. Trans. at 72, 200–02. Ms. Grewal further has not persuaded the Court that she ever signed a client or drafted a complaint in either the HSBC or Capital One cases. Even if she contributed ideas that were ultimately used in the cases, she has

neither satisfied the three-prong test for origination fees nor shown that CGL recovered fees as a result of any client or complaint she brought into the cases.

Grewal also mentioned in passing and/or submitted to the Court several exhibits regarding, the "Potatoes" matter and a case captioned as the "Navistar Diesel Engine Products Liability Litigation." *See* Tr. Trans. at 60; P's Ex. 38, 39, 40 (the Potatoes matter); P's Ex. 44 (Navistar case). Defendant also observes in its post-trial brief that she may have referred to cases on behalf of businesses named Bosch or Religare. *See* D's Post-Trial Br. at 11. Ms. Grewal has not proven that she satisfied the prerequisites for origination fees in any of these cases.

## B. Claims for Other Purported Breaches of Contract

Aside from her claims to origination and other forms of compensation, Ms. Grewal also argued throughout trial that she was "entitled to work on the matters" that she brought to the firm. *See* Tr. Trans. at 44, 68–69, 145–46, 179–80. This argument took essentially two forms. First, Ms. Grewal argued that, once she had an idea for a case, it was hers, and any case stemming from it would be hers, and no one else at the firm would be permitted to pursue it—even if she failed to do so for a significant period of time. *See, e.g., id.* at 180. Ms. Grewal has not, however, proven the existence of any contract—implied or otherwise—entitling her to such a right.[24] Second, she appeared to argue that the firm was obliged to pursue all of the cases for which she had found clients or proposed ideas, even after she left the firm. This right, too, was not guaranteed by Ms. Grewal's contract. Mr. Cuneo credibly testified that he never promised Ms. Grewal that the firm would pursue the cases of any clients she brought to the firm. *See id.* at 607. This testimony was bolstered further by the record evidence that others at the firm had to push and push to get the firm

---

[24] *Cf.* D's Ex. 33 at 1–2 (establishing that Ms. Grewal emailed Mr. Cuneo in 2010 asking him to "[p]lease ask Jon Tostrud not to spend any time" on a case she was working on, and that Mr. Cuneo responded that "[i]n this office we share the work" and ultimately explained to Ms. Grewal that "leadership" in a case required a complaint, client, and a "conflict free, good case").

to pursue their cases with their clients, not to mention Ms. Grewal's own concession that it was not a breach of contract if CGL simply declined to bring a case. *See id.* at 74, 569, 584.[25]   The Court finds that Ms. Grewal's contract with the firm was silent on, and therefore permitted, the firm to decline her clients and to terminate her cases upon her departure.  Ms. Grewal nonetheless argued that it was a "breach of contract" for CGL to tell her that "they are very much interested in a case, later on did it, but in such a manner that they say we never did it.  Or they say we did it but we did it because we hadn't brought the issues, somebody else brought it." *See id.* at 74.  According to Ms. Grewal, CGL "cannot tell anybody to bring in clients and say we have a responsibility agreement and then terminate them, and say we terminated them, so we won't pay you the fees[.]" *Id.*  She relatedly testified that Mr. LaDuca and others at various points asked her to go out and find clients.  *See id.* at 51, 68–69, 79, 171–72.  Such requests of an employee, however, do not amount to new or enforceable contracts—or binding modifications to an existing contract—that would require an employer to pursue any clients obtained as a result of those requests.  *See generally Kamdem-Ouaffo v. Pepsico, Inc.*, No. 14-CV-227 (KMK), 2015 WL 1011816, at *8 (S.D.N.Y. Mar. 9, 2015).  Ms. Grewal has not otherwise identified any agreement between her and CGL that the firm might have breached by declining to pursue her cases.

For these reasons, Ms. Grewal was not contractually entitled to work on cases she had the ideas for, to file claims unilaterally on behalf of clients she found, or to have the firm pursue her cases after she left.  Moreover, and for the reasons explained above, Ms. Grewal has failed to persuade the Court that CGL's decisions not to pursue her cases, claims, or clients were anything

---

[25] The Court also credits Mr. Cuneo's testimony and Defendant's other evidence about the general procedures for how the firm took on clients: "any clients" brought in by Ms. Grewal "would be firm clients"; Ms. Grewal was not authorized to "sign [clients] as firm clients without . . . approval"; and CGL's business development practices were required to "conform to [the] firm's standards and priorities."  *See* D's Ex. 3, 24; *see also* Tr. Trans. at 31, 32, 451–52, 569, 584, 699–700; P's Ex. 7, 14.

but an exercise of the firm's reasonable business judgment. And the Court finds that the firm had the discretion to exercise that judgment under its contract with Ms. Grewal.

## V.      Plaintiff's Obligations

Defendant further argues in its post-trial brief that Ms. Grewal failed to prove that she complied with her contractual obligations, an essential element of her breach of contract claim. *See Diesel Props S.r.l.*, 631 F.3d at 52. CGL focuses this argument primarily on Ms. Grewal's purportedly unauthorized *pro bono* representation of a woman named Elizabeth Thomas and Ms. Grewal's alleged failure to conduct herself in a manner consistent with CGL policies as set forth in the firm's 2011 employee handbook. Ms. Grewal objected at the final pretrial conference and at trial that this evidence was irrelevant. The Court reserved ruling on the relevance objections and allowed CGL to present the evidence prior to any Court ruling on its admissibility. *See* Trial Tr. at 1-11, 96; Dkt. 268. Because the trial was a bench trial, there was no prejudice from doing so. *See Anderson v. Smith*, 751 F.2d 96, 106 (2d Cir. 1984).

As set forth above, the Court now finds that CGL never breached any terms of the relevant contract and that Ms. Grewal has not satisfactorily proven damages as to many of the relevant cases regardless. It thus need not consider Ms. Thomas's testimony and the other evidence related to the employee handbook, nor need it decide whether that evidence was admissible to show that Plaintiff was or was not in compliance with any contractual obligations she may have had.

## MISCELLANEOUS MATTERS

CGL still has pending various requests for dismissal and sanctions that relate to Ms. Grewal's failure to follow Court orders. *See* Dkts. 237, 241. For example, CGL requested that Ms. Grewal be sanctioned for her failure to appear at a conference in August 2017. *See* Dkts. 235, 241. Ms. Grewal later asserted that her absence was inadvertent and that she had not known about

the conference. *See* Dkt. 237. The Court exercises its discretion to deny the motion for sanctions due to Ms. Grewal's absence at the August 2017 conference, because it finds that absence to have been unintentional and, although Ms. Grewal was often late, she did not fail to appear for any other Court proceedings. CGL's various requests for dismissal based on Ms. Grewal's conduct, to the extent they remain outstanding, are denied as moot.

## CONCLUSION

For the reasons listed above, judgment shall be entered for Defendant and the case shall be dismissed.

The Clerk of Court is respectfully directed to mail a copy of this Opinion to Plaintiff, terminate all pending motions, enter judgment for Defendant, and close the case.

SO ORDERED.

Dated:     September 28, 2018
           New York, New York

_____
Ronnie Abrams
United States District Judge